1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly
Situated,

                          Plaintiff,

          vs.

STERLING FINANCIAL
CORPORATION, HAROLD B.
GILKEY and DANIEL G. BYRNE,

                          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

**INTRODUCTION**

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Sterling Financial Corporation ("Sterling" or the "Company") between July 23, 2008 and January 13, 2009 (the "Class Period"), against Sterling and certain of its officers and/or directors for violations of the  Securities Exchange Act of 1934 ("1934 Act").

2.     Sterling is the bank holding company for Sterling Savings Bank and Golf Savings Bank. Sterling Savings Bank is the largest commercial bank headquartered in the state of Washington and is one of the largest regional community banks in the western United States.  It offers banking products and services, mortgage lending, construction financing and investment products to individuals, small businesses, commercial organizations and corporations.  Golf Savings Bank is a savings bank focused on the origination and sale of single-family residential mortgage loans. Sterling is headquartered in Spokane, Washington.

3.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Defendants engaged in improper behavior which harmed Sterling's investors by failing to disclose the extent of seriously delinquent commercial real estate loans and construction and land loans.  The Company also failed to adequately and timely record losses for its impaired loans, causing its financial results and its Tier 1 capital ratio to be materially false.  As a result of defendants' false statements, Sterling's stock traded at artificially inflated prices during the Class Period, reaching a high of $14.72 per share on October 1, 2008.

4.     Then, on January 13, 2009, Sterling issued guidance for the fourth quarter and year end 2008, announcing it anticipated reporting a massive loss for both the fourth quarter and the year ended December 31, 2008.  According to Sterling, the

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS                     - 1 -

loss would be due in substantial part to an anticipated increase in its allowance for loan and lease loss reserves of approximately $230 million and an expected goodwill impairment charge of between $275 million to $325 million. Sterling further announced that it would be suspending its quarterly cash dividend.

5. On this news, Sterling's stock collapsed $3.05 per share to close at $3.40 per share on January 14, 2009, a one-day decline of 47% on high volume.

6. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) Defendants' assets contained hundreds of millions of dollars worth of impaired and risky securities, many of which were backed by real estate that was rapidly dropping in value and for which Sterling had failed to record adequate loan loss reserves;

(b) Defendants failed to properly account for Sterling's commercial real estate loans and construction and land development loans, failing to reflect impairment in the loans;

(c) Sterling had not adequately reserved for loan losses such that its financial statements were presented in violation of Generally Accepted Accounting Principles ("GAAP");

(d) Sterling had not adequately accounted for its goodwill or its deferred tax assets such that its financial statements were presented in violation of GAAP;

(e) Sterling had not adequately reserved for loan losses such that its Tier 1 capital was presented in violation of banking regulations; and

(f) The Company's capital base was not adequate enough to withstand the significant deterioration in the real estate markets and, as a result, Sterling would

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

- 2 -

1  be forced to consent to a cease and desist order from the  Federal Deposit Insurance
2  Corporation ("FDIC") directing it to raise $300 million in capital.

3        7.     Thereafter, on August 19, 2009, Sterling announced it had missed its
4  recent dividend payment on preferred shares owned by the Treasury Department
5  pursuant to the Treasury Department's investment in the Company through the
6  Troubled Asset Relief Program in December 2008.

7        8.     On October 15, 2009, Sterling announced it had agreed to a cease and
8  desist order from the FDIC.  Under an agreement with the FDIC and the Washington
9  Department of Financial Institutions, the Company agreed to decrease its
10 nonperforming assets, related to its troubled commercial real estate and acquisition
11 loans, land development loans and construction loans.  Sterling further agreed to
12 review and revise its allowance for loan and lease losses and remedy any deficiencies
13 in the allowance.  Additionally, Sterling agreed to increase Sterling Savings Bank's
14 Tier 1 Capital ratio by at least $300 million and thereafter maintain a Tier 1 leverage
15 ratio of not less than 10%.

16       9.     Then, on October 22, 2009, Sterling issued its results for the third quarter
17 of 2009 and nine months ending September 30, 2009, announcing another massive
18 quarterly loss.  The Company reported a net loss of $463.7 million, compared to net
19 income of $5 million for the third quarter of 2008.  The disastrous results were due in
20 large part to an increase in its allowance for loan and lease losses as well as to
21 additional charges for impaired goodwill and a valuation allowance charge against the
22 Company's deferred tax assets.

23      10.    As a result of defendants' false statements and omissions, Sterling's
24 publicly traded securities traded at artificially inflated prices during the Class Period.
25 However, after the above revelations seeped into the market, the Company's shares
26

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS      - 3 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

1  were hammered by massive sales, sending them down more than 76% from their Class
2  Period high.

### JURISDICTION AND VENUE

4      11.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted
5  herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

6      12.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of
7  the false and misleading statements were made in or issued from this District.

8      13.    Sterling's principal executive offices are located at 111 North Wall
9  Street, Spokane, Washington.

### PARTIES

11      14.    Plaintiff City of Roseville Employees' Retirement System purchased
12  Sterling publicly traded securities as described in the attached certification and was
13  damaged thereby.

14      15.    Defendant Sterling operates as the bank holding company for Sterling
15  Savings Bank, which provides various banking products and services to small and
16  medium-sized businesses, and individuals.

17      16.    Defendant Gilkey co-founded Sterling.  Gilkey was, at all relevant times,
18  Chairman of the Board, Chief Executive Officer ("CEO") and President of Sterling
19  until leaving the Company on October 19, 2009.

20      17.    Defendant Daniel G. Byrne ("Byrne") is, and at all relevant times was,
21  Executive Vice President-Finance, Chief Financial Officer ("CFO") and Assistant
22  Secretary of Sterling.

23      18.    Defendants Gilkey and Byrne (the "Individual Defendants"), because of
24  their positions with the Company, possessed the power and authority to control the
25  contents of Sterling's quarterly reports, press releases and presentations to securities
26  analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

1  They were provided with copies of the Company's reports and press releases alleged
2  herein to be misleading prior to or shortly after their issuance and had the ability and
3  opportunity to prevent their issuance or cause them to be corrected.  Because of their
4  positions with the Company, and their access to material non-public information
5  available to them but not to the public, the Individual Defendants knew that the
6  adverse facts specified herein had not been disclosed to and were being concealed
7  from the public and that the positive representations being made were then materially
8  false and misleading.  The Individual Defendants are liable for the false statements
9  pleaded herein.

10  ## FRAUDULENT SCHEME AND COURSE OF BUSINESS

11      19.    Defendants are liable for: (i) making false statements; or (ii) failing to
12  disclose adverse facts known to them about Sterling.  Defendants' fraudulent scheme
13  and course of business that operated as a fraud or deceit on purchasers of Sterling
14  publicly traded securities was a success, as it: (i) deceived the investing public
15  regarding Sterling's prospects and business; (ii) artificially inflated the prices of
16  Sterling publicly traded securities; and (iii) caused plaintiff and other members of the
17  Class to purchase Sterling publicly traded securities at inflated prices.

18  ## CLASS ACTION ALLEGATIONS

19      20.    Plaintiff brings this action as a class action pursuant to Rule 23 of the
20  Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise
21  acquired Sterling publicly traded securities during the Class Period (the "Class").
22  Excluded from the Class are defendants.

23      21.    The members of the Class are so numerous that joinder of all members is
24  impracticable.  The disposition of their claims in a class action will provide substantial
25  benefits to the parties and the Court.  Sterling has over 52 million shares of stock
26  outstanding, owned by hundreds if not thousands of persons.

22.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the prices of Sterling publicly traded securities were artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

23.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

24.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

25.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

26.    Sterling operates as the bank holding company for Sterling Savings Bank, which provides various banking products and services to small and medium-sized businesses, and individuals. Sterling Savings Bank generates a range of deposit

products, including transaction accounts, interest and non-interest bearing checking accounts, savings accounts, money market deposit accounts, certificates of deposit accounts, and time deposits. It also provides loan products comprising commercial lending products, such as lines of credit, receivable and inventory financing, equipment loans, and permanent and construction real estate financing; multifamily residential and commercial real estate loans; one-to-four-family residential loans; and consumer loans for automobiles, boats and recreational vehicles, and lines of credit for personal use. Sterling also markets fixed income and equity products, mutual funds, fixed and variable annuities, and other financial products. The Company, through its subsidiary Golf Savings Bank, engages in the origination and sale of residential mortgage loans.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

27.    On July 22, 2008, Sterling issued its second quarter 2008 earnings results, in a release which stated in part:

> Sterling Financial Corporation, a leading community bank in the western region, today announced that second-quarter 2008 earnings relative to first-quarter 2008 earnings increased as a result of a lower provision for credit losses, stable net interest margin, higher non-interest income, and improved operating efficiency. Earnings in the second quarter of 2008 were $11.7 million, or $0.23 per diluted share, and reflect a provision for credit losses of $31.0 million. Earnings for the first quarter of 2008 were $2.9 million, or $0.06 per diluted share, and included a provision for credit losses of $37.1 million. Earnings in the second quarter of 2007 were $27.0 million, or $0.52 per diluted share, and included a provision for credit losses of $4.0 million. Earnings for the six months ended June 30, 2008, were $14.6 million, or $0.28 per diluted share, compared with $49.9 million, or $1.02 per diluted share, for the same period in 2007. The provision for credit losses for the first six months of 2008 was $68.1 million compared with $8.2 million for the first six months of 2007.

> "Thanks to the focus and commitment of our employees, our core banking operations performed solidly in the midst of an ongoing credit cycle troubling the country. Our customer base remained steadfast during the quarter and their loyalty reflects our relationship-based, service-oriented Hometown Helpful(R) culture," stated Harold B. Gilkey, chairman and chief executive officer.

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS
- 7 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

"*Early in this credit cycle, we implemented stringent measures to address softening credit quality. During the last three quarters, our credit team has generally identified, quantified and isolated the distressed assets, which primarily reside in our residential construction portfolio. Our credit department has also intensified its efforts toward credit resolution and we expect that it will take several quarters to resolve the issues related to non-performing assets. We are encouraged by the results we are seeing*. We, however, remain cautious as parts of the Pacific Northwest continue to see pockets of credit deterioration," said Mr. Gilkey.

\* \* \*

Credit Quality

During the second quarter of 2008, Sterling recorded a $31.0 million provision for credit losses compared with $37.1 million for the linked quarter and $4.0 million for the same period a year ago. This provision stems from relative levels of non-performing and classified assets. As of June 30, 2008, non-performing assets were $303.4 million compared with $223.1 million at March 31, 2008, and $33.4 million at June 30, 2007. Residential construction loans continue to be the primary driver of non-performing assets, representing $240.9 million, or 79% of all non-performing assets. As of June 30, 2008, classified assets, which include non-performing assets, were $497.5 million compared with $402.8 million at March 31, 2008, and $95.0 million at June 30, 2007.

"Credit trends appear to be stabilizing in some markets and softening in other areas. The increase in classified assets was less than the increase experienced in the first quarter of 2008. Our immediate goal is to stem the increase of both classified and non-performing assets and then to reduce the overall level of classified and non-performing assets," Mr. Gilkey stated.

"The Puget Sound region is our largest market, representing 39% of residential construction loans commitments, which total over $1 billion. The non-performing loans related to this market segment amount to $31.0 million, or 3% of the outstanding commitments. Other segments of our loan portfolio, such as commercial lending, are also performing in line with expectations. Early in this cycle, we identified three regions containing stressed residential construction assets: Boise, Idaho; Southern California; and Bend, Oregon. This quarter, credit-quality trends in Boise and Bend appear to be stabilizing. Southern California experienced a decline in credit quality reflecting one loan entering non-accrual status. Last quarter, we identified Portland, Oregon, and Utah as additional regions with distressed assets. Both regions experienced a worsening of credit quality during the quarter," continued Mr. Gilkey.

At June 30, 2008, the allowance for credit losses totaled $168.7 million, or 1.80% of total loans, compared with $151.3 million, or 1.63% of total loans, at March 31, 2008, and $105.7 million, or 1.23% of total loans, at June 30, 2007. The year-to-date ratio of net charge-offs to

average loans was 0.18% compared with 0.02% in the comparable period last year. ***Management believes the allowance is adequate and appropriate given its current analysis of the loan portfolio and the relative mix and risk of loan products.*** Sterling will continue to evaluate the level of allowance relative to credit conditions in each of its markets.

\*    \*    \*

Balance Sheet and Capital Management

As of June 30, 2008, Sterling's total assets were $12.70 billion, compared with total assets of $12.69 billion at March 31, 2008, and $11.46 billion at June 30, 2007. "***Sterling's liquidity position remains strong***," Mr. Gilkey stated. The total value of Sterling's cash, cash equivalents and high grade investment securities was $2.39 billion at June 30, 2008. Sterling's investment securities provide substantial liquidity and collateral for borrowings. As of mid-July, Sterling had additional borrowing capacity of over $700 million through the Federal Home Loan Bank of Seattle, plus access to over $2.3 billion in additional liquidity through commercial banks and the Federal Reserve and from available securities.

As of June 30, 2008, Sterling's tangible book value per share was $13.41, up from $12.31 reported at the end of the second quarter of 2007, and down from $13.68 reported at the end of the first quarter of 2008. The year-over-year increase in book value reflects the retention of earnings and the improvement in the unrealized market value of the securities portfolio, whereas the quarter-to-quarter decrease in book value reflects a decline in the unrealized market value of the securities portfolio. With respect to market volatility, ***Sterling is continuing to analyze the value of goodwill related to its acquisitions to determine whether the value of goodwill has been impaired***. Sterling anticipates that the analysis will be completed by the end of the third quarter. Sterling's ratio of tangible shareholders' equity to tangible assets was 5.71% at the end of the second quarter of 2008, compared with 5.76% reported at the end of the second quarter of 2007. Risk-based capital ratios continue to exceed the "well-capitalized" requirements. ***As of quarter end, Sterling's Tier 1 and total risk-based capital ratio were 9.6% and 10.9%, respectively, and above the regulatory minimum "well-capitalized" requirements of 6.0% and 10.0%, respectively***.

28.    On this news, Sterling's stock rose $1.88 per share, to close at $7.76 per share on July 23, 2008 – a one-day increase of 31%.

29.    On October 21, 2008, Sterling announced its third quarter 2008 earnings results in a release which stated in part:

Sterling Financial Corporation, a leading community bank in the western region, today announced third-quarter 2008 earnings of $5.0 million, or $0.10 per diluted share, compared with third-quarter 2007

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

\- 9 -

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

earnings of $26.5 million, or $0.51 per diluted share. Earnings for the nine months ended September 30, 2008 were $19.5 million, or $0.38 per diluted share, compared with earnings of $76.4 million, or $1.54 per diluted share, for the nine months ended September 30, 2007. Results for the third quarter of 2008 as well as for the first nine months of 2008 reflect higher provisions for credit losses primarily relating to Sterling's residential construction portfolio. The provisions for credit losses for the third quarter of 2008 and the nine months of 2008 were $37.0 million and $105.1 million, respectively, compared with $3.9 million and $12.1 million, respectively, for the comparable periods one year ago.

"Sterling's results reflect some dislocations in the Pacific Northwest economy caused by a variety of factors, including global disruptions to the financial system and the Boeing union strike. These events created a slowdown in the sale of residential product and thereby affected our borrowers and elevated our credit costs. The Pacific Northwest is insulated, but not isolated, from the broader economy. Still, the Pacific Northwest remains relatively strong," stated Harold B. Gilkey, chairman and chief executive officer.

"Operationally, Sterling's execution was solid. We slightly reduced the size of our balance sheet while shifting our mix of assets away from residential construction. We grew our deposits. We controlled operating costs. Our liquidity and capital positions remained strong. ***Our credit administration team proactively managed loan portfolio risk. In sum, we are managing through a difficult credit cycle while maintaining a safe, sound and secure banking practice***," said Mr. Gilkey.

*      *      *

Credit Quality

In the third quarter of 2008, Sterling recorded a $37.0 million provision for credit losses, compared with $31.0 million for the linked quarter and $3.9 million for the same period a year ago. This provision stems from higher levels of classified assets, which include non-performing assets. As of September 30, 2008, classified assets were $671.5 million, compared with $497.5 million at June 30, 2008, and $215.6 million at September 30, 2007. Residential construction assets continue to make up approximately two thirds of all classified assets.

At September 30, 2008, non-performing assets were $436.7 million, compared with $303.4 million at June 30, 2008, and $61.8 million at September 30, 2007. Real estate owned, which is included in non-performing assets, was $55.0 million at quarter end, compared with $23.0 million in the linked quarter and $3.4 million in the year-ago quarter. Real estate owned represents a key part of the process of resolving non-performing assets, in which the bank gains control of problem assets and then sets about to dispose of them in an orderly fashion.

Residential construction loans continue to be the main constituent of non-performing assets, representing $316.8 million, or 73% of non-performing assets. Of the $133.3 million increase in non-performing assets in the third-quarter 2008 over the second-quarter, residential construction made up $75.9 million and other loan collateral types constituted $57.4 million of the increase. Residential construction non-performing assets rose 31% over the linked quarter; the increase primarily was a result of one large relationship based in Portland. Excluding this non-performing asset, residential construction non-performing assets rose 14%. The other portion of the $133.3 million increase in non-performing assets was associated with non-performing assets within Sterling's residential mortgage and commercial portfolios and were mainly tied to borrowers working in or associated with real estate brokerage, residential construction or the housing industry.

"We are one year-plus into this current credit crisis. In the month of September, we witnessed a glimmer of recovery in the house marketing – a rise in the number of pending home sales in the Puget Sound region as well as Washington State. Nonetheless, non-performing assets, particularly those related to residential construction, are likely to remain elevated over the next several quarters. *Sterling has the capital reserves and earnings capacity to continue to manage through this difficult cycle and an excellent asset recovery team to resolve problem assets*," said Mr. Gilkey. "We are fortunate to reside in one of the strongest regions of the country. Compared to other regions of the country, the Puget Sound region, our largest market, continues to perform relatively well. Non-performing loans related to this market amount to $38.1 million, or 4% of outstanding commitments," Mr. Gilkey added.

\*     \*     \*

At September 30, 2008, the allowance for credit losses totaled $183.7 million, or 1.99% of total loans, compared with $168.7 million, or 1.80% of total loans, at June 30, 2008, and $108.3 million, or 1.22% of total loans, at September 30, 2007. The year-to-date ratio of net charge-offs to average loans was 0.41% compared with 0.03% in the comparable period last year. "*Our year-to-date experience with resolving non-performing credits suggests that our actual loan loss content is in line with our estimated loan loss allowances*," said Mr. Gilkey. *Management believes the allowance is adequate and appropriate given its current analysis of the loan portfolio and the relative mix and risk of loan products. Sterling will continue to evaluate the level of allowance relative to credit conditions in each of its markets*.

Balance Sheet and Capital Management

At September 30, 2008, Sterling's total assets were $12.62 billion, compared with total assets of $12.70 billion at June 30, 2008, and $11.75 billion at September 30, 2007. The total value of Sterling's cash, cash equivalents and high grade investment securities was $2.41 billion at

September 30, 2008. Sterling's investment securities provide substantial liquidity and collateral for borrowings. As of September 30, 2008, Sterling had additional capacity of over $1.3 billion through the Federal Home Loan Bank of Seattle, plus access to over $1.8 billion in additional liquidity through the Federal Reserve, correspondent relationships and available securities. "***Sterling's liquidity position remained strong and improved slightly relative to the second quarter of 2008***. Sterling had no exposure to equity investments of either Fannie Mae or Freddie Mac," Mr. Gilkey stated.

At September 30, 2008, Sterling's tangible book value per share was $13.45, up from $13.08 at the end of the third quarter of 2007, and up from $13.41 at the end of the second quarter of 2008. The year-over-year increase in tangible book value reflects the retention of earnings and the improvement in the unrealized market value of the securities portfolio, whereas the quarter-to-quarter increase in tangible book value reflects an increase in the unrealized market value of the securities portfolio. ***During the quarter, Sterling completed its analysis of the value of goodwill as of June 30, 2008, and concluded that there was no impairment of goodwill***. However, given market volatility, Sterling will continue to monitor its goodwill value and impairment indicators on a quarterly basis. Sterling's ratio of tangible shareholders' equity to tangible assets was 5.77% at the end of the third quarter of 2008, compared with 5.97% reported at the end of the third quarter of 2007, and 5.71% at the end of the second quarter of 2008. Risk-based capital ratios continue to exceed the "well-capitalized" requirements. Sterling's Tier I and total risk-based capital ratio were 9.7% and 11.0%, respectively, and above the regulatory minimum "well-capitalized" requirements of 6.0% and 10.0%, respectively.

Sterling is currently evaluating the federal government's Troubled Asset Relief Program created pursuant to the recently enacted Emergency Economic Stabilization Act, which includes legislation concerning access to capital, problem asset resolution and other items.

30.    On November 24, 2008, Sterling issued a press release entitled "Sterling Financial Corporation to Participate in U.S. Treasury Capital Purchase Program," which stated in part:

Sterling Financial Corporation, a leading community bank in the western region, today announced that it has received notification of preliminary approval from the U.S. Department of Treasury for the sale of $303 million in senior preferred stock and related warrants to the U.S. Treasury under the Capital Purchase Program of the Emergency Economic Stabilization Act of 2008.

Under the Capital Purchase Program, the U.S. Treasury plans to purchase up to $250 billion of senior preferred shares on a voluntary basis from healthy U.S. financial institutions, as part of its efforts to

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

provide a firmer capital foundation for banks and to increase credit availability to businesses and consumers.

"The U.S. Treasury's approval of Sterling's participation in this voluntary program is positive affirmation of our strength and financial health," stated Harold B. Gilkey, chairman and chief executive officer. "The investment is anticipated to increase Sterling's total risk-based capital ratio to 13.8%, on a pro forma basis, from 11.0% at September 30, 2008. The fortification of Sterling's capital position through attractively priced capital from the U.S. Treasury enhances Sterling's financial flexibility to make additional loans to the businesses and consumers in the communities in which we serve. We are hopeful that this program will help stabilize and accelerate recovery of the economy."

The nonvoting senior preferred shares will pay a cumulative compounding dividend of 5% per year for the first five years and will reset to a rate of 9% per year after five years. The shares are callable by Sterling at par after three years and may be replaced if Sterling were to choose to repurchase them with newly raised equity capital at any time. In addition to the preferred shares, the U.S. Treasury will receive 10-year warrants entitling the Treasury to purchase shares of Sterling common stock with an approximate aggregate value equal to $45 million or 15% of the senior preferred investment.

31.    Then, on January 13, 2009, Sterling issued a press release entitled "Sterling Financial Corporation of Spokane, Washington, Provides Fourth-Quarter 2008 Guidance," which stated in part:

Sterling Financial Corporation, a leading community bank in the western region, announced today that it expects to recognize a non-cash charge of $275 million to $325 million related to the impairment of goodwill. This non-cash charge does not affect Sterling's liquidity, operations or regulatory capital ratios. In addition, Sterling plans to record a fourth-quarter provision for credit losses of approximately $230 million for the quarter ended December 31, 2008. The increase in provision relates to worsening economic conditions, the continued stress on real estate values, increasing levels of both classified and non-performing assets and higher net charge-offs. As a result of the higher provision for credit losses and the non-cash charge for impairment of goodwill, Sterling anticipates that it will report a net loss for both the fourth quarter and for the year ended December 31, 2008.

Sterling's board of directors has decided to suspend its quarterly cash dividend payable on its common stock until economic conditions improve. In December 2008, Sterling strengthened its capital position by raising $303 million through the sale of preferred shares and related warrants to the U.S. Department of Treasury as part of the Treasury's Capital Purchase Program. The actions that Sterling has taken to strengthen and preserve its capital base are expected to enable Sterling to exceed the regulatory minimum "well capitalized" capital ratios. Sterling

anticipates that its total risk-based capital ratio will be above 12% as of December 31, 2008. The anticipated impairment charge related to goodwill does not affect the regulatory capital ratios of Sterling or of its subsidiary banks because goodwill is excluded from calculations governing regulatory capital. Sterling and its subsidiary banks therefore are anticipated to remain "well capitalized" under the regulatory requirements.

In November 2008, Sterling took steps to protect customer deposits through its participation in the Federal Deposit Insurance Corporation's (FDIC's) voluntary expanded insurance program, which provides, without charge to depositors, full guarantee on all non-interest bearing transaction accounts held by any depositor, regardless of dollar amount. In addition, to protect interest bearing transaction accounts, the basic limit on federal deposit insurance coverage increased from $100,000 to $250,000 per depositor under the Emergency Economic Stabilization Act enacted in October 2008.

32.     On this news, Sterling's stock collapsed $3.05 per share to close at $3.40 per share on January 14, 2009, a one-day decline of 47% on high volume.

33.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Defendants' assets contained hundreds of millions of dollars worth of impaired and risky securities, many of which were backed by real estate that was rapidly dropping in value and for which Sterling had failed to record adequate loan loss reserves;

(b)     Defendants failed to properly account for Sterling's commercial real estate loans and construction and land development loans, failing to reflect impairment in the loans;

(c)     Sterling had not adequately reserved for loan losses such that its financial statements were presented in violation of GAAP;

(d)     Sterling had not adequately accounted for its goodwill or its deferred tax assets such that its financial statements were presented in violation of GAAP;

(e)     Sterling had not adequately reserved for loan losses such that its Tier 1 capital was presented in violation of banking regulations; and

(f)     The Company's capital base was not adequate enough to withstand the significant deterioration in the real estate markets and, as a result, Sterling would be forced to consent to a cease and desist order from the FDIC directing it to raise $300 million in capital.

## POST CLASS PERIOD EVENTS

34.     On January 27, 2009, Sterling issued a press release entitled "Sterling Financial Corporation of Spokane, Washington, Announces 2008 Earnings Results – Total Risk-Based Capital Near Record Levels Liquidity Position Remains Strong," which stated in part:

> Sterling Financial Corporation, a leading community bank in the western region, today released earnings results for the quarter and year ended December 31, 2008. As previously announced, results for the quarter and full year include a non-cash charge of $223.8 million related to the impairment of goodwill and a provision for credit losses of $228.5 million. Sterling determined that the value of its goodwill had become impaired based on a number of factors including the sustained and protracted decline in its stock price and market capitalization, similar in magnitude to other publicly traded financial institutions. The increase in provision relates to worsening economic conditions, the continued stress on real estate values, increasing levels of both classified and non-performing assets, as well as the recognition of higher net charge-offs and the requirement for additional allowances for credit losses caused by a change in determining the fair market value of impaired loans.

35.     On August 19, 2009, Sterling issued a press release entitled " Sterling Financial Corporation of Spokane, Washington, Announces Deferral of Interest Payments on Trust Preferred Securities and Suspension of Cash Dividend Payments on Preferred Stock," which stated in part:

> Sterling Financial Corporation today announced that, as part of its ongoing strategy to manage through the current economic cycle, it has deferred regularly scheduled interest payments on its outstanding junior subordinated notes relating to its trust preferred securities. Sterling also announced the deferral of regular quarterly cash dividend payments on its $303 million in preferred stock. Sterling is allowed to defer payments

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

- 15 -

of interest on the junior subordinated notes for up to 20 consecutive quarterly periods without default.

"Today's actions are consistent with our strategy of maintaining a solid balance sheet and a strong liquidity position. We continue to focus on our core banking business and our Hometown Helpful(R) customer service. These are all essential elements of realizing our long-term growth potential," said Harold B. Gilkey, chairman and chief executive officer of Sterling Financial Corporation. "Sterling management has been actively pursuing a strategy to strengthen its balance sheet by reducing non-performing assets and improving certain loan concentrations. We believe our actions in this challenging economic environment are in the best long-term interest of our shareholders and customers."

Sterling estimates that the deferral of interest payments on the junior subordinated notes and the suspension of cash dividend payments on its preferred stock will preserve approximately $5.7 million per quarter in cash. At June 30, 2009, all of Sterling's capital ratios were above the "well capitalized" minimums under regulatory guidelines, with Sterling's total risk-based capital ratio at 13.0% and its tier 1 leverage ratio at 8.7%.

36.    On October 14, 2009, the Company announced that defendant Gilkey had resigned from his positions as Chairman of the Board, CEO and President of the Company.

37.    On October 15, 2009, Sterling issued a press release entitled "Sterling Financial Corporation of Spokane, Washington, Announces Agreement with Regulator," which stated in part:

Sterling Financial Corporation today announced that its subsidiary, Sterling Savings Bank, has entered into an agreement with its regulators to continue taking actions to strengthen its financial condition and operations.

William L. Eisenhart, chairman of Sterling's board of directors, stated, "Sterling has been working closely with its regulators since the start of this economic cycle to ensure that we are maintaining safe and sound banking practices. Our agreement formalizes steps that already are underway and that we and our regulators feel are necessary to maintain Sterling's financial health, and its ability to provide high levels of service to our customers and the communities we serve throughout the Pacific Northwest."

The agreement commits Sterling's principal banking subsidiary, Sterling Savings Bank, to continue taking actions relating to its capital position, asset quality, liquidity and management oversight. It is known

as a Stipulation and Consent to the Issuance of an Order to Cease and Desist, and was entered into with the Federal Deposit Insurance Corporation ("FDIC") and Washington Department of Financial Institutions.

Under the agreement, Sterling Savings Bank is required, among other things, to achieve and maintain a Tier I leverage capital ratio of not less than 10% by December 15, 2009. Sterling continues to work with its financial advisor, Sandler O'Neill + Partners, L.P., to evaluate options for raising additional capital. In July, Sterling filed a shelf registration statement with the Securities and Exchange Commission to provide the ability to raise up to $500 million over the next three years and, in September, it received shareholder approval to increase the number of authorized shares of Sterling common stock to facilitate the raising of capital.

The agreement also commits Sterling to reducing its level of classified and non-performing loans and other assets. Sterling's board and management have launched initiatives to reduce the proportion of its loans and other assets that are classified non-performing, and to improve its credit practices going forward.

To lead the efforts to improve credit quality and strengthen oversight of the bank, the board named a new generation of executive leadership. J. Gregory "Greg" Seibly was named acting president and acting chief executive officer of Sterling Financial Corporation and acting chief executive officer of Sterling Savings Bank. Ezra A. Eckhardt was named acting chief operating officer of Sterling Financial Corporation and acting president of Sterling Savings Bank, and continues as its chief operating officer.

Customer deposit accounts and non-classified loans are unaffected by the agreement with regulators. Deposits remain fully covered by FDIC insurance to at least $250,000 per depositor. In addition, non-interest bearing transaction accounts and qualified NOW Checking accounts are fully guaranteed by the FDIC for an unlimited amount of coverage under the FDIC's Transaction Account Guarantee (TAG) program, in which Sterling is a participant. The coverage under the TAG program is in addition to, and separate from, the coverage available under the FDIC's general deposit insurance protection.

"Our core deposits have been growing in response to our relationship-driven deposit strategy. This is helping us to maintain a strong liquidity position," said Mr. Seibly. "As the Pacific Northwest's largest community bank, Sterling is committed to ensuring that it has the financial strength and resources to serve our customers over the long term."

38.    Then, on October 22, 2009, Sterling issued a press release entitled "Sterling Financial Corporation of Spokane, Washington, Announces Third-Quarter 2009 Results," which stated in part:

> Sterling Financial Corporation, the bank holding company of Sterling Savings Bank and Golf Savings Bank, today announced results for the quarter and the nine months ended September 30, 2009.
>
> The net loss attributable to Sterling's common shareholders was $463.7 million, or $8.93 per common share, compared with net income in last year's third quarter of $5.0 million or $0.10 per common share.
>
> The net loss was $459.4 million before the accrual of $4.3 million in cumulative preferred dividends associated with the U.S. Treasury's Capital Purchase Program. The loss for the quarter reflects the following:
>
> - a non-cash charge of $227.6 million to account for the impairment of the remaining goodwill, which primarily relates to banks that Sterling acquired between 1998 and 2007;
> - a provision of $195.5 million to increase the allowance for loan losses; and,
> - a non-cash valuation allowance of $143.0 million established against its deferred tax asset.

39.    As a result of defendants' false statements, Sterling's stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 76% from their Class Period high.

## GAAP PROVISIONS VIOLATED BY DEFENDANTS IN ACCOUNTING FOR CREDIT AND LOAN LOSS RESERVES[1]

40.    The two central accounting items related to defendants' understatement of Sterling's loan loss reserves during the Class Period were the Reserve or Allowance for Loan and Lease Losses ("ALLL") on the balance sheet (which reduces assets), and the corresponding Loan Loss Provision, which is a direct reduction of pretax earnings on Sterling's income statement.   The accounting for these items is governed by specific GAAP provisions, SEC rules and Office of Thrift Supervision guidance. Because there is a plethora of guidance on the subject, defendants were well informed of how to account for the ALLL and Loan Loss Provision during the Class Period. The rules that defendants violated are set forth below.

41.    Section 9.19 of the Audit and Accounting Guide for Depository and Lending Institutions provides that financial institutions are responsible for *"[m]aintain[ing] adequate controls to ensure the ALLL is consistently determined in accordance with GAAP, stated policies and procedures, and relevant supervisory guidance."*

42.    Section 9.04 of the same Audit and Accounting Guide for Depository and Lending Institutions also provides: *"Management is responsible* for estimating credit losses. . . .   [M]anagement must make careful judgments about collectibility and estimates of losses.   *Management's judgments should consider micro- and macro-economic factors; past, current, and anticipated events based on facts in evidence at the balance-sheet date*; and realistic courses of action it expects to take."

---

[1]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

43.    Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss.  *See* FASB Statement of Financial Accounting Standards ("SFAS") No. 5, ¶1.[2]  The collectability of mortgage loans is an example of a loss contingency.  GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) ***information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated***.  *See* SFAS No. 5, ¶8.

44.    Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable possibility***" that a loss or an additional loss may have been incurred.[3]  SFAS No. 5, ¶10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  *See* SFAS No. 5, ¶10.

45.    Nearly two-thirds of Sterling's loan portfolio consisted of commercial real estate loans and construction and land development loans.  Defendants caused Sterling to provide insufficient provision for loan losses during the Class Period.  The Company's insufficient provisions for loan losses is shown by the large charges the Company recorded in the fourth quarter of 2008 and in the third quarter of 2009.

---

[2]    On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification*[TM] ("ASC"), which will become the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

[3]    GAAP defines "reasonably possible" as "[t]he chance of the future event or events occurring is more than remote but less than likely."  SFAS No. 5, ¶3.

46.    Sterling recorded a $228.5 million provision for its credit losses for the fourth quarter of 2008, more than six times its provision for the third quarter of 2008 and more than seventeen times its provision for the fourth quarter of 2007, despite the fact that the real estate mortgage problems began well before year-end 2008.

## LOSS CAUSATION/ECONOMIC LOSS

47.    By misrepresenting demand for Sterling's products, the defendants presented a misleading picture of Sterling's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Sterling's business was not as healthy as represented, defendants falsely concealed the extent of its credit impairment on its commercial real estate and acquisition, land development and construction loan portfolios and the threat to its entire business from its failure to properly account for its loan loss reserves, its goodwill and its deferred tax assets.

48.    These claims of profitability caused and maintained the artificial inflation in the prices of Sterling publicly traded securities throughout the Class Period and until the truth was revealed to the market.

49.    Defendants' false and misleading statements had the intended effect and caused Sterling stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $14.72 per share on October 1, 2008.

50.    As a direct result of defendants' admissions and the public revelations regarding the truth about Sterling's profitability and its actual business prospects going forward, Sterlings's stock price plummeted 47%, falling from $6.45 per share on January 13, 2009 to $3.40 per share on January 14, 2009, a one-day decline of $3.05 per share. This drop removed the inflation from Sterling's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

Lovell Mitchell & Barth, LLP
911 Western Ave., Suite 308, Seattle, WA 98104
Telephone: 206/432-8330 • Fax: 206/432-8331

# COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

51.     Plaintiff incorporates ¶¶1-50 by reference.

52.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)     employed devices, schemes and artifices to defraud;

    (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sterling publicly traded securities during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sterling publicly traded securities.  Plaintiff and the Class would not have purchased Sterling publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

# COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

1    56.    The Individual Defendants acted as controlling persons of Sterling within

2  the meaning of §20(a) of the 1934 Act.  By reason of their positions with the

3  Company, and their ownership of Sterling stock, the Individual Defendants had the

4  power and authority to cause Sterling to engage in the wrongful conduct complained

5  of herein.  Sterling controlled the Individual Defendants and all of its employees.  By

6  reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

7                              **PRAYER FOR RELIEF**

8          WHEREFORE, plaintiff prays for judgment as follows:

9          A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ.

10  P. 23;

11          B.    Awarding plaintiff and the members of the Class damages, including

12  interest;

13          C.    Awarding plaintiff reasonable costs and attorneys' fees; and

14          D.    Awarding such equitable/injunctive or other relief as the Court may deem

15  just and proper.

16                              **JURY DEMAND**

17          Plaintiff demands a trial by jury.

18  DATED:  December 11, 2009          LOVELL MITCHELL & BARTH, LLP
                                         KARL P. BARTH, WSBA No. 22780
19
20
                                         _____
21                                             KARL P. BARTH

22                                        911 Western Ave., Suite 308
                                          Seattle, WA 98104
23                                        Telephone:  206/432-8330
                                          206/432-8331 (fax)
24

25

26

COMPLAINT FOR VIOLATION OF THE                      Lovell Mitchell & Barth, LLP
FEDERAL SECURITIES LAWS          - 23 -      911 Western Ave., Suite 308, Seattle, WA 98104
                                               Telephone: 206/432-8330 • Fax: 206/432-8331

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

VANOVERBEKE MICHAUD &
TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Sterling Financial.doc