THE HONORABLE EDWARD F. SHEA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

|  |  |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>         vs.<br><br>STERLING FINANCIAL CORPORATION, et al.,<br><br>                              Defendants. | No. 2:09-cv-00368-EFS<br><br>CLASS ACTION<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   JURISDICTION AND VENUE ..................................................8

III.  PARTIES .................................................................................9

IV.   BACKGROUND LEADING UP TO THE CLASS PERIOD ....................10

    A.   Sterling's Reckless Growth Strategy Resulted in a Rapid Increase in Risky Construction Loans....................................10

    B.   Leading Up to the Class Period, Defendants Were Aware of Numerous Red Flags and Negative Trends that Required Sterling to Increase ALL Reserves to Adequately Account for Sharply Rising Credit Risk........................................14

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD .................................................................................21

    A.   Sterling's False and Misleading Financial Results During the Class Period ....................................................................22

        1.   False and Misleading Financial Results in 2008 ....................22

        2.   False and Misleading Financial Results in 2009 ....................23

        3.   False Sarbanes-Oxley Certifications ......................................24

    B.   Facts Supporting Falsity and Scienter for Sterling's Overstated Financial Results and Sarbanes-Oxley Certifications ........................24

        1.   Defendants Knew Sterling Was Understating Classified Assets and NPAs, Overstating Earnings and Concealing Risk by Improperly Accounting for Unpaid Construction Loans in *2008*.......................................25

        2.   Defendants Knew Sterling Was Understating NPAs, Overstating Earnings and Concealing Risk by Improperly Accounting for Unpaid Construction Loans in *2009*...............30

        3.   Defendants Deliberately Ignored Numerous Red Flags and Manipulated Sterling's ALL Reserves and Provision for Credit Losses to Conceal Risk and Inflate Earnings..........32

        4.   Defendants' Manipulations of Sterling's Provision for Credit Losses Reinforces Scienter ......................................38

CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS (2:09-cv-00368-EFS)

- i -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1

2                                                                                          **Page**

3          5.    Defendants' Misleading Explanations in 4Q08 Regarding
                 Sterling's Financial Results Reinforce Falsity and
4                Scienter.................................................................................39

5          6.    Defendants' Representations Concerning Their Close
                 Personal Relationships with Borrowers and Their
6                Admissions that They Closely Monitored and Reviewed
                 Every Loan in Sterling's Portfolio Supports a Strong
7                Inference of Scienter ..........................................................42

8          7.    Facts Reported by Former Sterling Employees Support a
                 Strong Inference of Scienter ..............................................44

9
     C.    False Statements Concerning "Safe and Sound" Banking
10         Practices...........................................................................................51

11   D.    Facts Supporting Falsity and Scienter for Statements Regarding
           Safe and Sound Banking Practices....................................................52
12
     E.    False Statements Concerning the Adequacy of Sterling's ALL
13         Reserves and Strength of Sterling's Credit Quality and Credit
           Risk Monitoring in 2008 ..................................................................57
14
     F.    Facts Supporting Falsity and Scienter for Defendants' 2008
15         Statements Concerning Credit Quality and Risk ...............................60

16   G.    False 2009 Statements Concerning Credit Quality and Risk.............61

17   H.    Facts Supporting Falsity and Scienter for Defendants' 2009
           Statements Regarding Credit Quality and Risk .................................64
18
     I.    False Statements Regarding Sterling's Capital Position....................65
19
     J.    Facts Supporting Falsity and Scienter for Statements Regarding
20         Sterling's Capital Position................................................................66

21   VI.   DISCLOSURES AT THE END OF THE CLASS PERIOD .......................70

22   VII.  ADDITIONAL ALLEGATIONS SUPPORTING A STRONG
           INFERENCE SCIENTER ........................................................................72
23
     A.    The Sudden Ouster of Two of Sterling's Most Senior Sterling
24         Executives Reinforces Scienter.........................................................72

25   B.    Defendants' Compensation Structure and Stock Option Awards
           Support Scienter ...............................................................................74
26

1
2

**Page**

3    C.    Defendants' Violations of OCC Regulations Underscore
          Scienter ........................................................................................75

4    D.    Sterling's Specific GAAP Violations.............................................76

5          1.    General GAAP Provisions Violated .........................................76

6

7          2.    GAAP Provisions Violated by Defendants' Failure to
                Account for Declining Collateral Values................................80

8          3.    GAAP Provisions Violated by Defendants in Accounting
                for ALL Reserves ...................................................................80

9

10         4.    SEC Rules Violated by Defendants in Accounting for
                ALL Reserves .........................................................................83

11   VIII.  LOSS CAUSATION/ECONOMIC LOSS ....................................................84

12   IX.    CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-
           MARKET PRESUMPTION.......................................................................87

13   COUNT I....................................................................................................90

14   COUNT II...................................................................................................91

15   X.     PRAYER FOR RELIEF ..........................................................................92

16   XI.    JURY DEMAND.....................................................................................92

17
18
19
20
21
22
23
24
25
26

1  **I.    INTRODUCTION**

2      1.    This is a securities class action on behalf of all persons who purchased or

3  otherwise acquired the publicly traded securities of Sterling Financial Corporation

4  ("Sterling" or the "Company") between July 23, 2008 and October 15, 2009 (the

5  "Class Period") against Sterling and its top officers for violations of the Securities

6  Exchange Act of 1934 ("1934 Act") and U.S. Securities and Exchange Commission

7  ("SEC") Rule 10b-5 promulgated thereunder.  Defendants include Sterling; its former

8  Chief Executive Officer ("CEO"), Chairman of the Board and co-founder, Harold

9  Gilkey ("Gilkey"); and its Chief Financial Officer ("CFO") and Executive Vice

10  President of Finance, Daniel G. Byrne ("Byrne").

11      2.    Sterling is a bank holding company operating through its two main

12  banking subsidiaries – Sterling Savings Bank and Golf Savings Bank.  Sterling

13  Savings Bank is the largest commercial bank headquartered in Washington and one of

14  the largest regional community banks in the western United States.  Sterling offers

15  banking products and services including mortgage lending and construction financing

16  to individuals, businesses, commercial organizations and corporations.  The Company

17  is headquartered in Spokane, Washington and trades under the ticker symbol "STSA."

18      3.    According to Sterling's 2007 filings with the SEC, the Company's

19  business model was "an aggressive growth strategy to become the leading community

20  bank in the western United States."  In 2006 and 2007, defendants Gilkey and Byrne

21  accelerated Sterling's aggressive growth plan by acquiring other banks.  In just two

22  years, Sterling acquired four financial institutions valued at $567.2 million, including

23  the two largest acquisitions in its corporate history – Golf Savings Bank and Northern

24  Empire Bancshares.  *The Spokesman-Review* reported that "Sterling Financial Corp.

25  has been the merger machine of Northwest banking almost since the doors opened in

26  1983.  The Spokane bank has pulled off 13 acquisitions in 23 years, with a 14th

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)          - 1 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  pending.  The folks at Sterling know the drill."  By December 31, 2007, Sterling had
2  $12.15 billion in total assets, with 178 depository banking offices, becoming the
3  largest commercial bank headquartered in Washington.

4      4.      Leading up to the Class Period, Sterling recklessly pursued its growth
5  strategy by rapidly increasing its portfolio of "construction" loans – *i.e.*, loans issued
6  to borrowers such as real estate developers, home builders and construction financiers
7  who used the money to build residential and commercial construction projects.  From
8  2004 to 2007, Sterling's portfolio of construction loans exploded from $653 million to
9  *$2.9 billion*, an increase of *350%* in just three years, accounting for roughly 50% of all
10 new loan originations each year.

11     5.      One of the primary reasons for Sterling's aggressive move toward
12 construction lending was that the loans were typically larger (multiple millions) and
13 more lucrative than individual mortgage loans because of higher yields.  Rapid growth
14 in construction lending, however, also resulted in increased risk.  Unlike individual
15 mortgage loans which typically involve one borrower and one property, construction
16 loans often involve huge multi-unit projects that are subject to numerous layers of
17 uncertainty and risk, including construction delays, cost overruns, overbuilding and
18 borrowers' inability to sell the underlying construction properties, especially in a
19 declining real estate market.

20     6.      In 2007 and 2008, during the apex of the credit crisis and real estate
21 market collapse, Sterling continued to recklessly lend billions in risky construction
22 loans at alarming rates.  To justify the exponential increase in construction lending
23 and the corresponding increase in risk, defendants falsely represented to investors that
24 the Company's "*cautious approach* to residential construction underwriting" and its
25 personal "*long-term relationships*" with its borrowers adequately protected Sterling
26 from the severe credit risks facing other banks and the overall market.  Defendants

Gilkey and Byrne repeatedly represented that Sterling had adequate reserves for its risky construction loans and was well-capitalized and well-insulated from the overall downturn because of its "***conservative***" credit risk practices, its "safe and sound" banking[1] and its "***underwriting discipline***" for construction loans, which purportedly established Sterling as a safe haven for investors to put their money.

7.    Throughout the Class Period, Gilkey and Byrne continued to make material misrepresentations to investors in violation of the federal securities laws concerning: (a) Sterling's financial results and the adequacy of its reserves for loan and credit losses (formally called "Allowance for Loan Losses" or "ALL Reserves"); (b) the riskiness of its loan portfolio and quality, integrity and adequacy of its credit risk practices; (c) the "safety and soundness" of Sterling's banking operations; and (d) the strength of the Company's capital and liquidity positions and its overall financial condition.

8.    Despite defendants' misrepresentations, Wall Street analysts repeatedly pressed defendants about how Sterling could maintain such low ALL Reserves and support its bullish outlook given the rising default rates in Sterling's construction loans and the rapidly deteriorating credit and real estate markets plaguing the U.S. banking sector.  Defendants repeatedly ***denied*** that Sterling needed additional ALL Reserves because of its purportedly strict credit monitoring practices, its "cautious" approach to loan underwriting, and the safety and soundness of its banking operation.

9.    Defendants also distinguished Sterling's risk from that of the overall market by emphasizing its focus on regional lending in certain metropolitan areas,

---

[1]    In the banking sector, the terminology "safe and sound" has a specific and formal regulatory and definitional meaning, as set forth more fully in §V.C. herein.

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 3 -    ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1   such as Portland and Puget Sound, which defendants claimed would help protect

2   Sterling from the overall housing meltdown.  Defendants also misleadingly convinced

3   investors to believe Sterling was somehow positioned better than competing banks

4   because it had **close personal relationships** with its construction loan clients to

5   mitigate the risk of non-payment and default.

6          10.    Simply put, throughout the Class Period, defendants deceptively

7   represented to investors that Sterling was a conservative, insulated, hometown bank

8   that adequately monitored its risk and protected investors by cautiously underwriting

9   its loans and knowing its borrowers on a personal level.  Defendants repeatedly told

10  investors that Sterling operated a "safe and sound" bank and had more than enough

11  capital to ride out the economic storm and bolster the Company's stock price.

12         11.    Defendants' representations to investors have now been revealed to be

13  materially and deliberately false.  Unbeknownst to investors, Sterling's operations

14  behind closed doors were far from "conservative" or "cautious," and defendants were

15  not operating a "safe and sound" bank as represented during the Class Period.  In fact,

16  on October 15, 2009, defendants abruptly revealed that the Federal Deposit Insurance

17  Corporation ("FDIC") and the Washington Department of Financial Institutions

18  ("WDFI") – the regulatory agencies charged with protecting federal and state bank

19  depositors – investigated Sterling and issued an Order to Cease and Desist (the "FDIC

20  Order") expressly concluding that Sterling "**engaged in unsafe or unsound banking**

21  **practices and violations of law and/or regulations**."  *See* Ex. A, attached hereto.

22         12.    The FDIC Order required Sterling to cease and desist from numerous

23  improper banking practices, including "operating with **inadequate capital** in relation

24  to the kind and quality of assets held by the Bank," "operating with a **large volume of**

25  **poor quality loans**," "operating with **inadequate board of directors oversight**" and

26  "operating in such a manner as to produce operating losses."  *Id*. at 2.  The FDIC also

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)                - 4 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

ordered Sterling to "restore **all aspects** of the Bank to safe and sound condition, including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk." *Id.* at 3. Sterling also had to meet numerous financial requirements, including increasing its capital ratios by at least $300 million, adequately reserving for problem loans, and reducing the level of nonperforming assets to an "acceptable" level. *Id.* at 8. The FDIC's findings directly contradict defendants' false representations to investors during the Class Period. Sterling was nowhere close to meeting the regulatory safety and soundness requirements of U.S. banks.

13.    In addition to the FDIC's findings of Sterling's legal and regulatory violations and its unsafe and unsound banking practices, numerous corroborating facts reveal that defendants' improper conduct and misrepresentations during the Class Period were fraudulent. Most fundamentally, numerous facts reveal that defendants intentionally manipulated and misrepresented Sterling's financial results in 2008 and 2009. Defendants deliberately understated the Company's exposure to catastrophic risk in its construction loan portfolio, including its "Classified Assets," "Nonperforming Loans" and "Nonperforming Assets"[2] – all of which are stark internal indicators of increased risk and deteriorating credit. Defendants also

---

[2]    "Classified Assets" are a category of riskier assets, including loans, that management deems to have a deficiency or weakness that might result in a loss. "Nonperforming Loans" or "NPLs" are loans that are not performing pursuant to the original terms of the loan contract. "Nonperforming Assets" or "NPAs" consist of NPLs plus other various Nonperforming Assets and are a subset of Classified Assets.

1  fraudulently manipulated Sterling's ALL Reserves, masking hundreds of millions of

2  dollars in unpaid and risky construction loans.

3    14.    Specifically, in 2008, defendants intentionally concealed rising risk and

4  credit deterioration in its construction loan portfolio by improperly accounting for

5  hundreds of millions of dollars in construction loan payments that were contractually

6  due in 2008, but were not paid.  Instead of accounting for those unpaid construction

7  loans as Classified Assets or NPAs – which would require increased ALL Reserves –

8  defendants deliberately deferred the risk of those loans to future periods, effectively

9  concealing short-term risk and compounding Sterling's long-term collapse.

10  Defendants' practice of manipulating Classified Assets and NPAs allowed defendants

11  to artificially understate Sterling's ALL Reserves, which resulted in inflated income,

12  earnings and capital in 2008 and 2009, while concealing severe financial deterioration

13  and knowingly misleading investors.

14    15.    In addition to deliberate financial manipulations of Classified Assets and

15  Nonperforming Assets, defendants also misrepresented Sterling's "Provision for

16  Credit Losses," which is the charge taken each quarter to increase the ALL Reserve to

17  account for anticipated loan losses.  Throughout the Class Period, defendants were

18  aware that nearly every crucial economic indicator – both internally at Sterling and

19  externally in the overall market – showed rapidly increasing risk and deteriorating

20  credit quality.  For example, in 2Q08, the first quarterly results issued during the Class

21  Period, Sterling's nonperforming construction loans rose nearly *2,600%*, from only $9

22  million in 2Q07 to over $253 million in 2Q08.  During the same 12-month period

23  (2Q07 through 2Q08), Sterling's total NPAs rose *809%*, and the amount of delinquent

24  loans 60 or more days past due increased *914%*.  The ratio of 60-day delinquencies as

25  a percentage of total loans also increased *830%* during the same 12-month period.

26

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)        **- 6 -**

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

16.    Despite defendants' knowledge of this massive increase in risk, Sterling deceptively maintained inadequate ALL Reserves by *lowering* its Provision for Credit Losses by 16%, from $37 million in 1Q08 (the quarter immediately preceding the Class Period) to only $31 million in 2Q08 (the first quarterly results during the Class Period). This manipulation evidences a deliberate attempt to conceal risk, inflate earnings and mask financial deterioration at the Company, all of which misled investors.

17.    Defendants' reckless practices and concealment of risk are corroborated by numerous former Sterling employees, who experienced firsthand the meltdown in Sterling's construction lending business and the corresponding increase in risk. According to multiple witnesses, the collapse in Sterling's construction loan business became apparent in 2007 and early 2008 and was well known inside the Company *before* the Class Period began. Those witnesses reveal a pattern and practice of lax underwriting, credit monitoring controls and rapidly increasing risk throughout the Class Period. The witnesses also report major concerns within the Company in 2007 and 2008 about the poor credit quality of Sterling's construction borrowers and the deteriorating condition of construction loans. The witness-based facts contradict defendants' repeated representations throughout the Class Period.

18.    Defendants' deceptive representations, omissions of material fact, and deliberate concealment of credit risk caused Sterling's stock price to trade at artificially inflated levels as high as $14.72 per share during the Class Period. When the true financial condition of the Company and the consequences of defendants' misconduct were finally revealed through several partial disclosures, Sterling's stock price plummeted – falling over 92% from its Class Period high to an all-time low of $0.43 per share after the Class Period. Following the FDIC's Order and the collapse in Sterling's stock price, CEO and co-founder Gilkey suspiciously left the Company.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 7 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

Sterling now trades at around $0.68 per share. Just 10 days ago, on June 8, 2010, the Company received notification from NASDAQ threatening to delist the Company for violation of its minimum trading price requirements.

19.    Following Sterling's disclosures of the FDIC Order and Gilkey's "departure" from the Company, investors were shocked and analysts questioned the credibility of management's previous statements. According to an article in *American Banker* on October 16, 2009:

> Just three months after saying its problems had begun to level off, Sterling Financial Corp. in Spokane, Wash., unexpectedly ousted its longtime leader and was ordered by regulators to boost capital levels.

> The double-whammy stunned observers who were under the impression that the company had begun to turn a corner.

\*        \*        \*

> "My first thought was, 'Oh my God, it is worse than I thought,' said Theodore Kovaleff, an analyst at Horowitz & Associates Inc., who owns shares in Sterling. "*I had believed them when they said things were leveling off, but clearly the answer is 'no' now*."

20.    Defendants' fraudulent conduct during the Class Period not only nearly wiped out Sterling's shareholders and caused tens of millions of dollars in damages, it also cost U.S. taxpayers millions of dollars in TARP funds to bail out Sterling from its reckless banking practices. Sterling has never fully recovered and had to be rescued by private equity funds, further diluting any remaining value in Sterling's shares. Sterling investors lost tens of millions of dollars as a result of defendants' deceptive conduct – and hereby state a claim.

## II.    JURISDICTION AND VENUE

21.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

22.    Venue is proper in this District pursuant to §27 of the 1934 Act. Most of the false and misleading statements, omissions and fraudulent conduct occurred and

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)        - 8 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  originated in this District.   Sterling has a substantial presence in the State of
2  Washington, and its principal executive offices are located in Spokane, Washington.

3     23.    In connection with the acts alleged herein, defendants, directly or
4  indirectly, used the means and instrumentalities of interstate commerce, including, but
5  not limited to, the mails, interstate telephone communications and the facilities of the
6  national securities markets.

7  **III.    PARTIES**

8     24.    Court-appointed Lead Plaintiff City of Roseville Employees' Retirement
9  System purchased Sterling's publicly traded securities during the Class Period and
10 was damaged thereby.

11    25.    Defendant Sterling operates as the bank holding company for Sterling
12 Savings Bank and Golf Savings Bank, which provides various banking products and
13 services to individuals, small and medium-sized businesses and corporations.

14    26.    Defendant Gilkey co-founded Sterling and was, at all relevant times,
15 CEO and  Chairman of the Board of Sterling since its inception in 1992.  Gilkey also
16 served as Sterling's President since February 2008 until being forced out of the
17 Company in October 2009.  He also served as Chairman of the Board and CEO of
18 Sterling's wholly owned subsidiary, Sterling Savings Bank, from its inception in 1981
19 until October 2003.  Additionally, he was the Chairman of the Board and CEO of Golf
20 Savings Bank, and a director of INTERVEST-Mortgage Investment Company,  a
21 wholly owned subsidiary of Sterling Savings Bank.  As Chairman of the Board and
22 CEO, Gilkey had supervision and control over the business and affairs of Sterling and
23 its operating subsidiaries.  He also served on the Board of Directors for the Federal
24 Home Loan Bank of Seattle and was a past Chairman of the Savings Association
25 Insurance Fund Industry Advisory Committee, a committee advising the FDIC.
26

27.    Defendant Byrne joined the Company in 1983 and was at all relevant times Sterling's CFO, Executive Vice President of Finance and Assistant Secretary. Byrne was also Assistant Secretary of Sterling Savings Bank and Golf Savings Bank during the relevant time period. Byrne is a Certified Public Accountant and serves as a member of the American Institute of Certified Public Accountants ("AICPA"). Before joining Sterling, Byrne worked with the accounting firm of Coopers & Lybrand.

28.    Defendants Gilkey and Byrne are the "Individual Defendants." Because of their positions, duties, responsibilities and acts within the Company, the Individual Defendants possessed the power and authority to control the contents of Sterling's communications to the market, including quarterly and yearly SEC filings, press releases, conference call statements and presentations to securities analysts, portfolio managers and institutional investors. The Individual Defendants were provided with copies of the Company's reports, press releases and communications alleged herein to be misleading prior to or shortly after their issuance and had the control, power, means, ability and opportunity to prevent their issuance or cause them to be not misleading. Because of their positions, duties, responsibilities and control within the Company and their access to material nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed and were concealed from the public and that the positive representations made were materially false and misleading. The Individual Defendants are liable for the false statements, omissions and deceptive conduct alleged herein.

## IV.    BACKGROUND LEADING UP TO THE CLASS PERIOD

### A.    Sterling's Reckless Growth Strategy Resulted in a Rapid Increase in Risky Construction Loans

29.    Leading up to the Class Period, Sterling's business model was rapid growth through aggressive construction lending. Although the growth in construction

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 10 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1   lending initially resulted in higher profits, it also resulted in greatly increased risk.

2   Unlike typical individual mortgage loans with 15- to 30-year repayment terms, most

3   construction loans had relatively short repayment periods of 12 to 24 months.  In a

4   typical construction loan transaction, Sterling issued loans to real estate, land and

5   construction developers that used the money to finance and build large residential and

6   commercial construction projects, including homes, condominiums, subdivisions,

7   townhouses, office parks or other construction projects.  After building, marketing and

8   selling the properties, including any individual units, construction borrowers would

9   then pay back to Sterling the loan principal plus interest.

10      30.     Construction loans are typically riskier than residential mortgage loans.

11  Indeed, Sterling itself acknowledged in its SEC filings that, for construction loans,

12  "Sterling is likely to experience higher levels of loan losses than it would on

13  residential mortgage loans."  Unlike residential mortgage loans, construction loans

14  depend not upon a single mortgage borrower who pays back the loan over the course

15  of many years, but rather upon the successful building, marketing and sale of large

16  construction projects, including any individual houses or commercial units underlying

17  the projects.  In a declining real estate market (and even during flat markets),

18  construction lending carries multiple layers of enhanced credit risk because repayment

19  is heavily dependent upon multiple contingencies, including excessive vacancy rates,

20  inadequate operating cash flows, construction delays, regulatory hurdles, cost

21  overruns, insufficient valuations and inability to obtain permanent financing in a

22  timely manner.

23      31.     Sterling's construction loans were also riskier than individual mortgage

24  loans because they depended largely upon the estimated cost of construction which

25  could change over time.  If the initial estimated cost of construction turned out to be

26  inaccurate, Sterling had to advance funds beyond the amount originally committed to

**CONSOL CPT FOR VIOLATION OF FEDERAL**
**SECURITIES LAWS** (2:09-cv-00368-EFS)                    - 11 -

1  permit completion of the development and protect its security position in the

2  properties.  Construction loans were also risky because they depended upon the

3  accuracy of the initial estimate of the property's value upon completion of

4  construction or development.  If real estate prices fell at or prior to maturity of the

5  loans, or if construction borrowers could not sell the individual units to recoup the

6  cost of construction, the properties underlying the loans provided insufficient value to

7  ensure full repayment.

8         32.     Recklessly ignoring these risks, from 2004 to 2007, Sterling's origination

9  of construction loans exploded, becoming the largest category of loans originated at

10  the Company.   For example, from 2004 to 2005, Sterling's construction loan

11  originations increased 76% from $1.0 billion to *$1.8 billion*, or 46% of Sterling's total

12  loan originations.   In 2006, when the economy was at the brink of a recession,

13  Sterling's originations of construction loans increased sharply to *$2.3 billion*, or

14  approximately 47% of total loan originations, making construction loans Sterling's

15  single largest category of loans.  In 2007, Sterling originated another *$2.2 billion* in

16  construction loans, 40% of total loan originations, and by the end of 2007 – when

17  defendants knew the economy was suffering from a full-blown recession – Sterling's

18  total construction loans ballooned to *$2.9 billion*.  Thus, from 2004 to 2007, Sterling's

19  balance of construction loans increased 350%, from $653 million to $2.9 billion in

20  only three years.  The rapid growth in Sterling's construction lending is illustrated in

21  the following chart:

22

23

24

25

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Construction Loans**
**Balance Outstanding at December 31**
**(Millions of Dollars)**

15    33.    In 2008, during the height of the credit crisis, defendants largely ignored

16  Sterling's  increasing  risk  and  continued  its  aggressive  construction  lending,

17  originating  another  $602 million  in  construction  loans.    Even  more  troubling,

18  defendants were aware that approximately $2.2 billion, or 74%, of Sterling's total

19  construction  loans  ***contractually  matured  in  2008***.    They  also  were  aware  of

20  numerous red flags and alarming trends in construction loan delinquency rates.  Thus,

21  defendants knew Sterling needed to adequately, timely and accurately account for the

22  true loss exposure from defaulting construction loans by sharply increasing both its

23  ALL  Reserves  and  Provision  for  Credit  Losses  to  address  the  billions  in  loans

24  maturing  in  a  collapsing  real  estate  market  amid  buyer  cancellations,  declining

25  property values and a gridlocked mortgage market.  Instead, defendants deliberately

26  downplayed the risk and concealed the problems from investors.

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

**B.   Leading Up to the Class Period, Defendants Were Aware of Numerous Red Flags and Negative Trends that Required Sterling to Increase ALL Reserves to Adequately Account for Sharply Rising Credit Risk**

34.   At the start of the Class Period, defendants were aware of numerous negative trends, including sharp increases in Nonperforming Assets, Nonperforming Loans, Classified Assets and Loans 60 days or more past due that required Sterling to *increase* its ALL Reserves.

35.   According to Sterling's 2007 Form 10-K, "[n]on-performing assets are loans and other assets that [were] no longer performing in accordance with the terms of the original loan agreement."   Nonperforming *Loans*, which are the largest component of Nonperforming Assets, are those loans for which Sterling has stopped accruing interest and/or restructured due to nonpayment from borrowers.

36.   Between 2Q07 and 2Q08 (the 12-month period preceding the Class Period), Sterling's total Nonperforming Loans increased *855%*, and total Nonperforming Assets increased *809%*:

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Nonperforming Loans Loans ($ in thousands) | **$29,368** | $58,403 | $124,140 | $210,057 | **$280,409** |
| Gross Nonperforming Assets Loans ($ in thousands) | **$33,380** | $61,830 | $135,215 | $223,084 | **$303,407** |

37.   The vast majority of Sterling's Nonperforming Loans consisted of nonperforming *construction* loans.  During the same 12-month period leading up to the Class Period (2Q07-2Q08), nonperforming construction loans increased an astonishing *2,600%*, from $9 million to over $253 million in only 12 months:

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Nonperforming Construction Loans ($ in thousands) | **$9,401** | $40,263 | $105,415 | $178,276 | **$253,170** |

526557_1

CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS (2:09-cv-00368-EFS)                 - 14 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

38.    Residential construction loans were the primary drivers of the overall total nonperforming construction loans.  In 4Q07, 1Q08 and 2Q08 (the only quarters prior to the Class Period in which those numbers were broken out), nonperforming residential construction loans increased 135% from $102.4 million, to $153.3 million, to $240.9 million, respectively.

39.    Beginning in the third quarter of 2007, nonperforming construction loans had grown so rapidly that they constituted the majority of Sterling's total Nonperforming Loans and total Nonperforming Assets.  By 2Q08, nonperforming construction loans comprised over **90%** of Nonperforming Loans:

| | 2007 | | | 2008 | |
|---|---|---|---|---|---|
| | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Total Nonperforming Construction Loans as a % of Nonperforming Loans | 33% | 69% | 85% | 85% | **90%** |
| Total Nonperforming Construction Loans as a % of Gross Nonperforming Assets | 28% | 65% | 78% | 72% | **83%** |

40.    Defendants were also aware leading up to the Class Period that Sterling's Classified Assets, – the bucket of riskier assets, including loans, that management deems to have a deficiency that may result in a loss and includes all Nonperforming Assets – had sharply increased.  From 2Q07 to 2Q08, Classified Assets **increased 424%** to approximately $497 million.  From December 31, 2007 to June 30, 2008, construction-related classified assets **increased 172%** to $328 million – or 66% of Sterling's total Classified Assets.[3]

---

[3]      Prior to 2008, Sterling did not disclose or report classified construction loan assets.

41.    Another strong indicator of increasing risk leading up to the Class Period was the sharp increase in Sterling's delinquent loans that were 60 days or more past due.  Between 2Q07 and 2Q08, these delinquencies jumped ***914%***:

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Loans 60 Days or More Past Due ($ in thousands) | **$28,403** | $46,902 | $111,430 | $220,506 | **$288,036** |

42.    The delinquency ratio for loans 60 days or more past due as a percentage of total loans also ***increased 830%*** between 2Q07 and 2Q08:

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Delinquency Ratio for Loans 60 Days or More Past Due as a % of Total Loans | **0.33%** | 0.53% | 1.23% | 2.38% | **3.07%** |

43.    Several other ratios used by banks in measuring operating strength indicated that Sterling's loans were defaulting at an alarming rate.  The ratio of total Nonperforming Assets to total assets increased ***754%*** and the ratio of total Nonperforming Loans to loans increased ***779%***:

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| Total Nonperforming Assets as a % of Total Assets | **.28%** | .53% | 1.11% | 1.76% | **2.39%** |
| Total Nonperforming Loans as a % of Loans | **.34%** | .66% | 1.27% | 2.27% | **2.99%** |

44.    Despite defendants' knowledge of these numerous adverse trends from 2Q07 to 2Q08, including an ***855%*** increase in Nonperforming Loans and an ***809%*** increase in Nonperforming Assets, defendants kept ALL Reserves artificially low, increasing them by ***only 63%*** during this period.

|  | 2007 | | | 2008 | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| ALL Reserves ($ in thousands) | **99,634** | 102,042 | 111,026 | 145,009 | 162,368 |

45.    In fact, as the economy progressively worsened, the ratio of ALL Reserves as a percentage of Total Nonperforming Loans rapidly *decreased*, which gave investors the false impression that Sterling's loans were becoming *less* risky and therefore, needed a lower percentage of ALL Reserves:

|  | **2007** | | | **2008** | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| ALL Reserves as a % of Total Nonperforming Loans | 339.26% | 174.72% | 89.40% | 69.03% | **57.90%** |

46.    Similarly, although the ratio of ALL Reserves to total Nonperforming Assets should have increased to reflect greater risk, it actually *decreased*, which is a misleading indication to investors that a lower reserve is needed to protect against future loan losses:

|  | **2007** | | | **2008** | |
|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** |
| ALL Reserves as a % of Total Nonperforming Assets | 298.48% | 165.04% | 82.11% | 65.00% | **53.10%** |

47.    Before the Class Period, ALL Reserves as a percentage of total loans increased at a significantly *slower* rate than the ratio of nonperforming loans as a percentage of total loans.  As shown later, this trend continued until the end of the Class Period, only to reverse thereafter:

|  | **Rate of Quarterly Increase in ALL Reserves as a % of Total Loans** | **Rate of Quarterly Increase in NPLs as a % of Total Loans** |
|---|---|---|
| **2Q07** | 4.42% | 89.11% |
| **3Q07** | (0.39%) | 98.86% |
| **4Q07** | 6.28% | 107.63% |
| **1Q08** | 27.71% | 50.42% |
| **2Q08** | 10.57% | 45.00% |

48.    Despite these known adverse trends demonstrating increased risk leading up to the Class Period, defendants represented to investors that because of Sterling's strict credit monitoring and its "safe and sound" banking practices, it was unnecessary

1  to materially increase Sterling's ALL Reserves and book the corresponding loss (*i.e.*,

2  the Provision for Credit Losses) during the Class Period.

3      49.    For example, during an October 23, 2007 conference call, defendants

4  assured investors that Sterling's risk was contained and that it was less exposed to the

5  economic downturn than most banks because of its allegedly "diversified" portfolio,

6  its purported early intervention in problem loans and its close personal involvement

7  with borrowers.  According to CFO Byrne:

> BYRNE: I would remind you that ***we are pretty well-diversified***. Only 10% or approximately $258 million of our residential construction portfolio is in the Boise, Idaho market; and 2% or $62 million is in Bend, Oregon. ***We have been very involved with our customer borrowers, and we have opted to intervene early, as we have found over time that this is the most effective way to mitigate losses on problem loans***.  Our due diligence identified the more liberal underwriting on residential construction loans at FirstBank Northwest, and ***we have been getting ahead of the curve on these loans***.

13     50.    Despite defendants' representations, analysts were increasingly skeptical

14  of Sterling's inexplicably low Provision for Credit Losses and ALL Reserves.  During

15  the October 23, 2007 conference call, Brett D. Rabatin ("Rabatin"), an analyst at FTN

16  Midwest Securities Corporation ("FTN Midwest"), expressed his surprise at Sterling's

17  lower Provision for Credit Losses given the steep rise in nonperforming loans and

18  assets.  In response, Gilkey boasted about Sterling's capacity to manage loss exposure:

> RABATIN: Maybe a little more direct question on the provisioning.  Given the increase in NPAs and kind of the foreboding for a higher level of NPAs going forward and the increase in classified, ***I guess I'm confused as to why the provisioning wasn't higher this quarter***.  Maybe if Dan could talk about the provisioning guidance, maybe I didn't catch it, but the provisioning guidance for the fourth quarter based on current assumptions.

>                *      *      *

> It sounds like you think that loss exposure is minimal, despite the increase, [in nonperforming loans] projected increases?

> GILKEY: It depends on your definition of minimal.

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)          - 18 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    RABATIN: Just relative to where you are provisioning and kind
of the talk on how you have already identified things pretty early and
2    expect things to work out. Is a part of that that you think the market will
come back some, in the next quarter or so?
3
GILKEY: I just feel that the market has accelerated this, and it
4    will take a longer time to work out than either you or I would want to. *I
believe we've identified the loss exposure extremely well. I think it's
5    well within our capacity to manage*.

6    51.    Defendants made similar assurances in a press release to investors on

7    January 28, 2008:

8    Management continues to exercise a **cautious approach** towards
residential **construction underwriting**.
9
*    *    *
10
11    Management believes the **allowance is adequate and appropriate** given
its analysis of the loan portfolio and its relative mix and risk of loan
products.
12
*    *    *
13
14    [W]e have devoted significant time and effort in the fourth quarter
toward **asset quality, reviewing our loan portfolio for signs of weakness
and developing plans for resolution**.
15
*    *    *
16
**The overall safety and soundness of our bank remains strong** . . . .
17
18    During the second half of 2007, we were reminded why we have always
**prided ourselves on the strength of our credit management team and
our underwriting discipline**.
19
*    *    *
20
We have a **very strong credit administration process** and we have
21    identified process and **we have identified our loan problems**, and we are
confident in our ability to manage our way through this cycle.
22
23    52.    Also during a January 2008 conference call, Gilkey continued to boast

about the quality of Sterling's appraisals and "hometown" style of banking and
24
Sterling's personal relationships with its borrowers:
25
GILKEY: *[O]ver the past 90 days we have reviewed our position
26    on every residential loan in our portfolio*. We have received updated

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)            - 19 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

appraisals or broker's opinion[s] of value which, of course, are more current.

**And either our credit administrator or our special asset staff have met with these borrowers and/or have inspected all of the projects** in Boise[, Idaho] and Bend[, Oregon], where we are seeing the biggest slowdown in our market area.

\* \* \*

We are comfortable with the valuation on these properties. **A majority of our residential construction borrowers have long-term relationships with our lending officer and our company. So we feel we have a good understanding of their business, and we are confident that they are solid bank customers**.

53.    Defendants also told the market to expect the "provision for credit losses in 2008 to range between **[$]25 and $29 million**, with a little bit of larger portion of that coming the first half of the year."   Again, Rabatin, the analyst from FTN Midwest, questioned the inexplicably low Provision for Credit Losses given the rapidly deteriorating state of the economy.  This time, Gilkey assured investors that Sterling's risk was mitigated by defendants' personal relationships with its clients:

RABATIN: I understand that, Harold. I guess maybe I didn't come at it from quite the right angle.  Obviously, the selling season is coming up, so to speak, and **I just don't understand the guidance of 25 to 30 basis points of provisioning**.  I mean, it sounds like you are pretty optimistic that things will start to really improve pretty quickly, in terms of home sales in some of these softer markets.

GILKEY: I don't believe that our optimism is based on what has happened in the market. **Our optimism is based on what we know about our individual clients, and that will lead to them meeting their obligations to manage their portfolios**.

54.    In its Form 10-K for 2007, filed on February 28, 2008, defendants continued to position investors to believe Sterling was mitigating its risk with strict underwriting of construction loans:

"Sterling's **underwriting, monitoring and disbursement practices** with respect to construction financing are intended to ensure that **sufficient funds are available to complete construction projects**.   Sterling endeavors to limit its risk through its underwriting procedures by **using only approved, qualified appraisers and by dealing only with qualified builders/borrowers**."

1    55.    By April 2008, residential construction loans had grown so large that

2   Sterling assured investors that it had devoted a number of senior management

3   personnel to monitor the situation.  In an April 10, 2008 press release, Sterling

4   announced, "We have activated a Residential Construction Special Project Team,

5   composed of **senior Sterling leaders**, to address these types of credit issues related to

6   our residential construction portfolio."

7    56.    Accordingly, leading up to the Class Period, defendants were well aware

8   of numerous negative indicators and financial red flags showing that Sterling needed

9   to substantially **increase** its ALL Reserves, **increase** its Provisions for Credit Losses

10  and properly account for its sharply rising risk.  Instead, defendants deliberately (and

11  misleadingly) kept its ALL Reserves artificially low and deceived investors into

12  believing that Sterling was well insulated from the downturn and was adequately

13  managing its risk.  Defendants also falsely represented that Sterling was adequately

14  accounting for future loan losses and credit defaults and was well positioned to ride

15  out the economic storm – mostly because of its focus on the Pacific Northwest and its

16  purportedly close relationships with its borrowers, as set forth in more detail below.

17  **V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
    **AND OMISSIONS OF MATERIAL FACT DURING THE**
18  **CLASS PERIOD**

19   57.    Plaintiff alleges four categories of false and misleading representations

20  and omissions during the Class Period: (i) Sterling's financial results from 2Q08

21  through 2Q09 and the adequacy of Sterling's reserves for loan losses (*i.e.*, Sterling's

22  ALL Reserves and Provision for Credit Losses); (ii) defendants' statements

23  concerning the strength of Sterling's loan portfolio and the quality, integrity and

24  adequacy of Sterling's credit risk practices; (iii) defendants' statements concerning the

25  overall "safety and soundness" of Sterling's banking practices; and (iv) defendants'

26

1  statements regarding the strength of Sterling's capital position and overall financial

2  condition.

3       58.    Defendants also engaged in fraudulent acts and deceptive accounting

4  practices in combination with their false misrepresentations and omissions, including

5  manipulating Sterling's Classified Assets, NPAs and ALL Reserves and Provisions

6  for Credit Losses to inflate income and earnings.  Finally, defendants are liable for

7  material *omissions* because they failed to disclose, and intentionally concealed, known

8  risks that had already materialized within the Company which materially altered its

9  financial condition and ultimately damaged investors and Sterling's stock price.

10      59.    Defendants' false statements, omissions of material fact and deceptive

11  conduct in connection with investors' purchases of Sterling securities artificially

12  inflated Sterling's stock price during the Class Period and caused plaintiff and other

13  members of the Class to incur substantial damages when the artificial inflation was

14  removed from Sterling's stock price.  The particularized false statements are set forth

15  more fully below.

### A.    Sterling's False and Misleading Financial Results During the Class Period

### 1.    False and Misleading Financial Results in 2008

16

17

18

19  60.    On July 22, 2008, October 21, 2008 and January 28, 2009, Sterling issued

    its 2Q08, 3Q08 and FY08 financial results, respectively, containing the following

20  false results:

21

|                            | 2Q08     | 3Q08     | FY08      |
|----------------------------|----------|----------|-----------|
| Provisions for Loan Losses | $31.0M   | $37.0M   | $336.6M   |
| ALL Reserves               | $162.4M  | $177.3M  | $208.4M   |
| Nonperforming Assets       | $303.4M  | $436.7M  | $610.7M   |
| Classified Assets          | $497.5M  | $671.5M  | $984.9M   |
| Net Loan Receivable        | $9.219B  | $9.074B  | $8.807B   |
| Net Income (Loss)          | $11.7M   | $5.0M    | $(335.5)M |
| EPS (Diluted)              | $0.23    | $0.10    | $(6.51)   |

22

23

24

25

26

61.   The false 2Q08 results were repeated and discussed publicly on the following dates: July 23, 2008 (investor conference call); July 25, 2008 (SEC Form 8-K attaching an investor presentation defendants made on July 29-30, 2008 at the D.A. Davidson Investor Conference); August 8, 2008 (SEC Form 10-Q); and August 11, 2008 (SEC Form 8-K that included an investor presentation defendants made for 2008 Analyst Day).

62.   The false 3Q08 results were repeated and discussed publicly on the following dates: October 22, 2008 (investor conference call); November 7, 2008 (SEC Form 10-Q); and November 18, 2008 (SEC Form 8-K that included an investor presentation defendants made on November 18-19, 2008 at the D.A. Davidson Investor Conference).

63.   The misleading 4Q08 and FY08 results were repeated and discussed publicly on the following dates: January 28, 2009 (investor conference call); February 9, 2009 (SEC Form 8-K attaching an investor presentation defendants made on February 9-10, 2009 at the Sterne Agee Financial Services Symposium); March 3, 2000 (SEC Form 8-K attaching an investor presentation defendants made on March 2-4, 2009 at the Sandler O'Neill West Coast Financial Service Conference); and March 6, 2009 (SEC 2008 Form 10-K).

### 2.    False and Misleading Financial Results in 2009

64.   On April 23, 2009 and July 23, 2009, Sterling issued its 1Q09 and 2Q09 financial results, respectively, including the following financial information:

|  | 1Q09 | 2Q09 |
|---|---|---|
| Provisions for Loan Losses | $65.9M | $79.7M |
| ALL Reserves | $209.0M | $223.7M |
| Nonperforming Assets | $670.0M | $787.5M |
| Net Loan Receivable | $8.684B | $8.441B |
| Net Income (Loss) | $(20.4)M | $(29.5)M |
| EPS (Diluted) | $0.48 | $(0.65) |

65.    Defendants repeated the false 1Q09 results on the following dates: April 24, 2009 (conference call); May 6, 2009 (Form 8-K that included an investor presentation defendants made on May 6, 2009 at the D.A. Davidson & Co. 11th Annual Financial Services Conference); and May 8, 2009 (Form 10-Q).

66.    Defendants repeated the false 2Q09 financial results during a July 24, 2009 conference call and in the Company's Form 10-Q, signed and filed by defendants on August 7, 2009.

### 3.    False Sarbanes-Oxley Certifications

67.    In addition to reviewing, approving and signing Sterling's false financial results in 2Q08 through 2Q09, defendants Gilkey and Byrne also certified, under penalty of perjury, Sterling's financial results and financial reporting controls in accordance with §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  In those certifications, each defendant falsely represented as follows:

1.    I have ***reviewed*** this quarterly report on Form 10-Q of Sterling Financial Corporation;

2.    Based on my knowledge, this report does ***not contain any untrue statement of a material fact*** or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, ***fairly present in all material respects the financial condition***, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

### B.    Facts Supporting Falsity and Scienter for Sterling's Overstated Financial Results and Sarbanes-Oxley Certifications

68.    Sterling's financial results in 2Q08 through 2Q09 and defendants' certifications of those results pursuant to Sarbanes-Oxley were materially false and misleading for several reasons.  *First*, defendants materially understated Sterling's NPAs and Classified Assets and overstated its income and earnings by failing to

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)          - 24 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

properly account for millions of dollars in nonperforming construction loans that were due in 2008 and 2009 but were not paid.  *Second*, defendants deliberately ignored numerous red flags and failed to account for rapidly increasing risks that had already materialized at the time of publication of the 2008 and 2009 results.  *Third*, defendants deliberately manipulated Sterling's Provision for Credit Losses and recklessly kept ALL Reserves artificially low in order to conceal risk and inflate income and profits in the short term.  *Fourth*, defendants concealed the fact that Sterling's financial results were based on "unsafe or unsound banking practices and violation of law and/or regulations," as set forth in the FDIC's Order described more fully in §V.D.  Each of the foregoing reasons is set forth in more detail below.

1.    **Defendants Knew Sterling Was Understating Classified Assets and NPAs, Overstating Earnings and Concealing Risk by Improperly Accounting for Unpaid Construction Loans in *2008***

69.    At the time Sterling reported its 2Q08 through 4Q08 financial results, defendants knew the results drastically understated Sterling's Classified Assets, NPAs, exposure to risk and ALL Reserves, and overstated the Company's earnings and overall financial condition.  Defendants falsely mischaracterized hundreds of millions of dollars in unpaid construction loans that should have been accounted for as Classified and Nonperforming Assets – and properly reserved for – which would have reduced Sterling's earnings (or increased its losses) during 2008.

70.    Sterling's 2007 SEC Form 10-K states "Non-performing assets are a subset of classified assets, and consist of nonaccrual loans, restructured loans and real estate owned."  The 2007 Form 10-K further explains that "[a] loan is considered impaired or nonperforming, based on current information and events, if it is probable that Sterling will be unable to collect the scheduled payments of principal and interest when due *according to the contractual terms of the loan agreement*."

526557_1

CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS (2:09-cv-00368-EFS)

- 25 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

71.     According to Office of the Comptroller of Currency ("OCC") regulations and FDIC guidance, the level of NPAs is an important indicator of banking risk. The higher the level of NPAs, the more a company is required to reserve for future loan losses. With respect to bank lending, a borrower's failure to pay the principal and interest on a loan is a stark indicator of nonperformance.

72.     In 2005 and 2006, Sterling's NPAs were not a major concern for the Company because the economy was growing at a rapid pace and borrowers of construction loans were flush with cash due to a booming real estate market. Because of increased demand for real estate, Sterling's risk was mitigated by the ability of construction loan borrowers to quickly sell the properties underlying their construction projects and pay Sterling back within the typical 12- to 24-month repayment period. In fact, in 2005 and 2006, Sterling's borrowers actually paid billions *more* in principal than was contractually due in those years.

73.     For example, in 2005, although Sterling's "Principal Payments Due" from construction loans was $374.3 million, the Company actually received approximately $2.17 billion in payments on its construction loan portfolio, nearly *$1.8 billion in extra payments*, or approximately *480% more* than the amount contractually due in 2005. In 2006, the pattern continued – Sterling reported $550.9 million in Principal Payments Due but received approximately *$1.065 billion* in payments, *93% more* than contractually due in 2006.

74.     In 2007 and 2008, however, as the real estate and credit markets collapsed and the U.S. economy entered a full-blown recession, this trend completely reversed itself. In 2007, although Sterling's Principal Payments Due increased to $1.562 billion – due primarily to massive amounts of new construction loans made in 2005 and 2006 – Sterling only received $1.537 billion in payments, approximately $25 million *less* than the amount contractually due in 2007. This was an ominous red

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  flag for defendants as it indicated that borrowers were having problems paying back

2  their loans on time.  Ignoring this risk, defendants continued to recklessly lend ***billions***

3  in additional construction loans in 2007 without taking the necessary ALL Reserves

4  and adequately increasing its Provision for Credit Losses.  In fact, as set forth in

5  §V.B.4, Sterling actually fraudulently ***reduced*** its Provision for Credit Losses in

6  2Q08, demonstrating a deliberate attempt to hide risk from investors.

7      75.    In 2008, the risk in Sterling's construction loan portfolio increased to

8  catastrophic proportions.  Despite the fact that $2.17 billion (or 74%) of Sterling's

9  $2.94 billion total construction loan portfolio was contractually due in 2008 (during

10  the middle of the economic meltdown), Sterling only received approximately $1.01

11  billion in payments during the entire year, meaning construction borrowers ***failed to***

12  ***pay*** over ***$1.16 billion*** in principal contractually due in 2008.  In other words, at a time

13  when defendants were telling investors that Sterling was well insulated and adequately

14  managing risk due to its "cautious" loan underwriting, "conservative" lending

15  practices and personal relationships with its borrowers, defendants knew Sterling's

16  borrowers failed to pay back over ***$1.16 billion*** in principal payments due, or about

17  ***50%*** of the total amount contractually due in 2008.  These facts are illustrated in the

18  following chart:

| | 2005 ($ in thousands) | 2006 ($ in thousands) | 2007 ($ in thousands) | 2008 ($ in thousands) |
|---|---|---|---|---|
| Principal Payments Due | $   374,264 | $   550,858 | $1,562,065 | $2,172,912 |
| Total Payments Received | $2,170,317 | $1,065,258 | $1,537,591 | $1,012,267 |
| Overpayments (Underpayments) | $1,796,053 | $   514,400 | ($      24,474) | **($1,160,645)** |
| Ratio of Overpayments (Underpayments) to Principal Payments Due | 479.9% | 93.4% | (1.6%) | **(53.4%)** |

19      76.    Accordingly, under Generally Accepted Accounting Principles

20  ("GAAP"), OCC regulations and Sterling's own stated accounting policies,

21  defendants knew that a significant portion of the $1.16 billion in unpaid construction

loans should have been disclosed as Classified Assets and/or NPAs. Sterling's final 2008 results disclosed an increase in NPAs of only $379 million, far lower than necessary to account for $1.16 billion in nonperforming unpaid construction loans. Sterling's final 2008 results also disclosed $168 million in construction loans that were fully written off as uncollectible, and $221,000 in recoveries of previously written-off loans. Thus, even under the most conservative accounting, after subtracting those items from the overall $1.16 billion in unpaid construction loans in 2008, Sterling's NPAs were still understated in 2008 by approximately ***$613 million***. These calculations are illustrated below:

|  | 2008 ($ in thousands) |
|---|---|
| 2008 Past Due Amounts Unpaid Construction Loans | $1,160,645 |
| Less Construction NPAs Booked in 2008 | $  379,424 |
| Less Construction Loans Charged Off | $  168,471 |
| Plus Recoveries of Previous Loans Charged Off | $       221 |
| Amount of NPAs Understated in 2008 | **$  612,971** |

77.    Defendants' failure to classify unpaid construction loans as NPAs materially overstated both loan receivables and understated NPAs in Sterling's financial statements, both of which are important metrics of strong financial health. Further, by understating NPAs by at least $613 million in 2008, defendants also understated Sterling's ALL Reserve and Provision for Credit Losses and inflated earnings in 2008. Indeed, at the end of 2008, Sterling's ALL Reserve for construction loans was 24.4% of total construction NPAs. Defendants thus improperly avoided and concealed approximately ***$149.5 million*** ($613M x 24.4%) in additional ALL Reserves and Provisions for Credit Losses.

78.    Because the Provision for Credit Losses is an expense that directly reduces income and earnings, defendants overstated Sterling's reported pretax net income and earnings per share ("EPS") results for FY08 by approximately $149.5 million. Also, by understating the ALL Reserve, defendants overstated Sterling's loan

1  receivables and overstated its asset portfolio for FY08. These deliberate financial

2  manipulations rendered Sterling's 2008 financial results materially false during the

3  Class Period.

4         79.    Even if a portion of the $1.16 billion in unpaid construction loans in 2008

5  were previously designated as Classified Assets (which was never disclosed as such),

6  Sterling's Classified Assets were still materially understated, thereby overstating

7  earnings. When the total ending balance of Classified Assets in 2008 is subtracted

8  from the $1.16 billion in unpaid construction loans in 2008, Sterling's Classified

9  Assets were understated by over *$324* million in 2008. This calculation is illustrated

10 below:

|  | 2008 ($ in thousands) |
|---|---|
| 2008 Past Due Amounts Unpaid Construction Loans | $1,160,645 |
| Less Total Construction Classified Assets | $ 667,732 |
| Less Construction Loans Charged Off | $ 168,471 |
| Plus Recoveries of Previous Loans Charged Off | $ 221 |
| Amount of Classified Assets Understated in 2008 | **$ 324,663** |

15       80.    Because Sterling's Classified Assets were overstated by $324 million in

16 2008, its ALL Reserves were also understated. At the end of 2008, Sterling's ALL

17 Reserve was 17.7% of total Classified Assets. Thus, Sterling should have at least

18 increased its ALL Reserve and its Provision for Credit Losses by $58 million

19 ($324M x 17.7%), which would have reduced pretax income and earnings (and

20 increased losses) by $58 million in 2008. Defendants' improper accounting

21 manipulations materially misrepresented Sterling's financial results and its exposure

22 to risk.

23       81.    Additional facts show that defendants' accounting manipulations

24 intentionally concealed risk from the market. At the end of 2007, Sterling's SEC

25 Form 10-K reported that Sterling only had $657 million in principal payments from

26 construction loans due during the entire *three-year period* from 2009 to 2012. At the

CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS (2:09-cv-00368-EFS)   - 29 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1   end of 2008, however, the amount of principal payments due in 2009 suddenly
2   skyrocketed from $657 million at the beginning of 2008, to ***$2.08 billion*** at the end of
3   2008, with no explanation by defendants.  After subtracting the $602 million in ***new***
4   construction loans originated during 2008 from the $2.08 billion due in 2009, it is
5   clear that Sterling knowingly and improperly restructured and/or deferred the millions
6   in unpaid, nonperforming construction loan payments to 2009 in order to conceal
7   massive amounts of short-term risks from investors in 2008.

8       82.    Defendants' accounting manipulations not only had the effect of
9   understating classified assets and NPAs and overstating income and earnings during
10  2008, they also deceived investors into believing that Sterling had adequately
11  accounted for risk from the real estate market collapse and would be a safe place to
12  invest money during the U.S. recession.  Further, as set forth immediately below,
13  defendants' manipulations of unpaid NPAs allowed Sterling to also manipulate and
14  artificially reduce its ALL Reserves and Provisions for Credit Losses throughout the
15  Class Period, thereby inflating Sterling's earnings and stock price and masking its true
16  financial condition.

17      **2.    Defendants Knew Sterling Was Understating NPAs,
         Overstating Earnings and Concealing Risk by Improperly
18       Accounting for Unpaid Construction Loans in *2009***

19      83.    In 2009, defendants continued to manipulate Sterling's Classified Assets
20  and NPAs, thereby understating ALL Reserves and Provisions for Credit Losses and
21  inflating earnings.  As set forth above, $1.16 billion in construction loans in 2008 was
22  unpaid, and much of that risk was transferred and/or deferred into 2009.  This is
23  confirmed by the huge spike in construction loan payments due in 2009, from $657
24  million at the beginning of 2008 to ***$2.08 billion*** reported at the beginning of 2009.
25  Once again, however, Sterling's borrowers failed to pay approximately $1 billion of
26  the construction loans contractually due in 2009, as shown below:

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)          - 30 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

|  | 2009<br>($ in thousands) |
|---|---|
| Principal Payments Due | $2,083,295 |
| Total Payments Received | $1,083,247 |
| Underpayments | **($1,000,048)** |
| Ratio of Underpayments to Principal Payments Due | **(48.0%)** |

84.    In 2009, just like in 2008, defendants deliberately failed to classify unpaid construction loans as NPAs.  Sterling's final 2009 results disclosed an increase in NPAs of only $198 million, far lower than necessary to account for $1 billion in nonperforming unpaid construction loans.  Sterling's final 2009 results also disclosed $421 million in construction loans that were fully written off as uncollectible, and $6.8 million in recoveries of previously written-off loans.  Thus, even under the most conservative accounting, after subtracting those items from the overall $1 billion in unpaid construction loans in 2009, Sterling's NPAs were still understated in 2009 by approximately *$388 million*.  These calculations are illustrated below:

|  | 2009<br>($ in thousands) |
|---|---|
| 2009 Past Due Amounts Unpaid Construction Loans | $1,000,048 |
| Less Construction NPAs Booked in 2009 | $   197,837 |
| Less Construction Loans Charged Off | $   420,539 |
| Plus Recoveries of Previous Loans Charged Off | $       6,803 |
| Amount of NPAs Understated in 2009 | **$   388,475** |

85.    Further, by understating NPAs by at least $388 million in 2009, defendants also understated Sterling's ALL Reserve and Provision for Credit Losses and inflated earnings in 2009.  At the end of 2009, Sterling's ALL Reserve for construction loans was 27.1% of total construction NPAs.  Defendants thus improperly avoided and concealed approximately *$53 million*, *i.e.*, half of *$105.4 million* ($388M x 27.1%), in additional ALL Reserves and Provisions for Credit Losses for 1Q09 and 2Q09.

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 31 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

86.    As explained above for 2008, defendants' failure to disclose unpaid construction loans as NPAs, even though those loans were clearly nonperforming pursuant to the original terms of the loan contracts, had the effect of understating NPAs and inflating income and earnings in 2009.    Defendants' accounting manipulations allowed Sterling to keep its ALL Reserves and Provision for Credit Losses at artificially reduced levels during 1Q09 and 2Q09.  Had defendants properly accounted for the unpaid construction loans, Sterling's income and earnings would have been materially lower than reported.

### 3.    Defendants Deliberately Ignored Numerous Red Flags and Manipulated Sterling's ALL Reserves and Provision for Credit Losses to Conceal Risk and Inflate Earnings

87.    As set forth in §IV.B., at the time Sterling issued its 2Q08 financial results, defendants had four consecutive quarters of detailed internal and external data clearly showing catastrophic increases in risk and severe deterioration in Sterling's loan portfolio – especially its residential construction loans, which made up an increasingly large percentage of its loan portfolio.  All of these factors pointed to explosive risk, as set forth below:

- Between 2Q07 and 2Q08, nonperforming construction loans increased nearly *2,600%*, from $9 million to $253 million;

- Between 2Q07 and 2Q08, Nonperforming Loans increased *882%*, from $29 million to $280 million;

- Between 2Q07 and 2Q08, Nonperforming Assets increased *809%*, from $33 million  to $303 million;

- Between 2Q07 and 2Q08, loans 60 days or more past due increased *914%*, from $28 million to $288 million;

- By 2Q08, nonperforming construction loans constituted *90.3%* of Nonperforming Loans, compared to only 33% in 2Q07;

- By 2Q08, nonperforming construction loans constituted *83%* of total Nonperforming Assets, compared to only 28% in 2Q07;

- • Between 2Q07 and 2Q08, Classified Assets increased *424%*, from $95 million to $497 million;

- • Between 4Q07 and 2Q08, classified construction loan assets increased *172%*, from $121 million to $329 million;

- • Between 2Q07 and 2Q08, the delinquency ratio for loans 60 days or more past due as a percentage of total loans increased *830%*, from 0.33% to 3.07%;

- • Between 2Q07 and 2Q08, the ratio of total NPAs to total assets increased *754%*, from 0.28% to 2.39%; and

- • Between 2Q07 and 2Q08, the ratio of total Nonperforming Loans to loans increased *779%*, reaching 2.99%.

- • Between 2Q07 and 2Q08, foreclosures were skyrocketing as the amount of net Real Estate Owned and other collateralized assets increased about *475%*, from $4 million to $23 million;

88.    These known risks and red flags required Sterling to account for that risk by *increasing* its ALL Reserves and Provisions for Credit Losses to adequate levels to prevent a sudden sharp collapse in Sterling's earnings when loans defaulted. Nevertheless, defendants kept ALL Reserves and Provision for Credit Losses artificially low to conceal risk.

89.    Defendants' manipulations can be illustrated with a simple example. Between 2Q07 and 2Q08, the growth in Sterling's nonperforming loans skyrocketed *855%*, Nonperforming Assets increased *809%* and delinquent loans 60 days past due increased 914%. Despite these shocking indicators of increased risk, defendants deliberately kept the ALL reserve low – increasing it by only 63% during the same period. This stark discrepancy is illustrated below:

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 33 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26





**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)      - 34 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

90.     Sterling's risk continued to increase after 2Q08 during the Class Period. From 2Q08 to 2Q09, nonperforming residential construction loans increased **94%**, nonperforming construction loans increased **135%**, Nonperforming Loans increased **149%**, gross Nonperforming Assets increased **160%** and Classified Assets increased **144%**:

| | 2008 | | | 2009 | |
|---|---|---|---|---|---|
| | 2Q | 3Q | 4Q | 1Q | 2Q |
| Nonperforming Residential Construction Loans ($ in thousands) | **$240,900** | $316,782 | $410,338 | $   453,383 | **$   467,250** |
| Nonperforming Construction Loans ($ in thousands) | **$253,170** | $338,391 | $484,839 | $   532,271 | **$   594,970** |
| Nonperforming Loans ($ in thousands) | **$280,409** | $381,752 | $530,790 | $   569,439 | **$   697,733** |
| Gross Nonperforming Assets | **$303,407** | $436,709 | $610,665 | $   669,951 | **$   787,454** |
| Classified Assets | **$497,461** | $671,503 | $984,875 | $1,070,383 | **$1,215,271** |

91.     Similarly, the ratio of loans 60 days or more past due to total loans increased **110%**:

| | 2008 | | | 2009 | |
|---|---|---|---|---|---|
| | 2Q | 3Q | 4Q | 1Q | 2Q |
| Delinquency Ratio for Loans 60 Days or More Past Due as a % of Total Loans | **3.07%** | 3.69% | 4.86% | 5.24% | **6.45%** |

92.     Further, the ratio of total NPAs as a percentage of total assets increased **166%**, and the ratio of total Nonperforming Loans to loans increased **169%**:

| | 2008 | | | 2009 | |
|---|---|---|---|---|---|
| | 2Q | 3Q | 4Q | 1Q | 2Q |
| Total Nonperforming Assets as a % of Total Assets | **2.39%** | 3.46% | 4.77% | 5.23% | **6.35%** |
| Total Nonperforming Loans as a % of Loans | **2.99%** | 4.13% | 5.89% | 6.40% | **8.05%** |
| Total Nonperforming Assets as a % of Loans | **3.23%** | 4.72% | 6.77% | 7.53% | **9.09%** |

93.     In the aggregate, between 2Q08 and 2Q09, the growth in nonperforming loans significantly increased 149%, Nonperforming Assets increased 190% and loans

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)      - 35 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

60 days or more past due increased 94%. Despite these increases, defendants only
increased the ALL Reserve by 38% during this period:

|  | 2008 | | | 2009 | |
| --- | --- | --- | --- | --- | --- |
|  | 2Q | 3Q | 4Q | 1Q | 2Q |
| Allowance for Loan Losses ($ in thousands) | **$162,368** | $177,307 | $208,365 | $208,985 | **$223,709** |



1
2
3
4
5
6
7
8
9
10
11
12
13



14    94.    Similar to the 2008 trends, as the economy got progressively worse

15 during the Class Period, the ratio of ALL reserves to total NPAs *decreased* throughout

16 the Class Period, when it should have *increased*.  Only after the FDIC issued its Order

17 did defendants *increase* the ALL Reserves to appropriate levels:

18

| | 2008 | | | 2009 | | | |
|---|---|---|---|---|---|---|---|
| | 2Q | 3Q | 4Q | 1Q | 2Q | 3Q | 4Q |
| ALL Reserves to Total Nonperforming Loans | 57.90% | 46.45% | 39.30% | 36.70% | 32.06% | **36.89%** | **38.30%** |

22    95.    Similarly, the ratio of ALL Reserves to total Nonperforming Assets

23 decreased during the Class Period.  Only after the FDIC Order did defendants properly

24 increase the ratio:

25
26

|  | **2008** | | | **2009** | | | |
|---|---|---|---|---|---|---|---|
|  | **2Q** | **3Q** | **4Q** | **1Q** | **2Q** | **3Q** | **4Q** |
| ALL Reserves to Total Nonperforming Assets | 53.51% | 40.60% | 34.12% | 31.19% | 28.41% | **33.27%** | **34.78%** |

96.    Similarly, during the Class Period, ALL Reserves as a percentage of total loans increased at a significantly slower rate than the ratio of Nonperforming Loans as a percentage of total loans, only to reverse after the Class Period:

|  | **Rate of Quarterly Increase in ALL Reserves as a % of Total Loans** | **Rate of Quarterly Increase in NPLs as a % of Total Loans** |
|---|---|---|
| **2Q08** | 10.57% | 45.00% |
| **3Q08** | 10.74% | 38.06% |
| **4Q08** | 20.60% | 42.69% |
| **1Q09** | 1.68% | 8.76% |
| **2Q09** | 9.86% | 25.75% |
| **3Q09** | **29.55%** | **12.60%** |
| **4Q09** | **33.57%** | **28.54%** |

### 4.    Defendants' Manipulations of Sterling's Provision for Credit Losses Reinforces Scienter

97.    Despite the enormous increase in nonperforming construction loans, total Nonperforming Loans, total Nonperforming Assets, total Classified Assets and loans 60 days or more past due for four consecutive quarters (2Q07 through 2Q08), Sterling deliberately *reduced* its Provision for Credit Losses, which gave investors the false impression that Sterling's risk for credit losses was *decreasing* from 1Q08 to 2Q08:

|  | **2008** | |
|---|---|---|
|  | **1Q** | **2Q** |
| Provisions for Credit Losses ($ in thousands) | 37,143 | **30,987** |

98.    Defendants also intentionally *reduced* its Provision for Credit Losses on residential construction loans:

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 38 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

|  | 2008 | |
|---|---|---|
|  | 1Q | 2Q |
| Provisions for Residential Construction Loans ($ in thousands) | 23,615 | **13,641** |

99.    Defendants also ***decreased*** the Provision for Credit Losses in residential construction loans in 2Q08 and 3Q08 even though nonperforming residential construction loans increased drastically:

|  | 2007 | 2008 | | |
|---|---|---|---|---|
|  | 4Q | 1Q | 2Q | 3Q |
| Provisions for Residential Construction Loans ($ in thousands) | 10,353 | 23,615 | **13,641** | 10,894 |
| Nonperforming Residential Construction Loans ($ in thousands) | 102,373 | 168,520 | **240,900** | **316,782** |

100.    Despite these adverse trends and increasing risk, in 1Q09 defendants again reduced Sterling's Provision for Credit Losses. Whereas Sterling's NPAs increased by 9.7%, defendants improperly ***reduced*** the Provision for Credit Losses by ***71%***. Similarly, even though Sterling's nonperforming residential construction loans increased 10.4% in 1Q09, defendants ***decreased*** the Provision for Credit Losses for residential construction loans by ***80%***. These facts evidence an intentional attempt to falsify Sterling's financial results and conceal risk.

**5.    Defendants' Misleading Explanations in 4Q08 Regarding Sterling's Financial Results Reinforce Falsity and Scienter**

101.    On January 27, 2009, Sterling reported its 4Q08 and FY08 financial results. The results announced $228.5 million in total 4Q08 Provisions for credit losses, including $173 million related to residential construction loans. Defendants also charged off $223.3 million in loans. Instead of telling investors the truth, however – that Sterling's deliberately reckless practices, sharp increases in construction loans and failure to adequately account for known risk caused the increased ALL Reserves – defendants blamed the increases on an alleged ***sudden*** and

unexpected economic change in *4Q08*, which purportedly resulted in new appraisal values and a modified approach to assessing fair values of properly underlying Sterling's loans.  In the January 27, 2009 press release, Gilkey stated:

> "*During the fourth quarter of 2008, we witnessed acceleration in the slowdown of the economy, which caused higher levels of credit stress among our borrowers and an elevation in the level of both our non-performing and classified assets.  We, therefore, modified our approach in determining the fair market value of loans identified as impaired.  The weakening economy, the increased charge-offs and declines in real estate appraisal values led to the higher level of credit provisioning in the quarter*."

102.    In the same press release, Sterling cryptically blamed the increased charges on a "modified methodology" in calculation appraisal values:

> *This provision stems from higher levels of classified assets, which include non-performing loans and REO; it reflects significant declines in appraisal values of real estate and the implementation of a modified methodology to determine the fair value on impaired loans*.

103.    In a follow-up January 28, 2009 conference call, Gilkey stated:

> GILKEY: There were several factors that led us to set-aside a larger provision compared to what we expected earlier in the fourth quarter.  First and foremost, the provision relates to a decline in appraisal values of real estate.  *As we began the fourth quarter, we began to see adverse trends in real estate values in our primary markets.  As we got deeper into the quarter and particularly into December, we saw appraisal valuations fall significantly in many of our markets*.  These valuations affected not only the specific assets but also resulted in adjustments to our loan loss provision rates that we used to evaluate the rest of the portfolio.

104.    This explanation was deliberately misleading.  In fact, median home prices in Sterling's key residential construction markets had been consistently declining for numerous quarters, as illustrated below:

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 40 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

| S&P/CASE-SHILLER HOME PRICE INDICES[4] | | | | |
|---|---|---|---|---|
| | Los Angeles-Long Beach-Santa Ana, CA | San Diego-Carlsbad-San Marcos, CA | Portland-Vancouver-Hillsboro, OR-WA | Seattle-Tacoma-Bellevue, WA |
| Year | % Change (Month) | % Change (Month) | % Change (Month) | % Change (Month) |
| October 2007 | -1.76% | -1.99% | -0.06% | -0.80% |
| November 2007 | -3.04% | -2.87% | -0.35% | -0.77% |
| December 2007 | -2.72% | -2.50% | 0.05% | -0.47% |
| January 2008 | -2.93% | -1.95% | -0.88% | -0.80% |
| February 2008 | -3.60% | -3.48% | -0.88% | -0.70% |
| March 2008 | -3.42% | -2.38% | -1.27% | -1.21% |
| April 2008 | -2.38% | -3.15% | -0.23% | -0.02% |
| May 2008 | -2.68% | -1.98% | -0.46% | -1.03% |
| June 2008 | -2.07% | -2.50% | -1.05% | -0.98% |
| July 2008 | -2.39% | -2.50% | -1.06% | -1.28% |
| August 2008 | -2.21% | -2.40% | -1.43% | -1.06% |
| September 2008 | -2.73% | -2.54% | -1.37% | -1.24% |
| October 2008 | -2.18% | -2.39% | -1.66% | -1.25% |
| November 2008 | -1.61% | -1.70% | -1.89% | -1.78% |
| December 2008 | -2.25% | -1.22% | -1.83% | -2.86% |

| MEDIAN HOME PRICE (THOUSANDS)[5] | | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | | | |
| Metropolitan Statistical Area | 4Q | 1Q | 2Q | 3Q | 4Q |
| Seattle-Tacoma-Bellevue, WA | 377.5 | 372.3 | 380.5 | 350 | 325.9 |
| Portland-Vancouver-Hillsboro, OR-WA | 290.5 | 286.6 | 286.1 | 278.6 | 264.5 |
| Sacramento-Arden-Arcade-Roseville, CA | 297.6 | 258.5 | 229.5 | 212 | 187.9 |
| Los Angeles-Long Beach-Santa Ana, CA | 516.6 | 460.5 | 418.9 | 390.6 | 354.3 |
| San Diego-Carlsbad-San Marcos, CA | 522.9 | 459 | 434.9 | 377.3 | 332.8 |

105. Accordingly, defendants' excuse for the increase in ALL Reserves and Provision for Credit Losses – that there was a sudden, unexpected decline in appraised

[4]    The table displays monthly percent changes in the S&P/Case-Shiller Home Price Indices for the metropolitan statistical areas. http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us.

[5]    This median home price data is provided by the National Association of Realtors®. http://www.realtor.org/research.

526557_1

CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS (2:09-cv-00368-EFS)        - 41 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  real estate values all at once in 4Q08 – was knowingly untrue.  Defendants already

2  were aware of severe adverse trends for several prior quarters, including sharp

3  increases in NPAs and delinquencies and declining home prices.  Defendants also

4  knew there were hundreds of millions of dollars in unpaid construction loans that were

5  due and payable in 2008, but were not paid.  Their explanation that the 4Q08 losses

6  were due to a sudden and unexpected drop in home prices was materially misleading

7  and corroborates the inference of scienter.

8         **6.**  **Defendants' Representations Concerning Their Close
   Personal Relationships with Borrowers and Their
9   Admissions that They Closely Monitored and
   Reviewed Every Loan in Sterling's Portfolio Supports
10  a Strong Inference of Scienter**

11       106.  Defendants' knowledge of their misleading statements and concealment

12  of risk is also shown by admissions concerning defendants' close scrutiny and

13  monitoring of Sterling's loan values.  During a January 29, 2008 conference call,

14  defendants bragged about their detailed evaluation of "***every residential loan***" in the

15  Company's portfolio and represented that their ***close relationships with borrowers***

16  allowed them to timely and accurately calculate their potential loss:

17      GILKEY: ***[O]ver the past 90 days we have reviewed our position
   on every residential loan in our portfolio***.  We have received updated
18  appraisals or broker's opinion[s] of value, which, of course, are more
   current.

19
       And either our credit administrator or our special asset staff have
20  ***met with these borrowers and/or have inspected all of the projects*** in
   Boise[, Idaho] and Bend[, Oregon], where we are seeing the biggest
21  slowdown in our market area.

22              \*      \*      \*

23      ***We are comfortable with the valuation on these properties.  A
   majority of our residential construction borrowers have long-term
24  relationships with our lending officer and our company.  So we feel we
   have a good understanding of their business, and we are confident that
25  they are solid bank customers***.

26              \*      \*      \*

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)   - 42 -

*We have indeed had our credit administration and our loan officers review each of our construction loans, and we have got an updated appraisal or a broker's opinion. So we feel that we have got as good a handle on valuation as you can.*

107.    In Sterling's July 22, 2008 press release, defendants again boasted about their "high-quality" loan relationships that would offset risk:

Lending results for the second quarter of 2008 *reflect the focus of Sterling's lending staff on increasing high-quality loan relationships* to offset the runoff in residential construction and repayments in the mortgage-backed securities portfolio.

108.    In a later October 22, 2008 conference call, analysts asked Gilkey pointedly about Sterling's reliance on the Puget Sound market and its personal client "relationships" to mitigate risk:

CLARK: I guess, just lastly, your Puget Sound exposure on the resi[dential] construction side, call it, you know, it's your largest market, albeit it's your strongest market. The non-accruals there, what's gone bad is about only 4%. I guess what's your confidence in that not moving up materially from here? *Have you called all of your relationships* there and if you could just again provide some color on that piece of the business?

\*        \*        \*

GILKEY: *[T]he Puget Sound area is holding up extremely well, particularly as you are in downtown Seattle*.

109.    In January 2009, defendants also represented that, due to the acceleration of NPAs in 4Q08, they modified their approach in assessing the fair value of loans. They disclosed that Sterling suddenly stopped taking into account "*personal guarantees*" from borrowers in assessing the cash flow from loans to calculate the fair value of the loans. In a January 27, 2009 press release, Sterling stated:

Sterling modified its methodology in determining the fair value of loans being tested for impairment during the quarter. The fair value is now determined *excluding* the potential cash flows from *certain guarantors*.

110.    Byrne also admitted during the January 28, 2009 conference call:

1
2

     BYRNE: [W]e did modify our approach in determining the fair values on certain impaired loans to ***exclude the values of borrowers' personal guarantees***.

3     111.   These admissions demonstrate that defendants were so desperate to hide

4 the extent of Nonperforming Loans during 2008 that they recklessly used ***personal***

5 ***guarantees*** and assurances (*e.g.*, verbal commitments) from borrowers to determine

6 the eventual cash flow from loans in order to value the loans and quantify credit risk.

7 These disclosures confirm that defendants knew Sterling was ***not*** operating a safe and

8 sound banking practice as they misleadingly boasted throughout the Class Period, and

9 that the risk of losses in the $2 billion in construction loans due in 2009 had already

10 materialized.

11         **7.**    **Facts Reported by Former Sterling Employees**
12                **Support a Strong Inference of Scienter**

     112.   According to multiple former Sterling employees with personal

13 knowledge of the Company's business practices during the Class Period, Sterling's

14 underwriting and credit risk controls were not as represented to investors.  According

15 to a former Assistant Relationship Manager for Sterling Savings in Portland between

16 2005 and 2008, Confidential Witness ("CW") 1, Sterling lacked defined procedures,

17 processes and systems for the underwriting of new loans and the monitoring of

18 existing loans.  This was directly contrary to defendants' statements to investors about

19 "disciplined" and "cautious" underwriting.  The witness stated that the problems were

20 compounded by Sterling's extremely lax credit standards, which caused Sterling to

21 approve loans to borrowers who had been rejected by other banks.  CW1 stated that

22 the lack of standard guidelines and procedures was riskier and not typical of other

23 banks in the industry.  CW1 knew this because he/she worked at a major U.S. bank

24 prior to working at Sterling.  The witness said he/she expressed concerns about

25 Sterling's lending and underwriting practices, but his/her concerns were not

26 addressed.  CW1 voluntarily left Sterling in fall 2008 because he/she had serious

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)

- 44 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  concerns about Sterling's business practices and saw signs that the Company might

2  not survive.

3       113.    One of the main problems identified by CW1 was that Sterling relied

4  heavily on personal relationships and verbal assurances from borrowers rather than

5  adhering to strictly defined lending and underwriting standards.  CW1 described

6  instances where loans were given to "friends of friends" and borrowers who had

7  relationships with Sterling or its clients based on creative underwriting that did not

8  follow defined underwriting standards.  For example, CW1 described a $5 million

9  loan granted to the daughter of a big Sterling client that should not been approved and

10  would never have been approved, for any other borrower, but for her familial

11  relationship to Sterling's large client.  CW1 also reported that it was a common "red

12  flag" for borrowers to fail to provide adequate documentation on their financial

13  condition, but Sterling would approve the loans anyway based on personal verbal

14  assurances of future funds.  CW1 also said it was common practice for Sterling to

15  provide additional loans to borrowers who were already having financial difficulties.

16       114.    According to CW1, Sterling's inadequate practices caused it to exclude a

17  lot of risk in evaluating and rating its loan portfolios.  CW1 stated that Sterling wanted

18  to exclude risk so that it did not have to downgrade loans and increase reserves.  CW1

19  stated that his/her loan portfolio typically exceeded $100 million, and of that amount,

20  approximately 30% of the loans should have been – but were not – downgraded to

21  lower ratings (which would require increased reserves).  CW1 also reported that

22  Sterling's system for rating loan quality was often based on verbal assurances from

23  borrowers, which would skew the rating that was otherwise appropriate based on the

24  actual loan data.  CW1 stated that the verbal assurances were not documented, and

25  Sterling's reliance on such assurances caused risk to be excluded.  CW1 stated that the

26

1  practice of approving loans based on personal assurances was part of Sterling's

2  "Hometown Helpful" marketing approach.

3      115.  CW1 also explained Sterling's internal audit system.  He/she stated that

4  his/her office was informed three days in advance that it was going to be audited and

5  of the precise items that would be audited.  Thus, according to CW1, Sterling had just

6  enough time to ensure that the specific items would be made complete.  CW1 said this

7  process basically negated the purpose of the audit in the first place.

8      116.  CW1 stated that all loans originated in his/her Sterling location had to be

9  approved by Sterling's Credit Committee in Spokane, which consisted of several

10  senior Sterling personnel.  Although CW1 could not recall whether Gilkey or Byrne

11  attended the meetings, Sterling's Chief Credit Officer, Steve Page, attended the

12  meetings and reported directly to Gilkey.  The Credit Committee held meetings

13  weekly to discuss the status of loans.  CW1 also stated that loans were often approved

14  without taking into account Sterling's position as a secured creditor.  Thus, when

15  loans defaulted, Sterling could not recoup its losses.

16      117.  According to CW2, a former Sterling Construction Credit Analyst in its

17  Oregon region from 2005 to June 2008, the Company's construction lending began to

18  drop off in *2007* and there was a ***major decline in early 2008***, even in the traditionally

19  strong Portland market.  CW2 knew this because he/she was responsible for

20  underwriting new construction loans before they were sent to Spokane headquarters.

21      118.  CW2 also stated that from mid-2007 onward, there was increasing

22  concern about the ***quality*** of Sterling's construction loans that had already been

23  extended, and that Sterling began downgrading the risk ratings of the loans.  CW2

24  noted that some loans were not downgraded because loan officers relied on their

25  personal relationships with borrowers in evaluating risk.  These relationships,

26  especially with big builders, sometimes "overrode the hard numbers" concerning risk

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)    - 46 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    evaluation.  CW2 said Sterling continued to lend to some builders even after their

2    loans were downgraded, increasing future risk.  There were also problems with

3    Sterling's underwriting of construction loans, including many loan officers' failure to

4    review the preliminary underwriting "write-ups" for the loans.  The witness stated that

5    in **early 2008**, it became very apparent from construction borrowers' inventory reports

6    that they had increasing levels of finished houses that remained unsold.  CW2 also

7    reported that many of the construction loans were "on spec," meaning the developer

8    did not pre-sell the houses and intended to find buyers for the houses only after they

9    were already built.  CW2 noted that Sterling's executives paid lip service to the

10   problems even though Sterling's employees knew that things were getting worse

11   during early 2008.

12       119.   The sharp drop-off in residential construction lending was corroborated

13   by CW3, a former Vice President of Sterling Savings who was involved in managing

14   residential construction lending for Sterling's "Action Mortgage" group, a

15   construction loan unit previously acquired by the Company.  CW3 worked at

16   Action/Sterling from 2001 to 2010 and was personally involved in monitoring the

17   quality and risk of Sterling's residential construction loan portfolio and briefing

18   Sterling's top executives.

19       120.   CW3 confirmed that the downturn in residential construction lending

20   **began in 2007**.  The witness stated that because homebuyers were increasingly unable

21   to get financing to buy homes, construction builders were unable to pay their loans for

22   the unsold units already built.  CW3 also observed that it was likely the case that

23   Sterling had more exposure to risk than initially disclosed. CW3 confirmed that the

24   vast majority of Sterling's construction loans had not been rated very high from a risk

25   standpoint (meaning the loans were not low risk) and that Sterling extended loans to

26

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)          - 47 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  borrowers with risk ratings that were lower than what Sterling considered to be high

2  quality loans.

3     121.   CW3 stated that, by late 2008, it was manifestly clear that the market in

4  the Pacific Northwest had been **_fully impacted_** by the economic downturn,

5  culminating in the bankruptcy of one of Sterling's largest clients (Renaissance

6  Homes). This contradicts defendants' repeated representations throughout the Class

7  Period regarding the strength and quality of the Pacific Northwest market that

8  purportedly would protect Sterling from substantial risk.

9     122.   According to CW4, a former Sterling Corporate Banking Team Leader in

10 the Oregon region from 2001 to 2010, the drop in residential construction lending in

11 2007 and early 2008 also impacted the corporate lending group **_as early as 4Q07_**. At

12 that time, there were clear signs that corporate borrowers who used the money to

13 finance and sell their input services to developers for construction projects (_e.g._,

14 carpeting businesses and cabinet-making companies) were impacted by the downturn

15 in the residential construction industry. CW4 stated that the commercial borrowers

16 were having increasing trouble paying back their loans due to the fact that they were

17 either not being paid by the construction developers or not getting new contracts.

18 CW4 stated that the problems **_began in 4Q07_** and persisted into the first three quarters

19 of 2008. The witness said that there were clear signs of deterioration that were

20 definitely known by Sterling personnel in both the Spokane and Portland offices, and

21 loans were downgraded because of increased risk. Furthermore, CW4 corroborated

22 CW3 in stating that Portland was not insulated from the downturn and was fully

23 impacted in late 2008 and continuing into 2009. CW4 observed that Sterling's

24 attempt to grow by increasing construction lending and leveraging those loans on

25 Sterling's balance sheet to purchase other banks was akin to a game of "musical

26

1   chairs," and Sterling got caught without a chair, at which time everything came

2   crashing down.

3       123.   Another witness, CW5, a former loan officer in residential construction

4   lending for Sterling's Action Mortgage Group from October 2003 until June 2008,

5   confirmed that Sterling's construction loan portfolio was deteriorating before and into

6   the Class Period.  CW5 reported that, six months before his/her departure in June

7   2008, there was already concern about Sterling's residential construction loans.  The

8   witness stated that Sterling was "over-concentrated" in residential construction loans

9   relative to the size of Sterling's complete loan portfolio, and by late 2007/early 2008,

10  it was clear that many of Sterling's residential construction borrowers were

11  experiencing problems trying to sell the homes they had built and would also be

12  unable to adequately service their loans.  CW5 also confirmed that Sterling carried

13  high risk and poor quality loans on its books due to its status as a smaller bank.  CW5

14  explained that because Sterling could not compete against major lenders such as Bank

15  of America or Wells Fargo for high caliber borrowers, Sterling ended up with

16  "second-tier borrowers," which, in Oregon, implied dealing with many "higher risk"

17  residential construction developers to whom larger banks would not lend money.

18      124.   CW5 further stated that the problems and concerns emerging in 2007

19  materialized in 2008.  By June 2008, it was clear that there was no basis to believe

20  matters would improve or that the economy and real estate market would rebound in

21  the second half of 2008 or 2009.  CW5 confirmed that Sterling lent monies to various

22  residential construction developers who had built homes that were not pre-sold at the

23  time construction commenced and were not selling because of the decline in real

24  estate prices.  CW5 also confirmed that personnel at the Spokane headquarters were

25  completely aware and informed of these negative developments.

26

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)

- 49 -

125.   CW5 also stated that Sterling refinanced and restructured an unusually high of number of loans to provide relief to borrowers experiencing financial difficulties.   Sterling refinanced residential construction loans by extending the repayment period 12 to 18 months beyond when repayment of the loans had originally been due.   CW5 stated that the refinancings increased during the first half of 2008. Also, CW5 confirmed that Sterling's restructuring enabled it to "extend more money to replenish the [borrower's] interest reserve."   In other words, Sterling threw good money after bad to borrowers who already were having trouble paying their original construction loans.

126.   The deterioration in Sterling's construction lending was also corroborated by CW6, a former Sterling Commercial Loan Officer from 2005 until May 2008. CW6 participated in underwriting, evaluating and monitoring loans originating from Sterling's Utah office.   CW6 stated that *in 2Q07 and 3Q07*, there were clear and significant signs of deterioration in residential construction loans, including higher delinquencies, and a material increase in borrower risk that continued until CW6 left the Company in May 2008.   CW6 stated that there were many increased risk factors, including lower borrower cash flows and higher numbers of unsold units in construction projects.   CW6 also confirmed that one of Sterling's responses to borrowers' delinquencies was to change the terms and covenants of the loans from the original contracts.   The witness stated that construction loan delinquencies were documented in a "delinquency report" that included delinquencies from all regions. CW6 confirmed that the reports demonstrated that many Sterling regions were impacted by the construction downturn.   In fact, the downturn was so severe in 2007 and early 2008 that Sterling shut down CW6's Utah office completely.

127.   According to CW7, a former high ranking executive who left Sterling in summer 2006, the most important factor by far in assessing Sterling's capital ratio

requirements was the ALL Reserve. CW7 stated that **Gilkey and Byrne** were definitely involved with the determination of the ALL Reserves. In fact, Gilkey "oversaw the processes, approved the procedures and maintained the standards" for how the ALL Reserve was determined, and both Gilkey and Byrne received quarterly reports on the ALL Reserves and monthly reports on the capital ratio status. Although CW7 left Sterling before the beginning of the Class Period, this information supports the inference of Gilkey and Byrne's knowledge and participation in Sterling's ALL Reserve manipulations during the Class Period. Furthermore, CW7 stated that defendant Byrne essentially took over the role of Chief Accounting Officer in mid-2006, including determining Sterling's monthly capital ratio requirements.

## C.   False Statements Concerning "Safe and Sound" Banking Practices

128.   Throughout the Class Period, defendants told investors that they were operating a "safe and sound" bank, which purportedly allowed Sterling to absorb credit losses in a deteriorating economy.

129.   <u>October 21, 2008 Press Release</u>:   On October 21, 2008, Sterling announced 3Q08 results in a press release quoting CEO Gilkey as follows:

> "Operationally, Sterling's execution was solid. We slightly reduced the size of our balance sheet while shifting our mix of assets away from residential construction. We grew our deposits. We controlled operating costs. Our liquidity and capital positions remained strong. Our credit administration team proactively managed loan portfolio risk. ***In sum, we are managing through a difficult credit cycle while maintaining a safe, sound and secure banking practice***."

130.   <u>October 22, 2008 Conference Call</u>:   On October 22, 2008, Gilkey made similar false statements in a conference call assuring investors that Sterling's safe and sound banking practices resulted in a strong capital position:

> GILKEY: Our employees' dedication to clients and to community is our unique hometown-helpful manner. It mattered more than ever and was a key contributor to the solid performance of our underlying bank. ***Thanks to safe, sound, secure banking discipline, our capital reserves and liquidity position remain strong***. We continue to shift our asset mix

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)   - 51 -

towards high-quality lending relationships in the business and consumer segments. We made good and ongoing progress in growing business-related fee income and deposits. We are indeed controlling our overhead through systematic process improvement. Our credit team has the skill and the tenacity to resolve problem assets.

131. <u>January 27-28, 2009 Press Release and Conference Call</u>: In a January 27, 2009 press release and a follow-up conference call announcing 4Q08 and FY08 results, Gilkey again falsely represented:

"Throughout the year, Sterling has taken steps to enhance and preserve its capital base and protect customer deposits. As a result, Sterling remains well capitalized. *We continue to be committed to safe, sound and secure banking practices*."

\*     \*     \*

GILKEY: During the quarter *Sterling proactively took initiatives to enhance its capital position to create a safety and soundness buffer to absorb credit losses*.

As a result, Sterling ended the year with *one of the strongest capital positions in its history.*

132. <u>July 23, 2009 Press Release</u>: On July 23, 2009, when announcing 2Q09 results, Gilkey continued to misrepresent Sterling's safe and sound practices:

"Throughout this credit cycle, Sterling has acted proactively to maintain healthy capital ratios and a strong liquidity position. *Our commitment is to continue maintaining a safe, sound and secure banking practice for the benefit of customers, shareholders and employees*."

**D.    Facts Supporting Falsity and Scienter for Statements Regarding Safe and Sound Banking Practices**

133. Defendants' statements that Sterling employed safe and sound banking practices for the benefit of shareholders were knowingly false. As set forth in §V.B., defendants knew Sterling was in fact violating law and engaging in unsafe and unsound practices by, among other things, maintaining a large quality of poor loans, maintaining an unacceptable level of NPAs, giving out additional credit to defaulted borrowers, having insufficient capital in relation to poor quality loans, maintaining inadequate ALL Reserves and maintaining reckless management.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 52 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

134.    On October 15, 2009, Sterling revealed that the FDIC and the WDFI had investigated Sterling's financial and operational condition and concluded that the bank had engaged in ***unsafe and unsound*** banking practices:

> The FDIC and the WDFI considered the matter and determined that they had reason to believe that the ***Bank had engaged in unsafe or unsound banking practices and violations of law and/or regulations***.

Ex. A at 1.

135.    The October 15, 2009 press release, entitled "Sterling Financial Corporation of Spokane, Washington, Announces Agreement with Regulators," stated that Sterling Savings Bank had consented to the issuance of the FDIC Order:

> Sterling Financial Corporation today announced that its subsidiary, Sterling Savings Bank, has ***entered into an agreement*** with its regulators to continue taking actions to strengthen its financial condition and operations.
>
> William L. Eisenhart, chairman of Sterling's board of directors, stated, "***Sterling has been working closely with its regulators since the start of this economic cycle to ensure that we are maintaining safe and sound banking practices***.  Our agreement formalizes steps that already are underway and that we and our regulators feel are necessary to maintain Sterling's financial health, and its ability to provide high levels of service to our customers and the communities we serve throughout the Pacific Northwest."

136.    According to the FDIC's Risk Management Manual of Examination Policies, which provides guidelines on FDIC examinations, the FDIC's conclusion that a financial institution exhibits "unsafe and unsound practices" has formal meaning, including:

- "There are serious financial or managerial deficiencies that result in unsatisfactory performance";

- "The problems range from severe to critically deficient";

- "The weakness and problems are not being satisfactorily addressed or resolved by the board of directors and management";

- "Financial institutions in this group generally are not capable of withstanding business fluctuations";

- "There may be significant noncompliance with laws and regulations";

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)          - 53 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

- • "Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile";

- • "Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to the problems"; and

- • "Institutions in this group pose a risk to the deposit insurance fund."

137. The above conditions were found at Sterling. For example, the FDIC Order also states that bank had *poor oversight, inadequate capital and a large volume of poor loans*:

> IT IS HEREBY ORDERED, that the Bank . . . desist from the following unsafe and unsound banking practices . . . .
>
> (a)    operating with *inadequate board of directors oversight*;
>
> (b)    operating with *inadequate* capital in relation to the kind and quality of assets held by the Bank;
>
> (c)    operating with a *large volume of poor quality loans*; and
>
> (d)    operating in such a *manner as to produce operating losses*.

*Id*. at 2.

138. The FDIC Order was followed by the sudden departure of Gilkey and the CEO of Sterling Savings Bank, Heidi B. Stanley ("Stanley"). The FDIC Order required that the "[t]he Bank shall have and *retain qualified management*" who would "operate the Bank in a safe and sound manner" and also "*restore all aspects of the Bank to a safe and sound condition*; including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk." *Id*. at 2-3. Therefore, the day before announcing the FDIC Order, Sterling had also announced the unexpected departure of Gilkey from his post as Chairman of the Board and CEO of Sterling and Sterling Savings Bank. The timing was not a coincidence.

139. The regulators also concluded that Sterling Savings Bank had inadequate capital and needed to raise it significantly. The FDIC Order required that Sterling

1 Savings Bank increase its "**Tier 1 capital by not less than $300 million**, and shall

2 thereafter maintain its Tier 1 capital in such an amount to ensure that the Bank's

3 **leverage ratio equals or exceeds 10.0 percent**." *Id.* at 4. This was a substantial

4 increase because, for a bank to be "well capitalized," the Tier 1 ratio needs to be at

5 least 5%. Therefore, for the regulators to require Sterling to maintain a ratio of 10% –

6 twice the required amount – speaks to the degree of capital cushion that regulators

7 believed was necessary for Sterling to stay afloat based on its reckless practices and

8 the poor quality of loans on its books.

9      140. Further, according to the FDIC Order, Sterling had to maintain this level

10 of capital "in addition to a fully funded allowance for loan and lease losses ('ALLL')

11 [ALL Reserves]." *Id.* at 5. Sterling was also warned that "[a]ny increase in Tier 1

12 capital necessary to meet the requirements . . . **may not be accomplished through a**

13 **deduction from the Bank's ALLL or other reserves**." *Id.* In other words, Sterling

14 could not **manipulate** its Provision for Credit Losses and ALL Reserves – as it had

15 been improperly doing throughout the Class Period – in order to meet the FDIC's

16 capital requirements.

17      141. The regulators also ordered Sterling's Board to review and revise, if

18 necessary, the appropriateness of Sterling's ALL Reserves and its comprehensive

19 policy for determining the level of allowance. The regulators required that the

20 Board's review comply with "the accounting standards set forth in Financial

21 Accounting Standard ("FAS") 5 and FAS 114, the results of the Bank's internal loan

22 review, loan and lease loss experience, trends of delinquent and non-accrual loans, an

23 estimate of potential loss exposure of significant credits, concentration of credit and

24 present and prospective economic conditions." *Id.* at 7. As set forth herein,

25 defendants deliberately ignored those factors and violated GAAP by manipulating

26 ALL reserves and NPAs during the Class Period.

526557_1    **CONSOL CPT FOR VIOLATION OF FEDERAL**    ROBBINS GELLER RUDMAN & DOWD LLP
**SECURITIES LAWS** (2:09-cv-00368-EFS)  - 55 -  100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    142.    Furthermore, the regulators found that Sterling had unacceptable levels of

2   NPAs.  The FDIC Order required that Sterling develop a written plan, approved by its

3   Board, "*for systematically reducing the level of nonperforming assets* and assets

4   listed on the Bank's watchlist to an *acceptable level*."  *Id.* at 8.

5    143.    Notably, Sterling's regulators also discovered that Sterling had *extended*

6   *credit to borrowers who had defaulted on their loans*.  The FDIC Order required that

7   "the Bank shall adopt and implement a policy to *prohibit extending*, directly or

8   indirectly, any *additional credit* to, or for the benefit of, any borrower that has a loan

9   or other extension of credit from the Bank that has been *charged off or adversely*

10   *classified*, in whole or in part, as 'Substandard,' 'Doubtful,' or 'Loss.'"  *Id.* at 8.

11    144.    Defendants were well aware of their obligation to implement "safe and

12   sound" banking practices at Sterling.  In its 2007 Form 10-K, signed by defendants,

13   Sterling described the safety and soundness standard imposed by the regulators:

14    *Safety and Soundness Standards*.  The Federal Deposit Insurance
     Corporation Act of 1991 requires the FDIC to impose upon banks certain
15    non-capital safety and soundness standards.  These standards cover,
     among other things, internal controls, information systems, internal audit
16    systems, loan documentation, credit underwriting, interest rate exposure,
     asset growth, compensation and benefits.  Additional standards apply to
17    asset quality, earnings and stock valuation.  An institution that fails to
     meet these standards must develop a plan acceptable to its regulators,
18    specifying the steps that the institution will take to meet the standards.
     Failure to submit or implement such a plan may subject the institution to
19    regulatory sanctions.

20    145.    Defendants repeatedly made misrepresentations about Sterling's safety

21   and soundness because they also knew investors would rely on those statements in

22   assessing Sterling as an investment.  In fact, Sterling's mission statement reads,

23   "Sterling is committed to managing a *safe and sound* financial institution, that builds

24   value for its shareholders."

25    146.    The FDIC's findings directly contradicted statements made by defendants

26   throughout the Class Period that Sterling operated under "safe and sound" banking

1    practices and had adequate capital to protect its shareholders' investments.    As

2    revealed by the FDIC Order, Sterling did not maintain safe, sound and secure banking

3    practices. Defendants knew or were deliberately reckless in not knowing the false and

4    misleading nature of these statements at the time they were made.

      **E.**    **False Statements Concerning the Adequacy of Sterling's ALL Reserves and Strength of Sterling's Credit Quality and Credit Risk Monitoring in 2008**

7        147.    <u>July 22, 2008 Press Release</u>: On July 22, 2008, Sterling issued a press

8    release containing several misrepresentations as follows:

> "Thanks to the focus and commitment of our employees, our core banking operations ***performed solidly in the midst of an ongoing credit cycle troubling the country***.  Our customer base remained steadfast during the quarter and their loyalty reflects ***our relationship-based, service-oriented Hometown Helpful(R) culture***," stated Harold B. Gilkey, chairman and chief executive officer.

> "***Early in this credit cycle, we implemented stringent measures to address softening credit quality.  During the last three quarters, our credit team has generally identified, quantified and isolated the distressed assets, which primarily reside in our residential construction portfolio.***

>            *      *      *

> ***Management believes the allowance is adequate and appropriate*** given its current analysis of the loan portfolio and the relative mix and risk of loan products.

    148.    <u>July 23, 2008 Conference Call</u>: On July 23, 2008, defendants held the

2Q08 conference call and made several misrepresentations as follows:

> GILKEY: ***We have, indeed, identified our credit issues and have allocated the necessary resources to manage through this asset quality cycle***. Overall, our construction portfolio declined by approximately $100 million during the quarter.

> Our credit administration and portfolio management teams have taken positive steps to reduce the problems in our residential construction portfolio.  ***I want to emphasize that our team has taken a conservative approach towards risk evaluation, and are disciplined in the rating of loans according to the appropriate risk***.

>            *      *      *

*With three quarters of experience in this cycle our credit team is confident that we have identified most of our credits that are either distressed or could become distressed. Our credit team has heightened its focus on resolving and working out credits . . . our capital and liquidity positions remain solid.*

149. <u>July and August 2008 Investor Presentations</u>: On July 25, 2008 and August 11, 2008, Sterling filed Form 8-Ks with the SEC that included investor presentations defendants Gilkey and Byrne were to make at a July 29-30, 2008 D.A. Davidson Investor Conference and the Company's 2008 Analyst Day. The investor presentations misled investors to believe that Sterling continued to operate safe and sound banking practices with a detailed focus on credit quality:

*Credit quality issues are TOP priority*

- Residential Construction Special Project Team
- Team of 26 experienced professionals dedicated to "special assets"
  - Focus on *early detection and remediation*
  - Open communication with customers
  - *Review of every residential construction credit*
  - *Resolve and work out NPAs*

150. <u>October 21, 2008 Press Release</u>: On October 21, 2008, Sterling issued its 3Q08 earnings press release including additional misrepresentation as follows:

"*Our year-to-date experience with resolving non-performing credits suggests that our actual loan loss content is in line with our estimated loan loss allowances*," said Mr. Gilkey. *Management believes the allowance is adequate and appropriate given its current analysis of the loan portfolio and the relative mix and risk of loan products*. Sterling will continue to evaluate the level of allowance relative to credit conditions in each of its markets.

151. <u>October 22, 2008 Conference Call</u>: On October 22, 2008, defendants held a conference call to discuss 3Q08 results and made several misleading statements as follows:

GILKEY: *Our credit administration and portfolio management teams remain diligent in assessing and ranking risks in our loan*

526557_1

CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS (2:09-cv-00368-EFS)    - 58 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

*portfolio and continue to focus on resolving our classified construction assets*. . . .

***The segmentation and management of construction classified assets will enable Sterling's credit team to fix, repair and manage these assets***. At the same time, our core credit administration team will be able to focus on growing and generating strategic assets, namely core deposits, business banking, and consumer loans.

\*    \*    \*

GILKEY: ***We have a strong management team that has experience to address the current market disruption and the asset quality challenges. Our credit team is capable and seasoned, and has the significant experience in loan resolution and work-out. We have a diversified loan portfolio***.

152. Analyst Rabatin from FTN-Midwest asked defendants directly about the risks of increased construction lending, and defendants falsely represented that Sterling had its "arms around the issue" and a "disciplined" approach to credit risk:

RABATIN: Okay. Then secondly, as you evaluate potentially getting into the TARP, I was curious on two things. One is the pace of the runoff on the construction book – ***is there possibilities for that to be more accelerated in the next few quarters***, and have you considered any bulk sales?

Then secondly is – in the stuff that you are showing us last quarter, you were assuming that charge-offs for the construction book kind of range was 4.5% to 5%. I was curious if there was any update or any thoughts on a new range of where you think that might be.

GILKEY: Well, first of all, ***I see the runoff as being pretty stable***, in the range that it has been experienced. I do think you might see a blip up with the Boeing settlement of the strike, but generally speaking, I would say that the ***runoff is pretty stable in a relative angle that we've experienced over the last three quarters***.

\*    \*    \*

RABATIN: Well, I just recall back to the investor day when you were kind of giving a range of – you were doing your stress testing and showing some numbers for the stress testing or as it relates to the construction book. I was curious if you had updated those numbers or had an updated idea of where those might be today relative to where we were a quarter or two ago.

BYRNE: We have not updated that schedule that we had in the analyst day at this point, Brett.

GILKEY: But Brett, *I would like to add that I don't think anything has changed from the standpoint of our conversation in the fact that we have identified – and we have a very disciplined performance of our credit group – to identify the magnitude of the problem accounts. We do indeed have our arms around the issue*, and resolutions are slower than we want them to because attorneys and accounts get in, and bankruptcy steps in place, so you've got to go through some court actions. *But I don't believe it's significantly different than what we've said before*.

### F.    Facts Supporting Falsity and Scienter for Defendants' 2008 Statements Concerning Credit Quality and Risk

153.    Numerous facts establish that defendants' 2008 representations concerning Sterling's credit quality and risk control practices were materially false and misleading.  First, as set forth in §V.B.1-2, defendants concealed risk that had already materialized by engaging in improper accounting for millions in unpaid construction loans.  Second, as set forth in §§V.B.3-4 and V.C., defendants were aware of numerous red flags and adverse facts that required Sterling to increase its ALL Reserves and Provision for Credit Losses.  Instead, defendants deliberately kept ALL Reserves and Provision for Credit Losses artificially low to mask deterioration in its loan portfolio.  Third, as set forth in §V.B.5-7, Sterling's admissions, witnesses and other corroborating facts showed that Sterling was not adequately protected from credit risk and knew that undisclosed risks had already materialized but were being concealed.  Defendants were aware at the time of their statements that Sterling was engaging in unsafe and unsound banking practices.

154.    Accordingly, defendants' statements, such as Sterling "performed solidly in the midst of ongoing credit cycle," "allowance is adequate and appropriate" and "our team has taken a conservative approach towards risk evaluations," were false and misleading.  Defendants knew that Sterling's operations were far from being conservative.  Sterling was riddled with poor quality loans that were collapsing rapidly for which they had deliberately failed to adequately and timely book ALL reserves.  Also, defendants manipulated ALL Reserves by failing to account for

hundreds of millions of dollars in unpaid construction loans as NPAs.  Further, defendants knew they were engaging in unsafe and unsound banking practices and violating laws and/or regulations.  Defendants knew or were deliberately reckless in not knowing the false and misleading nature of these statements at the time they were made.

### G.    False 2009 Statements Concerning Credit Quality and Risk

155.    <u>January 27, 2009 Press Release</u>: On January 27, 2009, Sterling issued its 4Q08 and FY08 earnings press release with the following misrepresentations:

> Despite the increased dollar value of non-performing assets associated with two projects located south of Seattle, ***the Puget Sound region and other areas in Washington State, on a percentage basis, continue to perform better than Sterling's overall residential construction portfolio***.
>
> *            *            *
>
> ***Sterling has been proactively addressing credit quality issues within its construction portfolios***.  During the fourth quarter of 2007, Sterling made a strategic decision to reduce its level of residential construction commitments.  ***During the first quarter of 2008, Sterling activated a Residential Construction Special Project Team to identify, manage and resolve credit quality issues***.  During the third quarter of 2008, Sterling separated its credit administration team into two dedicated teams: one to fix, repair and manage construction assets; and, the other to focus on generating strategic business and consumer assets. "Throughout the year, Sterling's bankers have been working in partnership with our borrowers to help avoid credit defaults and protect the bank from losses.  ***Because of our efforts at early intervention and remediation, we believe our level of classified assets continues to be manageable and will eventually lead to beneficial resolutions***," stated Mr. Gilkey.
>
> *            *            *
>
> ***Management believes the allowance is adequate given its current analysis of the loan portfolio and the relative mix and risk of loan products.  Sterling will continue to evaluate the level of allowance relative to credit conditions in each of its markets***.

156.    <u>January 28, 2009 Conference Call</u>: On January 28, 2009, defendants made the following misleading statements in its 4Q08 conference call with analysts:

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 61 -    ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    GILKEY: *Throughout the year Sterling bankers have been working in partnership with our borrowers to help avoid credit defaults and to protect the bank from losses. Because of our efforts at early intervention and remediation, we believe the level of classified assets continues to be manageable and will eventually lead to beneficial results*.

\*    \*    \*

GILKEY: *Sterling will continue to exercise prudent and conservative credit standards*. . . .

*We continue to manage and work out and resolve credit issues*. . . .

*We believe that we have a strong management team that has the experience to address the current market disruption and the asset quality challenges*.

*Our credit team is capable and seasoned and has significant experience in loan resolution to work out*.

\*    \*    \*

RABATIN: Okay. And then Harold, I wanted to circle back around about the Puget Sound. I want to make sure I understood. It sounds like you are basically saying that market is still better, but I was not clear how much of that was a function of you have more vertical rather than land exposure to that area, or you actually see the economy there still being more resilient.

GILKEY: It is a combination of all of that. *The Puget Sound market still remains one of the best performing economies*, albeit there is a little flutter in it. You probably noticed a reduction in employment announced at various major employers.

But the growth in jobs over the last three years and, quite frankly, even with the reduction in staff, we think the employment will stay relatively strong in that market.

I think the other piece of that is we do not have much land. It is all – the bulk of it is vertical. *So I think that that market will remain relatively strong in our particular product*.

RABATIN: Okay. And then just last, I wanted to make sure I understood something on the guidance you did give, Dan, *where you said profitability in '09*. Does that mean for the year for a particular quarter? I did not quite get the gist of what you meant by saying that.

BYRNE: *We were referring to the full-year 2009 with that statement*.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 62 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

157.  <u>April 23, 2009 Press Release</u>: On April 23, 2009 defendants issued its 1Q09 press release containing several misrepresentations as follows:

*Sterling believes that the slowing growth rates of classified and non-performing assets, mainly related to construction, reflects the cumulative efforts of its construction credit team, which has been in place for more than one year to identify, manage and resolve stressed assets.*

        *    *    *

*Management believes the allowance* [for credit losses] *is adequate given its current analysis of the loan portfolio and the relative mix and risk of loan products.*

158.  <u>April 24, 2009 Conference Call</u>: On April 24, 2009, defendants held Sterling's 1Q09 investor conference call and made several misleading statements:

*We have a strong management team that has the experience to address the current market disruption and the asset quality challenges. Our credit team is capable and seasoned and has significant experience in loan resolution and workout.*

159.  <u>July 23, 2009 Press Release</u>: On July 23, 2009, defendants issued its 2Q09 press release, which included the following false and misleading statements:

*Sterling believes its success at decreasing classified residential construction assets and reducing the rate of growth of non-performing residential construction assets, reflects the cumulative efforts of its construction credit team, which has been in place since early 2008 to manage and resolve stressed assets. The process of resolving problem assets involves restructuring loans, obtaining additional collateral, repossessing problem assets, evaluating loans in relation to fair market value and disposing of OREO assets.*

160.  <u>July 24, 2009 Conference Call</u>: On July 24, 2009, Sterling held its 2Q09 investor call with analysts and made the following misleading representations:

GILKEY:  *We made steady progress in achieving credit resolutions within our residential construction portfolio. For the first time during this credit cycle, our balance of classified residential construction assets declined 6%. Additionally, nonperforming residential construction assets are beginning to recede in many of our markets where we first experienced credit stress, such as the markets of Southern California and Utah as well as Boise, Idaho.* This is due to REO sales and loan payoffs.

        *    *    *

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)

- 63 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

*Resolving assets takes time. Throughout 2008 and the first half of 2009, we have increased our resources and efforts to manage and resolve problem loans. The numerous interventions we are taking are beginning to work. You can see that based on the level of credit resolutions achieved during this past quarter.*

\*      \*      \*

*We have a strong executive management team and an excellent credit administration group that has experience to address the current asset quality challenges and to build a better bank, creating value for our customers, our shareholders, and our employees.*

### H.    Facts Supporting Falsity and Scienter for Defendants' 2009 Statements Regarding Credit Quality and Risk

161.    Numerous facts establish that defendants' 2009 representations concerning Sterling's credit quality and risk control practices were materially false and misleading. First, as set forth in §V.B.1-2, defendants concealed risk that had already materialized by engaging in improper accounting for millions in unpaid construction loans. Second, as set forth in §V.B.3-4, defendants were aware of numerous red flags and adverse facts that required Sterling to increase its ALL Reserves and Provision for Credit Losses. Instead, defendants deliberately kept ALL Reserves and Provision for Credit Losses artificially low to mask deterioration in its loan portfolio. Third, as set forth in §§V.B.5-7 and V.C., Sterling's admissions, witnesses and other corroborating facts showed that Sterling was not adequately protected from credit risk and knew that undisclosed risks had already materialized but were being concealed. Defendants were aware at the time of their statements that Sterling was engaging in unsafe and unsound banking practices.

162.    Accordingly, defendants' statements, such as "Sterling has been proactively addressing quality issues within its construction portfolio," "allowance is adequate given its current analysis of the loan portfolio" and "Sterling will continue to exercise prudent and conservative credit standards" were knowingly false and misleading. Defendants knew that instead of addressing increasing credit risk,

1    Sterling was downplaying and concealing that risk by manipulating its NPAs, ALL
2    Reserves, Provision for Credit Losses and earnings.  Further, defendants had failed to
3    exercise a prudent and conservative approach because they were operating Sterling
4    with a large quantity of poor quality loans, unacceptable levels of NPAs, inadequate
5    capital and reckless management and were violating laws and/or regulations.
6    Defendants knew or were deliberately reckless in not knowing the false and
7    misleading nature of these statements at the time they were made.

8           **I.       False Statements Regarding Sterling's Capital Position**

9           163.   In addition to the aforementioned misrepresentations, defendants made
10   numerous false statements regarding the strength of Sterling's capital and liquidity
11   position.

12          164.   July 22, 2008 Press Release: In the July 22, 2008 press release, when
13   announcing Sterling's 2Q08 results, defendants made the following statements:
14   "***Capital ratios remain above 'well-capitalized' levels***," "***Sterling's liquidity position***
15   ***remains strong***" and "***Risk-based capital ratios continue to exceed the 'well-***
16   ***capitalized' requirements***."

17          165.   Defendants repeated substantially similar misrepresentations in each and
18   every quarter during the Class Period as follows: July 23, 2008 (2Q08 investor
19   conference call); October 21, 2008 (3Q08 press release); October 22, 2008 (3Q08
20   investor conference call); January 27, 2009 (4Q08 and FY08 press release); January
21   28, 2009 (4Q08 and FY08 conference call); April 23, 2009 (1Q09 press release); April
22   24, 2009 (1Q09 conference call); July 23, 2009 (2Q09 press release); and July 24,
23   2009 (2Q09 conference call).

24          166.   July 23, 2008 Conference Call: During the July 23, 2008 conference call,
25   Sterling made additional misleading statements to analysts:

26

CLARK: Is there a level at which you might not want to see that drop and you might proactively try to do something about it before you get to – if it were to get to a more thinner level?

GILKEY: Matt, I think your question is directed at our anticipation and need for capital. And I think I've answered that every way I know how. We believe that the best way to generate capital for this company is through the earnings that our bank provides. We have, as you know, in the history of this company been a leverage company. And I think we know how to manage that leverage well. And we will keep track of it and *do what is necessary to maintain the well capitalized position*.

167. January 28, 2009 Conference Call: During the January 28, 2009 conference call, Gilkey made the following additional misrepresentations:

GILKEY: *Our capital reserve and liquidity positions are the strongest levels in Sterling's recent history. As we begin 2009, we believe our outlook is realistic . . . we believe our capital position is adequate to enable Sterling to see its way through this cycle. We do not anticipate the need for further capital*.

168. April 24, 2009 Conference Call: During the April 24, 2009 conference call, defendants made the following additional misrepresentations to analysts:

BYRNE: *We expect to remain well capitalized through 2009. We believe we can manage through this credit cycle. Our capital position at the end of the first quarter and our earnings generating capacity provide a cushion to absorb additional credit costs depending on their timing and without implementation of draconian measures. The way we look at capital is to look at the amount of excess risk-based capital*. At 10% this would be $289 million, and if you want to maintain a higher, say 11%, the excess is $193 million. We also have allowances which have been excluded from risk-based capital of $108 million. This allows us to absorb additional provisions of $400 million at the 11% risk-based capital measure, or $550 million at the 10% risk-based capital measure. I would just add that I've assumed a 36% effective tax rate on those provisions. *Separately, each subsidiary has done its own stress testing and we have concluded that the potential loan losses are within their capital capacities without raising additional capital*.

**J.    Facts Supporting Falsity and Scienter for Statements Regarding Sterling's Capital Position**

169. The level of Sterling's capital was a critical metric for analysts and investors because it was an indicator of the financial health of the Company and its ability to continue its operations independently over time. For this reason, regulators

heavily focus on an institution's capital levels and assign threshold capital ratios for banks to achieve. The FDIC Risk Management Manual of Examination Policies states that existence of "unhealthy or deteriorating conditions, which may threaten this [public confidence] integrity," is evaluated, among other things, by "evaluation of the bank's capital adequacy." The Manual defines capital adequacy as:

> A financial institution *is expected to maintain capital commensurate with the nature and extent of risks to the institution* and the ability of management to identify, measure, monitor, and control these risks.

170. According to Sterling's 2007 Form 10-K, "Sterling, Sterling Savings Bank and Golf Savings Bank *are required by applicable regulations to maintain certain minimum capital levels*." Defendant Gilkey admitted the importance of the regulatory capital levels in response to an analyst's question during the January 28, 2009 conference call, when he stated: "I would just add that *I think the regulatory capital levels are still the primary focus of the regulators*, and as we mentioned, we've got very strong regulatory capital positions."

171. Capital is synonymous with a company's stockholders' equity. A company's stockholders' equity is derived from two main sources: money invested in the company and income that a company is able to accumulate over time (retained earnings). Stockholders' equity equals total assets less total liabilities. Accordingly, Sterling's 2007 Form 10-K states that capital resources and regulatory capital ratios of Sterling and its banking subsidiaries are "enhance[d] . . . through retention of an adequate amount of earnings and the management of the level and mix of assets." Therefore, if a company's assets are overstated and its liabilities remain constant, its stockholders' equity will be overstated. And defendants did exactly that to overstate Sterling's capital.

172. As alleged in §V.B.1-4, to hide its true loss exposure from risky construction loans throughout the Class Period, Sterling understated ALL Reserves by

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  failing to account for hundreds of millions of dollars in unpaid construction loans as

2  classified assets and NPAs.  As a result, net loans receivable, which is derived after

3  deducting ALL Reserves, were materially overstated during the Class Period, resulting

4  in an overstatement of Sterling's overall assets.  This allowed Sterling to overstate its

5  stockholders' equity – in other words, its capital.  Therefore, during the Class Period,

6  defendants overstated their capital and regulatory capital ratios by deliberately

7  manipulating ALL Reserves, Classified Assets and NPAs.

8       173.   Defendants also overstated their capital position by deliberating ignoring

9  numerous financial red flags and negative trends showing that Sterling needed to

10  substantially increase its ALL Reserves, as described in §V.B.3.  By failing to

11  properly account for unpaid construction loans by booking adequate ALL Reserves,

12  defendants were able to show that Sterling was better capitalized than it really was.

13       174.   Moreover, by misrepresenting Sterling's capital position, defendants

14  were also able to qualify Sterling for the U.S. Treasury Capital Purchase Program,

15  which was meant to facilitate only ***well capitalized*** institutions.  Sterling qualified for

16  $303 million from the U.S. Treasury by representing itself as a "well-capitalized"

17  institution.  On November 24, 2008, Sterling issued a press release entitled "Sterling

18  Financial Corporation to Participate in U.S. Treasury Capital Purchase Program,"

19  which stated in pertinent part:

20         Sterling Financial Corporation, a leading community bank in the
western region, today announced that it has received notification of
21  preliminary approval from the U.S. Department of Treasury for the sale
of $303 million in senior preferred stock and related warrants to the U.S.
22  Treasury under the Capital Purchase Program of the Emergency
Economic Stabilization Act of 2008.
23

24         Under the Capital Purchase Program, the U.S. Treasury plans to
purchase up to $250 billion of senior preferred shares on a voluntary
25  basis ***from healthy U.S. financial institutions***, as part of its efforts to
provide a firmer capital foundation for banks and to increase credit
26  availability to businesses and consumers.

**CONSOL CPT FOR VIOLATION OF FEDERAL**
**SECURITIES LAWS** (2:09-cv-00368-EFS)     - 68 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

*"The U.S. Treasury's approval of Sterling's participation in this voluntary program is positive affirmation of our strength and financial health,"* stated Harold B. Gilkey, chairman and chief executive officer. "The investment is anticipated to increase Sterling's total risk-based capital ratio to 13.8%, on a pro forma basis, from 11.0% at September 30, 2008. *The fortification of Sterling's capital position* through attractively priced capital from the U.S. Treasury enhances Sterling's financial flexibility to make additional loans to the businesses and consumers in the communities in which we serve. *We are hopeful that this program will help stabilize and accelerate recovery of the economy*."

175. As evidenced by the above press release, Gilkey misleadingly spun the U.S. Treasury's approval of funds for Sterling as a sign of Sterling's strong capital position and falsely implied that Sterling's participation in the U.S. Treasury program was to help stabilize the U.S. economy. In fact, Sterling desperately needed the TARP funds to stay afloat. Without the TARP funds and Sterling's accounting manipulations of its ALL Reserves and Provision for Credit Losses, Sterling was not "well capitalized." When Sterling's regulatory capital ratios are adjusted for understated ALL Reserves of $149.5 million (calculated in §V.B.1) and reduced by the $303 million in TARP bailout money, Sterling's regulatory capital ratio falls below the "well capitalized" level – to approximately 8.5%. A ratio of 10% is required for an institution to be considered "well capitalized."

176. Further, defendants' misrepresentations about Sterling's capital position are confirmed by the FDIC Order, as detailed above in §V.C-D. The FDIC concluded that Sterling had inadequate capital. The FDIC Order required that Sterling Savings Bank increase its "*Tier 1 capital by not less than $300 million*, and shall thereafter maintain its Tier 1 capital in such an amount to ensure that the Bank's *leverage ratio equals or exceeds 10.0 percent*." Ex. A at 4. Further, the regulators required that Sterling had to maintain this level of capital without "a deduction from the Bank's ALLL reserves or other reserves," which Sterling had been improperly doing previously to meet the FDIC's capital requirements. *Id.* at 5.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 69 -    ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA 94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    177.   Therefore, throughout the Class Period, defendants defrauded investors

2    by misleadingly assuring them that Sterling – because of its strong capital position –

3    would be able to survive the economic turmoil despite significant adverse trends in

4    defaulting risky construction loans.   As shown above, defendants manipulated

5    classified assets and NPAs and ignored red flags to overstate their capital position to

6    conceal Sterling's hopeless financial condition from investors.

7    **VI.    DISCLOSURES AT THE END OF THE CLASS PERIOD**

8    178.   On October 14, 2009, Sterling issued a press release announcing that

9    defendant Gilkey stepped down from his positions as Chairman of the Board, CEO

10   and President of the Company.   The Company also announced the "departure" of

11   Stanley from her positions as CEO and Chairman of the Board of Sterling Savings

12   Bank.

13   179.   On October 15, 2009, Sterling issued a press release announcing the

14   FDIC Order entitled "Sterling Financial Corporation of Spokane, Washington,

15   Announces Agreement with Regulator," which stated in pertinent part:

16        Sterling Financial Corporation today announced that its subsidiary,
     Sterling Savings Bank, has entered into an agreement with its regulators
17   to continue taking actions to strengthen its financial condition and
     operations.
18
19        William L. Eisenhart, chairman of Sterling's board of directors,
     stated, "Sterling has been working closely with its regulators since the
20   start of this economic cycle to ensure that we are maintaining safe and
     sound banking practices.  Our agreement formalizes steps that already
21   are underway and that we and our regulators feel are necessary to
     maintain Sterling's financial health, and its ability to provide high levels
22   of service to our customers and the communities we serve throughout the
     Pacific Northwest."

23        The agreement commits Sterling's principal banking subsidiary,
     Sterling Savings Bank, to continue taking actions relating to its capital
24   position, asset quality, liquidity and management oversight.  It is known
     as a Stipulation and Consent to the Issuance of an Order to Cease and
25   Desist, and was entered into with the Federal Deposit Insurance
     Corporation ("FDIC") and Washington Department of Financial
26   Institutions.

Under the agreement, Sterling Savings Bank is required, among other things, to achieve and maintain a Tier I leverage capital ratio of not less than 10% by December 15, 2009. Sterling continues to work with its financial advisor, Sandler O'Neill + Partners, L.P., to evaluate options for raising additional capital. In July, Sterling filed a shelf registration statement with the Securities and Exchange Commission to provide the ability to raise up to $500 million over the next three years and, in September, it received shareholder approval to increase the number of authorized shares of Sterling common stock to facilitate the raising of capital.

The agreement also commits Sterling to reducing its level of classified and non-performing loans and other assets. Sterling's board and management have launched initiatives to reduce the proportion of its loans and other assets that are classified non-performing, and to improve its credit practices going forward.

To lead the efforts to improve credit quality and strengthen oversight of the bank, the board named a new generation of executive leadership. J. Gregory "Greg" Seibly was named acting president and acting chief executive officer of Sterling Financial Corporation and acting chief executive officer of Sterling Savings Bank. Ezra A. Eckhardt was named acting chief operating officer of Sterling Financial Corporation and acting president of Sterling Savings Bank, and continues as its chief operating officer.

180.    Following Sterling's disclosures regarding the FDIC Order and Gilkey's departure from the Company, analysts questioned the credibility of management's previous statements. According to an article in *American Banker* on October 16, 2009:

The double-whammy stunned observers who were under the impression that the company had begun to turn a corner.

"My first thought was, 'Oh my God, it is worse than I thought,'" said Theodore Kovaleff, an analyst at Horowitz & Associates Inc., who owns shares in Sterling. "***I had believed them when they said things were leveling off, but clearly the answer is 'no' now***."

181.    On October 22, 2009, Sterling issued its 3Q09 results. According to the press release:

The net loss attributable to Sterling's common shareholders was $463.7 million, or $8.93 per common share, compared with net income in last year's third quarter of $5.0 million or $0.10 per common share.

The net loss was $459.4 million before the accrual of $4.3 million in cumulative preferred dividends associated with the U.S. Treasury's

Capital Purchase Program.   The loss for the quarter reflects the following:

- a non-cash charge of $227.6 million to account for the impairment of the remaining goodwill, which primarily relates to banks that Sterling acquired between 1998 and 2007;

- a Provision of $195.5 million to increase the allowance for loan losses; and,

- a non-cash valuation allowance of $143.0 million established against its deferred tax asset.

182.    As a result of defendants' false statements, Sterling's stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 92% from their Class Period high.

## VII.    ADDITIONAL ALLEGATIONS SUPPORTING A STRONG INFERENCE SCIENTER

### A.    The Sudden Ouster of Two of Sterling's Most Senior Sterling Executives Reinforces Scienter

183.    On October 14, 2009, Sterling abruptly announced the "departure" of defendant Gilkey from Sterling and "his roles as chairman of the board, president and chief executive officer of Sterling Financial Corporation, as a director of Sterling Savings Bank, as chief executive officer and a director of Golf Savings Bank."

184.    Sterling also announced the departure of Stanley, "from her position as chairman of the board and chief executive officer of Sterling Savings Bank and from the board of Sterling Savings Bank."  Stanley had been with Sterling since 1985.

185.    In the same press release, Sterling admitted that new management was required to fix Sterling's problems:

> "The board is committed to taking the actions necessary to respond to challenges that face Sterling and many other banks in the Pacific Northwest.  As a crucial next step, *the board is bringing in a new generation of management to lead the efforts to strengthen Sterling's capital and liquidity positions, work through our problems loans and put into place process to improve credit quality going forward*."

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)     - 72 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

186. The forced departure of Gilkey and Stanley as a result of FDIC's and WDFI's investigation reinforces the inference of their knowledge of Sterling's improper practices, including that the "Bank had engaged in unsafe and unsound banking practices and violation of law and/or regulations." Ex. A at 1-2. This is confirmed by the regulators' finding that Sterling was "operating with inadequate board of directors oversight." *Id.* at 2. They also ordered the bank to "retain qualified management" who would – unlike prior management – "operate the Bank in a safe and sound manner; comply with applicable laws and regulations; and restore all aspects of the Bank to a safe and sound conditions, including asset quality, capital adequacy, earning, management effectiveness, liquidity, and sensitivity to market risk." *Id.* at 2-3.

187. An article in *American Banker* on October 16, 2009 reported on the sudden departure of Gilkey and Stanley:

> The men both declined to comment on the departure of the former executives, saying it was a board discussion. Seibly said, though, that separation of control is another tenet of the company's restructuring. "We want to make sure that we have the proper governance and management in place," he said. "These changes go toward the issue of us being able to fix our ineffectiveness."

188. The fact that Sterling's board was forced to oust its **co-founder**, who had been with the Company since 1981, is telling. The Company did not say that Gilkey voluntarily resigned or left under amicable circumstances. The fact that these executive departures came within 24 hours of the announcement of the FDIC's findings and Order supports a strong inference that the personnel changes were due to Gilkey's participation in the deceptive acts and reckless practices at Sterling during the Class Period.

### B. Defendants' Compensation Structure and Stock Option Awards Support Scienter

189. Defendants Gilkey's and Byrne's compensation was directly tied to Sterling's' financial performance, which provided additional motive for defendants to hide Sterling's loss exposure to risky construction loans. According to Company's Proxy Statement filed with the SEC on March 21, 2008, defendants' compensation related "to the value created for Shareholders by being directly tied to the financial performance." Not coincidentally, the very financial metrics that defendants deliberately manipulated during the Class Period were primary factors used by Sterling's Board of Directors in awarding defendants' compensation, including:

- Growth in total assets;
- Growth in loan origination;
- Growth in total loans receivable;
- Return on average equity;
- Return on average assets;
- Maintenance of asset quality; and
- Performance of Sterling's stock price.

190. Defendants' financial manipulations materially overstated the above metrics. As described in detail herein, defendants failed to disclose millions of dollars of NPAs during the Class Period, which allowed them to book lower ALL Reserves throughout the Class Period and thereby overstate Sterling's Total Loans Receivable. This manipulation also overstated Sterling's assets and equity, thus showing false growth in total assets, Total Loans Receivable, inflated return on equity and assets, and materially overstated asset quality. Above all, defendants' fraudulent practices artificially maintained the inflated price of Sterling's stock. As a result, defendants were able to secure handsome compensation packages in 2008, even though Sterling

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 74 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  in 4Q08 alone was forced to book approximately $228 million in Provision for Credit

2  Losses and $163 million in charge-offs.

3      191.  Despite the fact that Sterling's risk had reached unsustainable levels in

4  2007, Gilkey's compensation jumped $150K in one year from $500K in 2007 to

5  $650K in 2008.  Defendant Byrne's compensation increased from $240K in 2007 to

6  $276K in 2008.  In addition, Gilkey was awarded 80,000 additional stock options

7  valued at $480K in 2008, compared to only 30,000 options awarded in 2007.  The

8  number of option grants *increased 167%*.

9      192.  Notably, defendants' increased options were awarded *before* 4Q08, when

10  Sterling was forced to book higher losses, and before Sterling's announcement that it

11  would participate in the U.S. Treasury's TARP bailout program.  Defendants Gilkey

12  was awarded his options on January 31, 2008 and August 29, 2008, and Byrne was

13  awarded his options on January 31, 2008.

14      193.  Not only did defendants benefit in 2008 by misleading investors, they

15  also ensured that their 2009 base salaries were substantially increased.  According to

16  the Proxy Statement filed on March 27, 2009 with the SEC, Gilkey's 2009 base salary

17  was increased to $950K from $650K in 2008, an increase of 46% and Byrne's salary

18  increased to $500K from $276K in 2008 an increase of 81%.

19      194.  In sum, by concealing short-term risk and misleading investors, Gilkey

20  was able to increase his salary 90% and Byrne 108% between 2007 and 2009.  These

21  increases were astonishing given the performance of the Company's stock price and

22  the state of the economy at the end of 2008, and they could not have been achieved

23  without defendants' fraudulent acts.

24  **C.    Defendants' Violations of OCC Regulations Underscore**
       **Scienter**

25      195.  Each quarter Sterling and its subsidiaries filed a Report of Condition and

26  Income with the OCC.  By reporting false and misleading ALL Reserves, defendants

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)

- 75 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  also violated OCC regulations.  According to the OCC's Handbook on Allowance for

2  Loan and Lease Losses ("Handbook"), "A misstated allowance for loan and lease

3  losses misrepresents both the earnings and the condition of the bank and may

4  **constitute a violation of the 12 USC 161** requirement that national banks file accurate

5  reports of condition."

6       196.  The Handbook further states that a failure to maintain an adequate

7  allowance for credit losses is **an unsafe and unsound practice**:

8          Every national bank **must have a program to establish and
9  regularly review the adequacy of its allowance**.  The allowance must be
        maintained at a level that is adequate to absorb all estimated inherent
10          losses in the loan and lease portfolio as of its evaluation date. . . .  **A
bank that fails to maintain an adequate allowance is operating in an
11  unsafe and unsound manner**.

12       197.  The Handbook further states:

13          [L]oan review systems must respond not only to the obvious indicators
of a problem, such as delinquency.  They must also recognize **more
14  subtle warnings of conditions that may affect the ability of borrowers
to repay on a timely basis, such as deterioration in a borrower's
15  financial statements or adverse market developments**.

16                   *     *     *

17          The allowance **should reflect all significant, existing conditions**
affecting the ability of the borrowers to repay.

18                   *     *     *

19          Bank **management must evaluate the adequacy** of allowance.

20       198.  Accordingly, by failing to book adequate ALL reserves by manipulating

21  classified assets and NPAs and by ignoring red flags, defendants also violated OCC

22  regulations, which further underscores scienter.

23      **D.**    **Sterling's Specific GAAP Violations**

24          **1.**      **General GAAP Provisions Violated**

25       199.  As detailed herein, Sterling's publicly issued financial statements and

26  related earnings releases during the Class Period were materially misstated in

1  violation of GAAP because defendants failed to record adequate and timely loan loss

2  reserves and misled investors as to the significant loss exposure Sterling faced related

3  to the Company's portfolio of loans.

4      200.    The two central accounting items related to defendants' fraudulent

5  manipulation of Sterling's earnings were the ALL Reserve (which reduces assets on

6  the balance sheet) and the corresponding Provision for Credit Losses, which is a direct

7  reduction of pretax earnings on Sterling's income statement.  The accounting for these

8  items is governed by specific GAAP provisions and SEC rules.  Because there is

9  substantial formal and written guidance on the subject, defendants were well informed

10  of how to account for the ALL Reserves and Provision for Credit Losses during the

11  Class Period.  These accounting items were the most important estimates Sterling

12  made in its financial statements.  The rules that defendants violated are set forth

13  below.

14      201.    SEC Staff Accounting Bulletin No. 102, Selected Loan Loss Allowance

15  Methodology and Documentation Issues ("SAB 102"), states, "For many entities

16  engaged in lending activities, the allowance and provision for loan losses are

17  significant elements of the financial statements."  Sterling was no exception, and as a

18  result of its failure to record adequate and timely ALL Reserves, Sterling's financial

19  statements during the Class Period were in violation of GAAP.  Sterling's reported net

20  loans, earnings and EPS were materially overstated and its Provision for Credit Losses

21  was understated during the Class Period.

22      202.    GAAP constitutes those standards recognized by the accounting

23  profession as the conventions, rules and procedures necessary to define accepted

24  accounting practices at a particular time.  The SEC has the statutory authority for the

25  promulgation of GAAP for public companies and has delegated that authority to the

26  Financial Accounting Standards Board ("FASB").  SEC Regulation S-X, 17 C.F.R.

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    §210.4-01(a)(1), provides that financial statements filed with the SEC that are not
2    presented in conformity with GAAP will be presumed to be misleading, despite
3    footnotes or other disclosures.  Regulation S-X, 17 C.F.R. §210.10-01(a), requires that
4    interim financial statements, such as quarterly financial statements, must also comply
5    with GAAP, with the exception that interim financial statements need not include
6    disclosures which would be duplicative of disclosures accompanying annual financial
7    statements.

8        203.    Statement of Financial Accounting Standards No. 5, *Accounting for*
9    *Contingencies* ("SFAS 5"), SEC Staff Accounting Bulletin No. 102, *Selected Loan*
10   *Loss Allowance Methodology and Documentation Issues* ("SAB 102"), Statement of
11   Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of*
12   *a Loan* ("SFAS 114"), EITF Topic No. D-80, *Application of FASB Statements No. 5*
13   *and No. 114 to a Loan Portfolio* ("EITF Topic D-80"), FASB Interpretation No. 14,
14   *Reasonable Estimation of the Amount of a Loss* ("FIN 14"), SEC Financial Reporting
15   Release No. 28 ("FRR 28"), and Statement of Financial Accounting Standards No. 65,
16   *Accounting for Certain Mortgage Banking Activities* ("FAS 65"), set forth the
17   standards of financial accounting and reporting for loan loss reserves.[6]

18       204.    Additionally, the AICPA issues industry-specific Audit and Accounting
19   Guides to provide guidance in preparing financial statements in accordance with
20
21   [6]    On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No.
22   168, *The* FASB Accounting Standards Codification™ *and the Hierarchy of Generally Accepted*
23   *Accounting Principles – a replacement of FASB Statement No. 162*.  FASB *Accounting Standards*
24   *Codification™* (ASC) will become the source of authoritative U.S. accounting and reporting
25   standards for nongovernmental entities, in addition to guidance issued by the SEC.  These
26   allegations use the historical references to GAAP as such references existed during the Class Period.

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)            - 78 -

1  GAAP.  The Audit and Accounting Guide for Depository and Lending Institutions

2  ("AICPA Audit and Accounting Guide") was applicable to Sterling.  The AICPA also

3  issues Audit Risk Alerts, particularized by industry, which address areas of concern

4  and identify the significant business risks that may result in the material misstatement

5  of the financial statements.

6       205.  Sterling was also required under GAAP to prepare its financial

7  statements in accordance with the following fundamental accounting principles:

8  •     The principle that financial reporting should provide information that is
9      useful to present and potential investors and creditors and other users of
   the financial reports in making rational investment, credit and similar
10 decisions (FASB Statement of Concepts No. 1, ¶34);

11 •     The principle that financial reporting should provide information about
   the economic resources of an enterprise, the claims to those resources,
12 and the effects of transactions, events and circumstances that change
   resources and claims to those resources (FASB Statement of Concepts
13 No. 1, ¶40);

14 •     The principle that financial reporting should provide information about
   an enterprise's financial performance during a period because investors
15 and creditors often use information about the past to help in assessing the
   prospects of an enterprise (FASB Statement of Concepts No. 1, ¶42);

16 •     The principle that financial reporting should provide information about
   how management of an enterprise has discharged its stewardship
17 responsibility to owners (stockholders) for the use of enterprise resources
   entrusted to it (FASB Statement of Concepts No. 1, ¶50);

18
19 •     The principle that financial reporting should be reliable in that it
   represents what it purports to represent.  That information should be
20 reliable as well as relevant is a notion that is central to accounting
   (FASB Statement of Concepts No. 2, ¶¶58-59);

21 •     The principle of completeness, which means that nothing is left out of
   the information that may be necessary to ensure that it validly represents
22 underlying events and conditions (FASB Statement of Concepts No. 2,
   ¶79); and

23
24 •     The principle that conservatism be used as a prudent reaction to
   uncertainty to try to ensure that uncertainties and risks inherent in
25 business situations are adequately considered (FASB Statement of
   Concepts No. 2, ¶95).

26

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)  - 79 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

## 2.    GAAP Provisions Violated by Defendants' Failure to Account for Declining Collateral Values

206.    In calculating Sterling's ALL Reserves, defendants were also required to consider the declining value of the collateral backing its loans.  In assessing loans for impairment, Sterling management should have identified loans for which it was probable that the Company would be unable to collect all amounts due according to the contractual terms of the loan agreements.   It was then incumbent upon management to evaluate the fair value of the underlying collateral to arrive at estimated impairment losses.  As domestic property values collapsed, delinquencies and subsequent foreclosures in Sterling's lending portfolio were more likely to, and did, result in significant losses.  SAB 102 states: "A registrant's loan loss allowance methodology generally should . . . [c]onsider current collateral values (less costs to sell)."

EITF Topic No. D-80 states:

> In assessing whether loans are fully collateralized and thus whether there is a need for an allowance on those loans, institutions should consider the reliability and timing of appraisals or other valuations to ensure that the values used for any allowance calculations are realistically and reliably measured.  An institution should ***ensure that an appraisal of collateral reflects a realistic estimate of fair value***, which takes into consideration the time it will take the institution to realize the value of the collateral and ***current market conditions for selling the collateral***.

207.    Given that the value of the underlying assets of Sterling's loans was dropping rapidly, market conditions required that defendants adjust Sterling's ALL Reserves to reflect the default risks.  Defendants, however, failed to timely adjust Sterling's ALL Reserves or reassess the value of the Company's collateral assets.

## 3.    GAAP Provisions Violated by Defendants in Accounting for ALL Reserves

208.    During a November 2000 speech to the AICPA National Conference on Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)

- 80 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio. ***As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred***.

209.   During the Class Period, Sterling's ALL Reserves failed to cover the likely and estimable losses associated with the Company's $8+ billion portfolio of risky loans.

210.   Section 9.19 of the Audit and Accounting Guide for Depository and Lending Institutions provides that financial institutions are responsible for "***maintain[ing] adequate controls to ensure the ALL is consistently determined in accordance with GAAP, stated policies and procedures, and relevant supervisory guidance***."

211.   Section 9.04 of the same Accounting Guide for Depository and Lending Institutions also provides: "***Management is responsible*** for estimating credit losses . . . . Management must make careful judgments about collectibility and estimates of losses. ***Management's judgments should consider micro- and macro-economic factors; past, current, and anticipated events based on facts in evidence at the balance-sheet date***; and realistic courses of action it expects to take."

212.   Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss. *See* SFAS 5, ¶1. The collectibility of loans is an example of a loss contingency. GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: ***(a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated***. *See* SFAS 5, ¶8.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)

- 81 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

213.   Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable possibility***" that a loss or an additional loss may have been incurred.[7]   SFAS 5, ¶10.   The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.   *See* SFAS 5, ¶10.

214.   SFAS 114, ¶13 states:

> When a loan is impaired as defined in paragraph 8 of this Statement, a creditor shall measure impairment based on the present value of expected future cash flows discounted at the loan's effective interest rate, except that as a practical expedient, a creditor may measure impairment based on a loan's observable market price, or the fair value of the collateral if the loan is collateral dependent.   Regardless of the measurement method, a creditor shall measure impairment based on the fair value of the collateral when the creditor determines that foreclosure is probable.   A loan is collateral dependent if the repayment of the loan is expected to be provided solely by underlying collateral. . . .   [If] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), ***a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense***.

215.   SFAS 114, ¶8, and EITF Topic D-80A clearly describe that an evaluation of loan impairment must be made in context of current information and events, stating in part:

> A loan is ***impaired*** when, ***based on current information and events***, it is ***probable*** that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. . . .   ***[A]ll amounts due according to the contractual terms*** means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement. . . .

---

[7]   GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is ***more than remote but less than likely***."   SFAS 5, ¶3.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)                - 82 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

*Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of current information and events when assessing a loan* that has been identified for evaluation under Statement 114.

(Emphasis added and in original.)

216.    In a hypothetical example included in EITF Topic D-80, the EITF described how current environmental factors, such as the "red flags" described herein, impact the evaluation of loan impairment in light of historical loss statistics.  EITF Topic D-80 states in part:

> The bank would consider the effect of the current economic downturn to assess whether a loss has been incurred in that group of loans at the balance sheet date and to estimate the amount of loss.  In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing.  *However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based*.

### 4.    SEC Rules Violated by Defendants in Accounting for ALL Reserves

217.    The SEC provides explicit guidance on the proper accounting for loan losses that defendants were required to follow but did not.  SAB 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a *disciplined and consistently applied process*. . . .  A registrant's loan loss allowance methodology generally should . . . *[c]onsider all known relevant internal and external factors that may affect loan collectibility; . . . [c]onsider the particular risks inherent in different kinds of lending; [c]onsider current collateral values (less costs to sell) . . . [and b]e based on current and reliable data*.

218.    SAB 102 also provides:

> Factors that should be considered in developing loss measurements include . . . *[l]evels of and trends in delinquencies and impaired loans; [l]evels of and trends of charge-offs and recoveries; . . . [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices; . . . [n]ational and local economic trends and conditions; [and] [i]ndustry conditions*.

219.    The SEC further states:

For many entities engaged in lending activities, ***the allowance and provision for loan losses are significant elements of the financial statements***. Therefore, the staff believes it is appropriate for an entity's management to ***review, on a periodic basis, its methodology for determining its allowance for loan losses***.

220. Sterling failed to adequately record the ALL Reserves in order to overstate its earnings prior to and during the Class Period in violation of GAAP and SEC rules. The Company's insufficient Provision for Credit Losses is shown by the large charges defendants recorded in 4Q08 and 3Q09. Despite the fact that the real estate mortgage problems began well before the Class Period, Sterling recorded a $228.5 million Provision for Credit Losses in 4Q08, more than six times its Provision for Credit Losses for 3Q08 and more than 17 times its Provision for Credit Losses for 4Q07; and Sterling recorded Provisions of $535.8 million during the last 6 months of 2009, more than doubling the large 4Q08 charge. Moreover, charge-offs had increased dramatically prior to the Class Period from $7.7 million in 2007 to a staggering $307.4 million in the first six months of 2008. This was clearly an omen of problems to come.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

221. As set forth above, defendants' deceptive conduct, misrepresentations and omissions of material fact caused the artificial inflation of Sterling's stock price throughout the Class Period. On July 22, 2008, the day before the Class Period, Sterling's stock price closed at $5.88 per share. After the market closed, Sterling announced its false and misleading 2Q08 financial results. On July 23, 2008, Sterling's stock ***increased 32%***, from $5.88 to $7.76 per share, as a result of the false 2Q08 results and defendants' statements. On the same day, Sterling's Peer Group index (as compiled from the Company's proxy statements) only increased 1.8%, indicating that the inflation in Sterling's stock price was due to Company-specific information and representations.

222.   On July 28-29, 2008, defendants continued to make false statements during the D.A. Davidson Investor Conference.  On July 29, 2008, Sterling's stock price ***increased 17%***, from $6.83 to $7.99 per share, compared to only 9.2% for the Peer Group.

223.   On Friday, August 8, 2008, Sterling filed its final 2Q08 financial results with the SEC on Form 10-Q.  The following trading day, Monday, August 11, 2008, Sterling filed a Form 8-K with the SEC that attached an investor presentation for Sterling's 2008 Analyst Day.  Following these misleading disclosures to the market, Sterling's stock price ***increased 6%*** on August 8, 2008, and ***another 18%*** on August 11, 2008, closing at over ***$10 per share*** (compared to only 4.7% and 5.5% increases for the Peer Group).  In the two months following, as defendants' misrepresentations remained alive in the market and continued to inflate the stock price, Sterling's stock steadily increased to a Class Period peak of ***$14.72*** per share.

224.   On November 24, 2008, after Sterling's stock price had drifted down to the $4-$5 range, Sterling announced that it had preliminary approval for $303 million in TARP funding from the U.S. government.  On this news, Sterling's stock price ***increased 16%*** (compared to only 2.2% for the Peer Group).  On December 5, 2008, Sterling announced the finalization of the TARP funding.  On this news, Sterling's stock price increased another ***16%*** over two trading days, compared to only 8.6% for the Peer Group.  As set forth in §V.J., *supra*, defendants' characterization of the necessity for the TARP funding was materially misleading and falsely masked Sterling's deteriorating financial condition.

225.   On January 13, 2009, after the market closed, Sterling announced its updated results for 4Q08.  The press release disclosed a significant $230 million charge for Provision for Credit Losses in 4Q08.  The press release also disclosed a non-cash charge of $275 million to $325 million for impairments of goodwill and a

suspension of Sterling's quarterly cash dividend.  On this news, Sterling's stock decreased 47% on January 14, 2009, to close at $3.40 per share.  Although these disclosures partially revealed significant increases in the Provision for Credit Losses and negative facts concerning Sterling's financial condition, the disclosures were incomplete and misleading and continued to conceal the full impact of defendants' misconduct during the Class Period.  Indeed, following the disclosures, defendants continued to manipulate and overstate Sterling's financial results in 1Q09 and 2Q09 and continued to make false statements about Sterling's credit quality and safe and sound banking practices while concealing the full extent of defendants' misconduct and its exposure to risk.  Thus, Sterling's stock continued to trade at artificially inflated (albeit lower) levels for the remainder of the Class Period.

226.   On January 27-28, 2009, Sterling announced its 4Q08 and FY08 financial results, which included additional disclosures of increasing ALL Reserves and Provisions for Credit Losses and other adverse facts.  Although these partial disclosures had a negative impact on Sterling's stock price and removed some of the inflation that had built up as a result of defendants' misrepresentations and false financial results in 2008, defendants continued to mislead investors and maintain the inflation in the stock price by concealing additional known risks (such as understating NPAs, ALL Reserves and Provisions for Credit Losses), continuing to falsify Sterling's financial results in 2009, and falsely assuring investors that its risk was under control.

227.   On April 8, 2009, when Sterling's stock was trading in the low to mid-$2 range, defendants announced an expansion of its grant lending program to expand small business loans.  On April 9, 2009, Sterling's stock price jumped 40% to over $3 per share (compared to 14.9% for the Peer Group).  Following Sterling's announcement of inflated 1Q09 financial results in late April 2009, the stock price

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)                    - 86 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

trended higher, trading in the $3-$5 range for several months.  For much of summer and fall 2009, Sterling's stock price lost some of its inflation and traded in the $2-$3 range as additional partial disclosures of adverse facts seeped into the market.  The stock price remained inflated, however, due to defendants' continued misrepresentations, false financial results and misleading assurances concerning Sterling's financial condition and the full extent of Sterling's credit risk exposure.

228.    On October 14, 2009, defendants announced the sudden departure of CEO and co-founder Gilkey.  On October 15, 2009, the last day of the Class Period, defendants announced the shocking news concerning the issuance of the FDIC Order.  Both of these disclosures revealed the materialization of risk previously known but concealed from the market.   The disclosures also revealed the economic and regulatory consequences of defendants' misconduct and Sterling's fraudulent financial reporting during the Class Period, including the misrepresentations concerning Sterling's "safe and sound" banking practices and its mitigation of credit risk.  Finally, the disclosures revealed the true financial condition of the Company, which was overstated and misrepresented throughout the Class Period.  Following these adverse disclosures, Sterling's stock price dropped 22% and 7% on October 15 and 16, 2009, respectively, and closed at $1.20 per share, completing a catastrophic 80% fall from the start of the Class Period and 92% from the Class Period high.

## IX.    CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION

229.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sterling securities on the open market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class are defendants, directors and officers of Sterling and their families and affiliates.

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)

- 87 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

230.   The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, there were approximately 52 million outstanding shares owned by thousands of persons.   Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

231.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

(a)   Whether the federal securities laws were violated by defendants;

(b)   Whether defendants engaged in fraudulent conduct and omitted and/or misrepresented material facts;

(c)   Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether defendants knew or recklessly disregarded that their statements were materially false and misleading;

(e)   Whether the prices of Sterling common stock were artificially inflated;

(f)   Whether defendants' fraudulent conduct, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(g)   The extent of damage sustained by Class members and the appropriate measure of damages.

232.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class purchased Sterling securities during the Class Period and sustained damages from defendants' wrongful conduct.  Plaintiff will adequately protect the interests of

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL SECURITIES LAWS** (2:09-cv-00368-EFS)    - 88 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1 the Class and has retained counsel who are experienced in class action securities

2 litigation.  Plaintiff has no interests that conflict with those of the Class.

3     233.  A class action is superior to other available methods for the fair and

4 efficient adjudication of this controversy.  A class action will achieve economies of

5 time, effort and expense and provide uniformity of decision to the similarly situated

6 members of the Class without sacrificing procedural fairness or bringing about other

7 undesirable results.  Class members have not indicated an interest in prosecuting

8 separate actions as none have been filed.  The number of Class members and the

9 relatively small amounts at stake for individual Class members make separate suits

10 impracticable.  No difficulties are likely to be encountered in the management of this

11 action as a class action.

12     234.  In addition, a class action is superior to other methods of fairly and

13 efficiently adjudicating this controversy because the questions of law and fact

14 common to the Class predominate over any questions affecting only individual Class

15 members.  Although individual Class members have suffered disparate damages, the

16 fraudulent scheme and the misrepresentations and omissions causing damages are

17 common to all Class members.  Further, there are no individual issues of reliance that

18 could make this action unsuited for treatment as a class action because all Class

19 members relied on the integrity of the market and are entitled to the fraud-on-the-

20 market presumption of reliance.

21     235.  The market for Sterling's securities was open, well developed and

22 efficient at all relevant times.  Sterling's stock met the requirements for listing, and

23 was listed and actively traded on the NASDAQ, a highly efficient and automated

24 market.  As a regulated issuer, Sterling filed periodic public reports with the SEC and

25 the NASDAQ.  Sterling regularly communicated with public investors via established

26 market communication mechanisms, including through regular disseminations of

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)                - 89 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1    press releases on the national circuits of major newswire services and through other

2    wide-ranging public disclosures, such as communications with the financial press and

3    other similar reporting services.

4         236.   As alleged herein, the change in the price of Sterling's stock – compared

5    to the changes in the peer group and NASDAQ – in response to the release of

6    unexpected material positive and negative information about the Company shows

7    there was a cause-and-effect relationship between the public release of the unexpected

8    information about Sterling and the price movement in the Company's stock.

9    Numerous analysts followed Sterling, attended the Company's conference calls and

10   issued reports throughout the Class Period.  The Company was eligible to register

11   securities on Form S-3 during the Class Period.

12        237.   As a result of the foregoing, the market for Sterling common stock

13   promptly digested current information regarding Sterling from all publicly available

14   sources and reflected such information in the Company's stock price.  Under these

15   circumstances, all purchasers of Sterling securities during the Class Period suffered

16   similar injury through their purchases of Sterling stock at artificially inflated prices

17   and the subsequent revelations concerning declines in price, and a presumption of

18   reliance applies.

19                                **COUNT I**

20   **For Violations of Section 10(b) of the 1934 Act and SEC Rule 10b-5**
21                        **(Against All Defendants)**

22        238.   Plaintiff incorporates ¶¶1-237 by reference.

23        239.   During the Class Period, defendants disseminated or approved the false

24   statements specified above, which they knew or deliberately disregarded were

25   misleading in that they contained misrepresentations and failed to disclose material

26

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  facts necessary in order to make the statements made, in light of the circumstances

2  under which they were made, not misleading.

3      240.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

4          (a)    Employed devices, schemes and artifices to defraud;

5          (b)    Made untrue statements of material facts or omitted to state

6  material facts necessary in order to make the statements made, in light of the

7  circumstances under which they were made, not misleading; or

8          (c)    Engaged in acts, practices and a course of business that operated as

9  a fraud or deceit upon plaintiff and others similarly situated in connection with their

10  purchases of Sterling's publicly traded securities during the Class Period.

11      241.   Plaintiff and the Class have suffered damages in that, in reliance on the

12  integrity of the market, they paid artificially inflated prices for Sterling's publicly

13  traded securities.  Plaintiff and the Class would not have purchased Sterling's publicly

14  traded securities at the prices they paid, or at all, if they had been aware that the

15  market prices had been artificially and falsely inflated by defendants' misleading

16  statements.

**COUNT II**

**For Violations of Section 20(a) of the 1934 Act
(Against the Individual Defendants)**

20      242.   Plaintiff incorporates ¶¶1-241 by reference.

21      243.   The Individual Defendants acted as controlling persons of Sterling within

22  the meaning of §20(a) of the 1934 Act.  By reason of their positions, duties and

23  responsibilities with the Company and their ownership of Sterling stock, the

24  Individual Defendants had the power and authority to cause Sterling to engage in the

25  wrongful conduct complained of herein.  Sterling controlled the Individual Defendants

526557_1

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)    - 91 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1  and all of its employees.  By reason of such conduct, defendants are liable pursuant to

2  §20(a) of the 1934 Act.

3  **X.    PRAYER FOR RELIEF**

4          WHEREFORE, plaintiff prays for judgment as follows:

5          A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ.

6  P. 23;

7          B.    Awarding plaintiff and the members of the Class damages, including

8  interest;

9          C.    Awarding plaintiff reasonable costs and attorneys' fees; and

10         D.    Awarding such equitable/injunctive or other relief as the Court may deem

11  just and proper.

12  **XI.    JURY DEMAND**

13         Plaintiff demands a trial by jury.

14  DATED: June 18, 2010                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
15                                          ELI R. GREENSTEIN
                                            S. ASHAR AHMED
16

17                                          _____
                                                  s/ Eli R. Greenstein
18                                              ELI R. GREENSTEIN

19                                          100 Pine Street, Suite 2600
                                            San Francisco, CA  94111
20                                          Telephone: 415/288-4545
                                            415/288-4534 (fax)
21
                                            Lead Counsel for Plaintiff
22
                                            LUKINS & ANNIS
23                                          BRYCE WILCOX

24

25                                          _____
                                                   s/ Bryce Wilcox
26                                              BRYCE WILCOX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

717 West Sprague Avenue, Suite 1600
Spokane, WA 99201
Telephone: 509/455-9555
509/747-2323 (fax)

Additional Counsel for Plaintiff

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)      - 93 -

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on June 18, 2010, I electronically filed the foregoing with

3 the Clerk of the Court using the CM/ECF system which will send notification of such

4 filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and

5 I hereby certify that I have mailed the foregoing document or paper via the United

6 States Postal Service to the non-CM/ECF participants indicated on the attached

7 Manual Notice List.

8      I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on June 18, 2010.

10

11                          s/ Eli R. Greenstein
                         ELI R. GREENSTEIN

12
                         ROBBINS GELLER RUDMAN
13                           & DOWD LLP
14                       100 Pine Street, Suite 2600
                         San Francisco, CA  94111
15                       Telephone:  415/288-4545
                         415/288-4534 (fax)
16

17                       E-mail:     elig@rgrdlaw.com

18

19

20

21

22

23

24

25

26
                              - 94 -

**CONSOL CPT FOR VIOLATION OF FEDERAL
SECURITIES LAWS** (2:09-cv-00368-EFS)

ROBBINS GELLER RUDMAN & DOWD LLP
100 Pine Street, Suite 2600, San Francisco, CA  94111
Telephone: 415/288-4545 • Fax: 415/288-4534

# Mailing Information for a Case 2:09-cv-00368-EFS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **S Ashar Ahmed**
  aahmed@csgrr.com

- **Karl P Barth**
  karlb@hbsslaw.com,dawn@hbsslaw.com

- **Britton F Davis**
  bdavis@wsgr.com,rcarter@wsgr.com,srobinson@wsgr.com

- **Douglas W Greene**
  dgreene@wsgr.com,rcarter@wsgr.com,srobinson@wsgr.com

- **Eli R Greenstein**
  elig@csgrr.com

- **Barry M Kaplan**
  bkaplan@wsgr.com,rcarter@wsgr.com,srobinson@wsgr.com

- **Gregory L Watts**
  gwatts@wsgr.com

- **Bryce James Wilcox**
  bwilcox@lukins.com,ksimonson@lukins.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Tricia L McCormick
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Darren I Robbins
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
```

- 95 -