UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, individually and behalf of all other similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>STERLING FINANCIAL CORPORATION; HAROLD B. GILKEY; and DANIEL G. BYRNE,<br><br>                    Defendants. | No.  CV-09-0368-EFS<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

## I.  <u>INTRODUCTION</u>

This matter comes before the Court on Defendants Sterling Financial Corporation ("Sterling"), Harold B. Gilkey, and Daniel G. Byrne's (collectively, "Defendants") Motion to Dismiss Consolidated Complaint, ECF No. 46.  Defendants ask the Court to dismiss Plaintiff City of Roseville Employees' Retirement System's consolidated class action complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.  Also pending before the Court are Defendants' Request for Judicial Notice and Notice of Incorporation by Reference, ECF No. 50, and Defendants' Second Request for Judicial Notice and Notice of Incorporation by Reference, ECF No. 59.  Having thoroughly reviewed

the pleadings, the documents filed in connection with the instant
motions, and applicable authority, the Court is fully informed and now
enters the following Order.

## II.    BACKGROUND

**A.    Factual History[1]**

This putative class-action lawsuit alleges securities fraud on
behalf of all persons who acquired Sterling's publicly traded
securities between July 23, 2008, and October 15, 2009 (the "Class
Period"). Consol. Compl. ("C.C.") ¶ 1, ECF No. 29, at 1. Plaintiff
alleges that Sterling and its top officers violated the Securities and
Exchange Act of 1934 (the "Exchange Act"), as amended by the Private
Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4,
and Securities and Exchange Commission (SEC) Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5. *Id.* Plaintiff asserts that
Defendants issued materially false and misleading representations
about Sterling's financials, its overall financial health, its loan
portfolio, and its approach to risk assessment and underwriting, with
either intent to deceive or deliberate recklessness about the
potential falsity of their representations. On behalf of the proposed

---

[1] The factual history recited herein is based on the factual allegations
in the Consolidated Complaint, ECF No. 29, and in the extrinsic
documents incorporated therein. *See Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009). The Court assumes to be true those portions of the
Consolidated Complaint that "contain sufficient allegations of
underlying facts to give fair notice and to enable the opposing party to
defend itself effectively," but the Court does not afford the
presumption of truth to allegations that "simply recite the elements of
a cause of action." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

1   class, Plaintiff seeks to recover all losses incurred from trading in

2   shares of Sterling's stock during the Class Period. C.C. ¶ A, at 92.

3       1.   <u>The Parties</u>

4       Plaintiff City of Roseville Employees' Retirement System

5   ("Roseville") has been appointed as lead Plaintiff in this

6   consolidated class-action lawsuit. *Id.* ¶ 24, at 9; ECF No. 14. The

7   complaint alleges that Plaintiff purchased Sterling's securities

8   during the Class Period and incurred losses as a result of Defendants'

9   fraudulent conduct. C.C. ¶ 24, at 9.

10      Defendant Sterling is a bank holding company which primarily

11  operates through two subsidiaries: Sterling Savings Bank and Golf

12  Savings Bank. *Id.* ¶ 2, at 1. Sterling Savings Bank is the largest

13  commercial bank headquartered in Washington, and one of the largest

14  regional community banks in the western United States. *Id.* Sterling

15  offers banking products and services, including mortgage lending and

16  construction financing, to individuals, businesses, and other

17  commercial entities. *Id.* Sterling is headquartered in Spokane,

18  Washington, and trades under the ticker symbol "STSA." *Id.*

19      The other named Defendants are Harold B. Gilkey and Daniel G.

20  Byrne (collectively, the "Individual Defendants"). *Id.* ¶ 1.

21  Defendant Gilkey co-founded Sterling in 1983, and at all times

22  relevant to the complaint, he was the Chairman of Sterling's Board of

23  Directors and the company's Chief Executive Officer (CEO). *Id.* ¶ 26,

24  at 9. Defendant Byrne joined Sterling in 1983, and at all relevant

25  times, he was Sterling's Chief Financial Officer (CFO) and Executive

26  Vice President of Finance. *Id.* ¶ 27, at 10. Plaintiff alleges that

because of their positions and responsibilities with Sterling, the Individual Defendants controlled Sterling's public communications and financial reports and were aware that material information was being withheld from investors. *Id*. ¶ 28.

2. <u>Sterling's Aggressive Growth Strategy</u>

Since its inception in 1983, Sterling pursued an aggressive growth strategy to become "the leading bank in the western United States." *Id*. ¶ 3, at 1. Over the course of 23 years, Sterling acquired 13 other banks. *Id*. In 2006 and 2007 alone, Sterling acquired four separate financial institutions, collectively valued at $567.2 million. *Id*. By December 31, 2007, Sterling maintained over $12 billion in assets and more than 175 depository banking offices, making it the largest commercial bank headquartered in Washington. *Id*. at 2.

In the years preceding the Class Period, Sterling substantially increased the size of its portfolio of construction loans.[2] *Id*. ¶ 4. Sterling focused on construction loans because the amounts loaned were typically larger, and due to higher interest rates and yields, the loans were far more lucrative than individual mortgage loans. *Id*. ¶ 5. From 2004 to 2007, Sterling's portfolio of construction loans increased by 350% - from $653 million to $2.9 billion. *Id*. ¶ 4. During that time, construction loan originations accounted for roughly 50% of Sterling's total loan originations each year. *Id*.

---

[2] Construction loans consist of loans issued to real estate developers, home builders, and construction financiers. *Id*. ¶ 4.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 4

1   Unlike individual mortgages, which usually consist of a single
2   borrower acquiring one property, construction loans often involve
3   multi-unit projects of much greater size and cost. *Id.* ¶ 5.  These
4   projects, which often require constructing a residential property from
5   the ground up, are subject to additional layers of risk, including
6   construction delays, cost overruns, and the borrower's inability to
7   sell the property or units once developed. *Id.*  Sterling consistently
8   disclosed the riskier aspects of these loans in its SEC filings,
9   cautioning that "a downturn in the local economies or real estate
10  markets could negative impact Sterling's banking business," and that
11  Sterling was "likely to experience higher levels of loan losses [on
12  construction loans] than it would on residential mortgage loans." *Id.*
13  ¶ 30, at 11; Ex. Q to Decl. of Douglas W. Greene ("Greene Decl."), ECF
14  No. 51-17, at 83-84.  Sterling's warnings proved prescient.

15      3.   Sterling's Response to the Great Recession

16      By 2006, the explosion in home mortgage financing and real
17  estate development, which had so dominated the early part of the
18  decade, began to falter. *See In re Fannie Mae 2008 Sec. Litig.*, 742
19  F. Supp. 2d 382, 391 (S.D.N.Y. 2010) ("In 2006, the demand for housing
20  dropped abruptly and home prices began to fall.").  This downturn
21  persisted, widened, and eventually began to affect the residential
22  construction market in 2007. *Id.* ¶ 120, at 47.  Before long, the
23  national and global financial markets began to feel the effects. *See*
24  *Blodgett v. Shelter Mortg. Co., LLC*, No. CIV-10-2233-PHX-MHB, 2013 WL
25  495501, at *18 (observing that this "time frame [is] commonly referred
26

to as the 'Great Recession' — a period of marked global economic decline beginning in December of 2007").

Sterling was not immune from the effects of the Great Recession. Although the Pacific Northwest — where many of Sterling's financed projects were concentrated — initially weathered the storm far better than other regional housing markets, it soon caught up with the national trend. *See* C.C. ¶¶ 103-04, at 40-41. By November 2008, the decline in residential home values in the Puget Sound region had started to mirror – and even, in some cases, exceed – the declines in other regions. *Id.*

Sterling experienced significant financial difficulty as a result. Before the Great Recession began, "the economy was growing at a rapid pace and borrowers of construction loans were flush with cash due to a booming real estate market." *Id.* ¶ 72, at 26. Sterling therefore had every reason to be optimistic about its loan portfolio and unconcerned about its low rate of defaulted loans. But by 2007 and 2008, "as the real estate and credit markets collapsed and the U.S. economy entered a full-blown recession, this trend completely reversed itself." *Id.* ¶ 74. For the five fiscal quarters preceding the Class Period – the last three quarters of 2007 and the first two quarters of 2008 – Sterling began to see a marked increase in loans "no longer performing in accordance with the terms of the original loan agreement" (known as non-performing loans, or "NPLs").[3] *Id.* ¶¶

---

[3] NPLs comprise the largest component of non-performing assets ("NPAs"), a broader category of troubled assets which include other, unspecified non-loan assets. *Id.* ¶ 35, at 14. Broader still is the category of

35-36, at 14.    During that time, the amount of total NPLs increased steadily from $33 million to $303 million.  *Id.* ¶ 36.   This increase was driven, in large part, by construction-related NPLs, which rose during the same period from $9 million to $253 million.  *Id.* ¶ 37.

Between 2Q08[4] and 2Q09, Sterling continued to report large increases in NPLs – specifically, construction NPLs, which had increased from $253 million in 2Q08 to nearly $595 million by 2Q09.  *Compare id.* ¶ 37, at 14 (2Q08 amounts), *with id.* ¶ 90, at 35 (2Q09 amounts).   Default rates and charge-offs increased, and Sterling was forced to absorb large losses on its balance sheets because of its increasingly deteriorating loan portfolio.  Ex. T to Greene Decl., ECF No. 51-20, at 123.

Sterling announced its 2Q08 financial results on July 22, 2008, the day before the beginning of the Class Period.  C.C. ¶ 60, at 22. The next day, during Sterling's July 23, 2007 earnings call addressing those results, Defendants expressed guarded optimism about the worsening global financial markets and Sterling's overall condition.

---

"Classified Assets," which includes NPAs and other assets that management deems to have a deficiency which could result in a loss.  *Id.* ¶ 40, at 15.

[4]   The Court adopts the parties' methodology for referring to fiscal quarters and years.   To identify a fiscal quarter, the Court uses "xQyy," with "x" being the quarter and "yy" being the last two digits of the year (e.g., "1Q07" represents the first quarter of 2007). Similarly, the Court uses "FYyy" to refer to a fiscal year.   Although not specifically pled, based on the timing of Sterling's quarterly financial announcements, it appears that Sterling's fiscal year ran from January 1 to December 31.

For example, Defendant Gilkey acknowledged that Sterling was "indeed navigating through a very difficult financial storm," and Defendant Byrne indicated that, as to Sterling's future outlook, "[t]he wider than normal guidance [on future earnings per share] reflects the uncertainty surrounding a couple of factors that will influence our performance [including] the level of classified and non-performing assets over the next two quarters and the severity of charge-offs we anticipate in these categories." Ex. B to Greene Decl., ECF No. 51-2, at 15-16. At the same time, Defendants indicated reason for optimism, based on their assumption that "the economy in the Pacific Northwest will begin to slow but will remain stronger than the national economy." *Id.* at 16. Defendant Gilkey also stated that Sterling's credit team was "confident [it had] identified most of our credits that are either distressed or could become distressed." *Id.* at 17. Similar representations followed in Sterling's announcement of 3Q08 financial results. *See, e.g.*, Ex. C. to Greene Decl., ECF No. 51-3, at 19-26 (excerpts from Sterling's October 22, 2008 earnings call addressing 3Q08 financials).

On January 13, 2009, two weeks before announcing its 4Q08 and FY08 financial results, Sterling pre-disclosed that it planned to take a record $230 million provision for credit losses "relat[ing] to worsening economic conditions, the continued stress on real estate values, increasing levels of both classified and non-performing assets[,] and higher net charge-offs." Ex. L to Greene Decl., ECF No. 51-12, at 55. Sterling announced that it anticipated a net loss for both the fiscal quarter and the fiscal year because of the increased

provisioning. *Id.* In its January 27, 2009 press release announcing 4Q08 and FY08 financial results, and on the January 28, 2009 earnings call, Sterling also indicated that it had "modified its methodology for determining the fair value of loans being tested for impairment during the quarter [by] excluding the potential cash flows from certain guarantors." Exs. D & M to Greene Decl., ECF Nos. 51-4 & 51-13, at 29 & 59.

In 2009, Sterling issued press releases regarding 1Q09 and 2Q09 financial results, and it held quarterly earnings calls with market analysts. During the 1Q09 earnings call, Defendant Gilkey acknowledged that while "recessions tend to come late to the Pacific Northwest . . . and tend to be shallower than the average for the whole nation," the recession had clearly begun impacting the region. Ex. E to Greene Decl., ECF No. 51-5, at 33. Sterling also recorded a $65.8 million loss provision, well above the $30-$37 million provisions taken in each of the first three quarters of 2008. Ex. N to Greene Decl., ECF No. 51-14, at 63. Defendant Gilkey acknowledged that, "[g]iven the economic uncertainties[,] it is difficult to determine when provisioning will begin to return to more normalized levels." *Id.* Sterling also began to see increasing signs of impaired loans outside its residential construction portfolio. Ex. E to Greene Decl., ECF No. 51-5, at 33.

In Sterling's July 24, 2009 earnings call discussing 2Q09 results, Defendant Gilkey expressed optimism that "local economies are bouncing along the bottom and are nearing a stabilized level." Ex. F to Greene Decl., ECF No. 51-6, at 36. He reported "steady progress"

in resolving Sterling's credit issues in its residential construction loan portfolio, and that NPAs within that segment had begun to recede in many of its markets. *Id.* Nonetheless, he also acknowledged that "determining the economic bottom and the quality of the economic recovery are difficult." *Id.*

All told, Sterling was profoundly affected by the economic collapse. By December 31, 2009, Sterling's total assets had declined from $12.8 billion, at the end of the prior year, to $10.9 billion. Ex. T to Greene Decl., ECF No. 51-20, at 123.

    4.   <u>Departure of Sterling Executives and Intervention by Federal & State Banking Regulators</u>

On October 14, 2009, Sterling announced that Defendant Gilkey had stepped down from his positions as Chairman of the Board, CEO and President of Sterling, and that Heidi Stanley had stepped down from her positions as Chairman of the Board and CEO of Sterling Savings Bank.[5] C.C. ¶¶ 183-84, at 72. The next day, Sterling announced that it had entered into a stipulated Cease & Desist Order (CDO) with the Federal Deposit Insurance Corporation (FDIC) and the Washington State

---

[5] Plaintiff alternatively characterizes the departures as "stepp[ing] down," *see* C.C. ¶ 178, at 70, and a "forced departure," *id.* ¶ 186, at 73. The actual text of the press release announcing the departures is not provided, and there is no evidence cited in the complaint to support Plaintiff's allegation (or insinuation) that the departures were forced, acrimonious, or resulted from fraud or malfeasance. In fact, Plaintiff cites an October 16, 2009 article in *American Banker*, in which an otherwise-unidentified person named "Siebly" indicated that the departures were related to "the issue of us being able to fix our ineffectiveness." *Id.* ¶ 187.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 10

Department of Financial Institutions (DFI). *Id.* ¶ 11, at 4. Although the CDO stipulated that Sterling did not admit or deny any of the allegations contained therein, the CDO reflected the FDIC and DFI's determination "that they had reason to believe that [Sterling] had engaged in unsafe or unsound banking practices and violations of law and/or regulations." *Id.* ¶ 134; FDIC Order, Ex. A to C.C., ECF No. 29-1, at 96-97. Specifically, the CDO directed Sterling to desist from practices such as "operating with inadequate board of directors oversight," "operating with inadequate capital in relation to the kind and quality of assets held," "operating with a large volume of poor quality loans," and "operating in such a manner as to produce operating losses." C.C. ¶ 137, at 54. Sterling was directed to "restore all aspects of the Bank to a safe and sound condition." *Id.* ¶ 138.

According to Plaintiff, investors were stunned by the "double-whammy" — the departure of Ms. Stanley and Defendant Gilkey, followed by the announcement of the CDO the next day. *Id.* ¶ 180, at 71. On October 22, 2009, approximately one week after the conclusion of the Class Period, Sterling announced its 3Q09 financial results, which included losses of $8.93 per share. *Id.* ¶ 181.

   5.   Sterling's Share Price During the Class Period

On July 23, 2008, the first day of the Class Period, Sterling's stock price increased from $5.88 to $7.76 per share following Sterling's previous-day announcement of 2Q08 financial results. *Id.* ¶ 221, at 84. This 32% increase markedly outperformed Sterling's peer group index, which only increased 1.8% that same day. *Id.* Sterling's

1  stock price continued to fluctuate, but after Sterling filed its 2Q08

2  financial results with the SEC on Friday, August 8, 2008, Sterling's

3  stock price increased 6% that day and 18% the following Monday,

4  closing at over $10 per share. *Id.* ¶ 223, at 85.

5      In the two months that followed, Sterling's stock price rose to

6  a high of $14.72 per share, which, according to Plaintiff, resulted

7  from the market's reliance on Defendants' misleading 2Q08

8  representations. *Id.* However, by November 24, 2008, Sterling's stock

9  price had fallen to between $4-$5 per share. *Id.* ¶ 224.

10     Sterling's stock price continued to fluctuate, increasing

11 substantially following Sterling's announcement of preliminary

12 approval to receive additional funding from the U.S. Government, *id.*,

13 but losing nearly half its value (to $3.40 per share) after Sterling

14 pre-announced its record 4Q08 loss provision on January 13, 2009, *id.*

15 ¶ 225, at 85-86.   Sterling's stock price hovered between $2-$5 per

16 share for most of 2009. *Id.* ¶ 227, at 86-87.   Following the twin

17 announcements on October 14-15, 2009, of executive departures and the

18 issuance of the FDIC's CDO, Sterling's stock price dropped more than

19 25% and closed at $1.20 per share, 92% less than its Class Period high

20 of $14.72. *Id.* ¶ 228, at 87.

21 **B.   Procedural History**

22     Plaintiff initially filed its complaint for violations of

23 federal securities laws on December 11, 2009.  ECF No. 1.  On February

24 9, 2010, Plaintiff sought appointment as lead plaintiff in the

25 lawsuit; Plaintiff also asked the Court to approve its selection of

26 Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel and Lukins

& Annis[6] as liaison counsel.  ECF Nos. 7 & 13.  The Court granted Plaintiff's motion.  ECF No. 14.

On June 18, 2010, Plaintiff filed the Consolidated Complaint on behalf of the putative class.  ECF No. 29.  On August 30, 2010, Defendants moved to dismiss the complaint.  ECF No. 46.

In connection with their opening memorandum and accompanying declaration, Defendants asked the Court to take judicial notice of certain documents and to treat certain documents as incorporated by reference into the Consolidated Complaint.  ECF No. 50.  Also, in connection with their subsequent reply memorandum and accompanying declaration, Defendants again sought judicial notice and incorporation by reference.  ECF No. 59.  After several scheduling conflicts were resolved, the Court heard argument on the pending motions on March 2, 2011.  ECF No. 78.  At the time, the motion to dismiss was taken under advisement.  *Id*.  Since that time, with the Court's leave, Defendants have submitted a supplemental memorandum, ECF No. 91, and both Plaintiff and Defendants have submitted notices of supplemental authority, ECF Nos. 94 & 92, respectively.

//

//

//

---

[6]  Plaintiff initially sought to have Lovell Mitchell & Barth LLP appointed as liaison counsel, ECF No. 7; however, upon the announced merger between Lovell Mitchell and the law firm Hagens Berman, to avoid any appearance of conflict, Plaintiff asked the Court to instead appoint Lukins & Annis.  ECF No. 13.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 13

1

### III.  LEGAL STANDARDS

2  **A.    Motion to Dismiss**

3         Federal Rule of Civil Procedure 12(b)(6) permits a defendant to

4  seek dismissal of a complaint that "fail[s] to state a claim upon

5  which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   When

6  considering a motion to dismiss, the Court must afford a presumption

7  of truthfulness to all material factual allegations and construe those

8  allegations in the light most favorable to the plaintiff.  *See Nursing*

9  *Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1229 (9th

10  Cir. 2004) (citing *Burgert v. Lokelani Bernice Pauahi Bishop Trust,*

11  200 F.3d 661, 663 (9th Cir. 2000)).    However, the Court is "not

12  required to accept legal conclusions cast in the form of factual

13  allegations if those conclusions cannot be reasonably drawn from the

14  facts alleged."  *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 755

15  (9th Cir. 1994) (internal citations omitted).

16         If the Court dismisses the complaint, it must decide whether to

17  grant leave to amend.   Denial of leave to amend is "improper unless it

18  is clear that the complaint could not be saved by any amendment."

19  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946

20  (9th Cir. 2005).

21  **B.    Specific Legal Standards Governing Plaintiff's Claims**

22         Plaintiff identifies two claims in the Consolidated Complaint:

23  first, Plaintiff claims that all Defendants violated § 10(b) of the

24  Exchange Act and corresponding SEC Rule 10b-5; and second, Plaintiff

25  claims that the Individual Defendants violated § 20(a) of the Exchange

26

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 14

Act.    The legal standards governing these claims are discussed

separately below.

    1.    <u>Claim I: § 10(b) and SEC Rule 10b-5</u>

    Section 10(b) of the Exchange Act makes it unlawful for any

person to

> use or employ, in connection with the purchase or sale of
> any security registered on a national securities
> exchange . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations
> as the [SEC] may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j(b).    SEC Rule 10b-5, promulgated pursuant to the

Exchange Act, makes it unlawful to, *inter alia*, "make any untrue

statement of a material fact or to omit . . . a material fact

necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading." 17 C.F.R.

§ 240.10b-5(b).

    "To sufficiently plead a primary violation of [SEC] Rule 10b-5

based on misstatements, a plaintiff must adequately allege the

following: "1) a material misrepresentation or omission by the

defendant ['falsity']; 2) scienter; 3) a connection between the

misrepresentation or omission and the purchase or sale of a security;

4) reliance on the misrepresentation or omission; 5) economic loss;

and 6) loss causation." *In re Rigel Pharm., Inc. Sec. Litig.*, 697

F.3d 869, 876 (9th Cir. 2012) (citing *Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).    Moreover, when

such a claim is brought, the complaint must also satisfy the

significantly heightened pleading requirements of Federal Rule of

Civil Procedure 9(b) and the PSLRA.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  Rule 9(b) requires that any party alleging fraud must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), which means the pleading party must specifically "identify[] the statement[] at issue[,] what is false or misleading about the statement[,] and why the statement[] [was] false or misleading at the time [it] was made." *Rigel*, 697 F.3d at 876.  The PSLRA requires a plaintiff to "state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

    2.    <u>Claim II: § 20(a)</u>

    Section 20(a) of the Exchange Act imposes joint and several liability for violations of § 10(b) and its underlying regulations, including SEC Rule 10b-5, on a company's "controlling" individuals:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco Partners*, 552 F.3d at 990 (quoting *No. 84 Employer-Teamster Joint Council*

1  *Pension Trust Fund v. Am. W. Holding Corp.* (*America West*), 320 F.3d
2  920, 945 (9th Cir. 2003)). Although this inquiry is usually an
3  "intensely factual question," *Paracor Fin., Inc. v. Gen. Elec. Capital*
4  *Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996), § 20(a) claims may be
5  summarily dismissed if a plaintiff fails to sufficiently plead a
6  primary violation of § 10(b). *Zucco Partners*, 552 F.3d at 990. Thus,
7  at this stage of the proceedings, Plaintiff's § 20(a) claim rises and
8  falls with its § 10(b) claim.

9  **C.  Consideration of Extrinsic Evidence**

10       In general, "a district court may not consider any material
11  beyond the pleadings in ruling on a [Rule] 12(b)(6) motion." *Branch*
12  *v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other*
13  *grounds*, *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir.
14  2002). There are, however, two relevant exceptions that apply to this
15  case. First, a court may take judicial notice of matters of public
16  record. Fed. R. Evid. 201(b)(2); *see also Mack v. South Bay Beer*
17  *Distribs.*, 798 F.2d 1279, 1281 (9th Cir. 1986). Second, a court may
18  consider extrinsic documents that have been incorporated into the
19  pleadings by reference. *Branch*, 14 F.3d at 553. These are each
20  distinct concepts, *see Busey v. P.W. Supermarkets, Inc.*, 368 F. Supp.
21  2d 1045, 1049 (N.D. Cal. 2005), therefore each is discussed separately
22  below.

23       1.  <u>Incorporation by Reference</u>

24       The doctrine of incorporation by reference allows "a district
25  court to consider documents 'whose contents are alleged in a complaint
26  and whose authenticity no party questions, but which are not

physically attached to the plaintiff's pleading.'" *In re Silicon Graphics, Inc. Sec. Litig.* (*SGI*), 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch*, 14 F.3d at 454). Because these documents have essentially been adopted as part of the complaint, the Court may consider them without converting the motion to dismiss into a motion for summary judgment. *See Branch*, 14 F.3d at 454. Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties – and the Court – are free to refer to any of its contents. *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 131 (D. Conn. 2007), *aff'd on other grounds*, 312 Fed. Appx. 400 (2d Cir. 2009).

     2.  <u>Judicial Notice</u>

Courts may take judicial notice of information "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts routinely take judicial notice of such things as public SEC filings, corporate press releases, and documented accounting rules. *See, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998); *In re Asyst Techs, Inc. Deriv. Litig.*, No. C-06-4669, 2008 WL 2169021, at *1 n.1 (N.D. Cal. May 23, 2008) (observing that "judicial notice is appropriate for SEC filings, press releases, and accounting rules" because such documents "are matters of public record" (internal quotations omitted)).

**IV.   DISCUSSION**

**A.   Defendants' Motions for Judicial Notice & Incorporation by Reference**

In connection with their opening memorandum in support of the motion to dismiss, Defendants have submitted a supporting declaration by Douglas W. Greene, counsel for Defendants, ECF No. 51. Defendants attached twenty-eight exhibits to Mr. Greene's declaration, consecutively identified as Exhibits A-Z, and AA-BB. Separately, Defendants ask the Court to take judicial notice of certain exhibits and to deem other exhibits incorporated by reference into the Consolidated Complaint. ECF No. 50. Additionally, in connection with their reply memorandum in support of the motion to dismiss, Defendants submitted a supporting declaration by Britton F. Davis, counsel for Defendants, ECF No. 57. Defendants attached eight additional exhibits to Mr. Davis's declaration, consecutively identified as Exhibits CC-JJ. Again, Defendants ask the Court to take judicial notice of certain exhibits and to deem other exhibits incorporated by reference into the Consolidated Complaint. ECF No. 59.

Plaintiff does not object to 1) Defendants' argument concerning the incorporation-by-reference doctrine, 2) the specific exhibits Defendants identifies as referenced in the Consolidated Complaint, or 3) the authenticity of any of the exhibits Defendant has provided. *See* ECF No. 55 (objecting only to the Court's consideration of the *truthfulness*, rather than the *existence*, of certain exhibits to be judicially noticed). Accordingly, this unopposed portion of

1   Defendants' motions are granted, and the Court hereby deems Exhibits

2   A-G, I-S, U-V, X-Y, AA, and CC-GG incorporated by reference.[7]

3       As to the issue of judicial notice, Plaintiff claims that the

4   exhibits for which Defendants are requesting judicial notice may only

5   be considered to the extent that such documents exist, not for the

6   truthfulness of the statements contained therein.   On this point,

7   Plaintiff is correct.   *See Klein v. Freedom Strategic Partners*, 596 F.

8   Supp. 2d 1152, 1157 (D. Nev. 2009) ("When a court takes judicial

9   notice of a public record, 'it may do so not for the truth of the

10  facts recited therein, but for the existence of the [record], which is

11  not subject to reasonable dispute over its authenticity.'") (quoting

12  *Lee v. City of Los Angeles*, 250 F.2d 668, 690 (9th Cir. 2001)).   To

13  the extent Defendants rely on case law to the contrary, they

14  mistakenly conflate the doctrine of incorporation by reference with

15  the separate concept of judicial notice.   *Cf., e.g.*, *United States v.*

16  *Richie*, 342 F.3d 903, 908 (9th Cir. 2003) (acknowledging that a

17  district court may assume that the contents of a document *incorporated*

---

[7]  The Consolidated Complaint cites excerpts from various press releases, conference call transcripts, and SEC filings, and contends they are misleading; but the complaint often omits important, qualifying statements preceding or following the alleged misrepresentations.   A "plaintiff cannot avoid dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations." *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1069 (9th Cir. 2008).   Accordingly, where necessary, the Court has considered additional material from these incorporated documents to ensure the alleged misrepresentation is viewed in the context in which it was originally made.

1  *by reference* "are true for purposes of a motion to dismiss"); *In re*

2  *Downey Sec. Litig.* (*Downey II*), No. CV 08-3261-JFW, 2009 WL 2767670,

3  at *6 n.4 (C.D. Cal. Aug. 21, 2009) (same). Defendants have not cited

4  any authority which permits the Court to assume the truthfulness of

5  the contents of documents for which it takes judicial notice (as

6  opposed to documents incorporated by reference).

7      In any event, in resolving the instant motion to dismiss, the

8  Court finds it unnecessary to consider the truthfulness of the

9  judicially noticeable documents Defendants have submitted.  Instead,

10 the Court decides the motion by taking judicial notice of the fact

11 that such documents exist.   In other words, to the extent the

12 documents contain out-of-court representations, the Court takes

13 judicial notice of the fact that the representations were made, but

14 does not take judicial notice of the truthfulness of such

15 representations.   Accordingly, Defendants' requests for judicial

16 notice and incorporation by reference are granted in part and denied

17 in part.

18 **B.  Defendants' Motion to Dismiss**

19     Defendants ask the Court to dismiss Plaintiff's claims for two

20 principal reasons.   First, Defendants contend that Plaintiff has

21 failed to identify a false or misleading statement by Defendants that

22 was false at the time the statement was made.   Second, Defendants

23 contend that Plaintiff has failed to raise a strong inference of

24 scienter.

25     As set forth below, the Court finds that Plaintiff fails to

26 identify a specific false or misleading representation sufficient to

state a claim for securities fraud.  Further, considering Plaintiff's allegations of scienter both individually and holistically, the Court finds that the complaint does not give rise to a strong inference of scienter.  Because Plaintiff fails to satisfy the PSLRA's pleading requirements with respect to both falsity and scienter, the Consolidated Complaint must be dismissed.

1.  Falsity

To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, [state] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also Rigel*, 697 F.3d at 877; *Zucco Partners*, 552 F.3d at 990-91.  When a plaintiff relies on two statements which contain material differences as evidence of falsity, the plaintiff must plead specific facts explaining why the difference between the two statements "is not merely the difference between two permissible judgments, but rather the result of a falsehood." *In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc), *superseded by statute on other grounds,* 15 U.S.C. § 78u-4(b)(1), *as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001).  Alternatively, when a plaintiff relies on an omission of fact as evidence of falsity, the plaintiff cannot simply show that the omission was material; instead, the plaintiff must show that the omission actually renders *other* statements misleading. *Rigel*, 697 F.3d 869, 880 n.8 (citing *Matrixx Initiatives,*

*Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011)). In other words, an entity subject to § 10(b) and SEC Rule 10b-5 does not have "an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . [other] statements [that were] made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 131 S. Ct. at 1321 (citing 17 C.F.R. § 240.10b-5(b)).

Inherent in the concept of falsity is the requirement of contemporaneousness. To viably plead a false or misleading statement, Plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." *Id.* (emphasis in original). The fact that a statement is *later* discovered to be untrue does not mean that, by default, the statement was untrue at the time it was made. As the Ninth Circuit has explained:

> [T]here is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.

*Id.* at 1548. Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 23

later contradictory statements, constitutes an impermissible attempt to plead fraud by hindsight. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("In sum, the complaint is an example of alleging fraud by hindsight.  For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").

Even if a plaintiff demonstrates that a specific statement by a defendant meets the PSLRA's three requirements for falsity, *see* 15 U.S.C. § 78u-4(b)(1), the PSLRA "carves out a safe harbor from liability if the statements at issue were forward-looking and accompanied by meaningful risk warnings." *Copper Mountain*, 311 F. Supp. 2d at 866 (citing 15 U.S.C. § 78u-5(c)).  This "safe harbor" provision is a statutory analog of the common law "bespeaks caution" doctrine, "which allows a court to rule as a matter of law that [a] defendant's forward-looking statements contained enough cautionary language or risk disclosure to protect against liability." *Id*. (citing *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)). Pursuant to the PSLRA, the Court must consider any statement cited in the complaint and any cautionary statement accompanying such statement in evaluating a motion to dismiss. *See* 15 USC § 78u-5(e).

Turning to the instant motion, Plaintiff identifies a number of representations about Defendants' business practices, as well as purported "red flags" about increasing risk in Sterling's loan portfolio, all of which occurred prior to the beginning of the Class Period, but all of which Plaintiff asserts should have placed Defendants on notice about the need for additional safeguards.  With

regard to Defendants' representations made within the Class Period, Plaintiff identifies four categories of allegedly false or misleading statements by Defendants: 1) quarterly and annual financial data, including press releases, conference calls, and investor presentations in which such data was discussed; 2) representations that Sterling maintained a "safe and sound" banking practice; 3) representations about Sterling's risk exposure, quality of loans, adequacy of reserves, underwriting standards, and management of troubled assets; and 4) representations about the adequacy of Sterling's capital position and the need for additional capital.  Each of these categories is discussed in detail below.

a.   *Statements Before the Class Period*

A significant portion of the Consolidated Complaint focuses on Defendants' pre-Class Period conduct and statements.  Plaintiff begins by highlighting general trends about Sterling's pre-Class Period financial performance, and in particular, the increasing risk of its loan portfolio.  Plaintiff also cites to certain aspects of Sterling's financial results, including the following:

1. Between 2004 and 2007, Sterling rapidly and significantly grew its portfolio of residential construction loans, which were inherently risky and more likely to experience higher levels of losses than other types of loans, C.C. ¶¶ 29-32, at 10-13;

2. Despite the ongoing credit crisis, in 2008, Sterling ignored risks and still originated $602 million in construction loans,

although much less than the $2.3 and $2.2 billion in such loans originated in the previous two years,[8] *id.* ¶ 33, at 13;

3. In the five fiscal quarters preceding the Class Period, Sterling's NPAs, NPLs, and construction-related Classified Assets all increased substantially, in some cases, by more than 800%, *id.* ¶¶ 36-40, at 14-15; in particular, nonperforming construction loans increased by 2600% from 2Q08 to 2Q09 (from $9 million to over $253 million), *id.* ¶ 37, at 14, and delinquency rates also increased, *id.* ¶¶ 41-43, at 16;

4. Despite these trends, Sterling's principal reserve used to account for loan losses – referred to as its Allowance for Loan Losses (or "ALL" reserves) – did not increase at the same rate as its NPAs and NPLs, and as a result, the ratio of ALL reserves to NPAs/NPLs declined, *id.* ¶¶ 44-47, at 16-17.

Plaintiff compares these results to Defendants' public statements in press releases and earnings calls in connection with Sterling's quarterly financial results, including statements about Sterling's ability to manage loss exposure, *id.* ¶ 50, at 18-19, Sterling's "cautious approach toward residential construction underwriting," *id.* ¶ 51, at 19, Defendants' belief of the adequacy of Sterling's loss allowance, *id.*, and their knowledge of the individual loans and borrowers, which gave them greater insight into risk management, *id.* ¶ 51-54, 19-20.

---

[8] The complaint indicates only that these originations occurred in 2008; it does not indicate whether the originations occurred before or after the Class Period began on July 23, 2008.

The Court finds it unnecessary to consider whether any of these allegations establish falsity or scienter, because all of the statements alleged in paragraphs 29–56 of the Consolidated Complaint occurred before — in some cases, substantially before — the Class Period. "As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made . . . before or after the purported class period are irrelevant to plaintiff['s] fraud claims." *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995); *see also Sharenow v. Impac Mort'g Holdings, Inc.*, 385 Fed. Appx. 714, 716 (9th Cir. 2010) (unpublished) (affirming dismissal of §§ 10(b) and 20(a) claims because the "alleged violations are not sufficiently tied to the class period").

Although there are numerous other paragraphs in the complaint that reference pre-Class Period statements and documents, the Court finds it unnecessary to list each of them. Should Plaintiff avail itself of the opportunity to file an amended complaint, Plaintiff cannot rely on pre-Class Period statements to show falsity.

> b.    *Sterling's Financial Results*

Plaintiff alleges that, at the conclusion of each fiscal quarter during the Class Period, Sterling issued materially false and misleading financial results. Plaintiff alleges that those financial results were in turn discussed on investor conference calls, in investor presentations, and in various SEC filings. Plaintiff also alleges that because these false statements were included in Sterling's financial reports, the Individual Defendants' quarterly

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS – 27

certifications of Sterling's financial results — pursuant to § 302 of the Sarbanes-Oxley Act of 2002 — were also false and misleading.

To support these allegations of falsity, Plaintiff rests on several assertions. Plaintiff contends that Defendants 1) "materially understated Sterling's NPAs and Classified Assets and overstated its income and earnings" by improperly deferring amounts due to future periods, thereby avoiding having to contemporaneously report the underlying loans as nonperforming; 2) ignored red flags and failed to account for rapidly increasing risks; and 3) deliberately manipulated Sterling's quarterly Provision for Credit Losses (PCL), thereby keeping ALL reserves artificially low, concealing rising risk, and inflating income and earnings.[9]    Having considered each of these allegations in detail, as set forth below, the Court finds that Plaintiff failed to sufficient plead falsity with respect to Sterling's financial results.

    i.    *Understated NPAs & Classified Assets*

_____

[9]  Plaintiff articulates a fourth reason why Sterling's financial results are false: because the results were based on "unsafe or unsound" banking practices.  This reason is apparently conflated with Plaintiff's second *category* of false statements: Defendants' representations that Sterling was operating in a safe and sound manner.  The Court cannot discern from the Complaint why the fact that Defendants were operating in an unsafe or unsound manner would render Sterling's financial data false or misleading; this contention is not pled with specificity.  Accordingly, the Court considers representations concerning the safety and soundness of Sterling's banking operations, as a separate category of allegedly false statements, in part IV.B.1.c, *infra*.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 28

Plaintiff contends that in 2008, despite the fact that $2.17 billion of Sterling's construction loan portfolio was contractually due, "Sterling only received approximately $1.01 billion in payments during the entire year, meaning construction borrowers failed to pay over $1.16 billion in principal contractually due in 2008." C.C. ¶ 75, at 27. Plaintiff repeats a similar allegation for 2009. *Id.* ¶ 83, at 30. Plaintiff contends these unpaid construction loans should have been — and were not — disclosed as Classified Assets and/or NPAs. *Id.* ¶ 76, at 27-28. Accordingly, Plaintiff contends that this allegedly deliberate act of concealment had a cascading effect: Sterling's financial reports overstated loan receivables and understated NPAs, *id.* ¶ 77, at 28, which in turn allowed Defendants to under-record PCLs and maintain artificially low ALL reserves, *id.*, which in turn resulted in an overstatement of Sterling's reported pretax net income and earnings per share, *id.* ¶ 78.

In addition, Plaintiff relies on Sterling's SEC Form 10-K reports from year-end FY07 and FY08. Plaintiff contends that in the FY07 filing, which was six months before the Class Period began, Sterling reported $657 million in principal payments due during the period between 2009 and 2012; however, in its FY08 filing, Sterling reported principal payments of $2.08 billion in 2009 alone. Plaintiff asserts that this difference in amounts provides compelling evidence that Sterling improperly deferred payments due in 2008 to 2009, to avoid having to report the defaulted payments as NPAs in 2008. *Id.* ¶ 81, at 29-30. Plaintiff argues that the failure to account for massive underpayments, coupled with deferral of loan payments from

1    2008 to 2009, demonstrates the falsity of Defendants' statements

2    concerning Sterling's financial results.

3          Plaintiff's allegations suffer from several fatal flaws.  First,

4    Plaintiff fails to show that its calculations are entitled to a

5    presumption of truth.  As Defendant points out, all of Plaintiff's

6    allegations regarding alleged underpayment of loans in 2008 and 2009

7    rest on Plaintiff's comparison of "Principal Payments Due" to "Total

8    Payments Received."  *See, e.g.*, *id*. ¶ 75, at 27 (2008); *id*. ¶ 83, at

9    30-31 (2009).  While Defendants publicly reported the amount of

10   principal payments due in their annual SEC filings, *see, e.g.*, Ex. Q &

11   R to Greene Decl., ECF Nos. 51-17 & 51-18, at 81 & 97, Defendants do

12   not appear to ever have disclosed the amount of total payments

13   received in any given fiscal year for construction loans.  Plaintiff

14   does not indicate the origin of this data or explain how it was

15   calculated.  Defendants attempt to divine a source for the data,

16   stating that Plaintiff has "backed in" to the calculation by relying

17   on reported construction loan originations and principal outstanding

18   due on construction loans.  Defs' Mem. Supp. Mot. Dismiss ("Mot."),

19   ECF No. 48, at 19-20.  Defendants explain the math and provide an

20   example, which appears to match the amounts pled by Plaintiff.  Mot.

21   at 20 n.5.  Defendants also illustrate why they believe Plaintiff's

22   math is faulty.  *Id*. at 19-21.

23         Plaintiff does not refute Defendants' assertion about how "Total

24   Payments Received" was calculated, but instead contends that

25   Defendants have raised a factual dispute that cannot be resolved at

26   this stage of the pleading.  The Court disagrees.  At the very least,

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS – 30

Defendants have properly pointed out that Plaintiff's allegations about improper accounting practices apparently rest on unsubstantiated — and more importantly, *undocumented* — assumptions about how the numbers add up.  The Court need not resolve a factual dispute to determine that the complaint fails to sufficiently allege *how* Plaintiff determined "Total Payments Received," upon which its allegations are founded.  Absent an identified source for this claim, the Court cannot determine whether Plaintiff's calculations are actual facts — entitling Plaintiff to a presumption of truthfulness — or mere speculation, which does not.  *See, e.g.*, *SGI*, 183 F.3d at 985 ("In the absence of such specifics, we cannot ascertain whether there is any basis for the allegations . . . .").  If Plaintiff files an amended complaint, Plaintiff must fully identify the source for this data and must set forth its calculations.  Plaintiff must also justify why its calculations should be entitled to a presumption of truthfulness.

Second, as to Plaintiff's assertion regarding the "improper" deferral of loan payments from FY08 to FY09, Plaintiff fails to allege why such a practice would render Plaintiff's financials false or misleading.  The complaint concludes that the practice was misleading, but it does not explain how.  Accounting terms have precise definitions, and it therefore must follow that if Defendants abided by those definitions in calculating their balance sheets, Plaintiff has not identified an affirmative false representation.  Plaintiff may instead be seeking to allege that Defendants' failure to explicitly report these deferrals constitutes an actionable omission; however, the complaint contains no indication why an additional statement would

be necessary to avoid making other statements not materially misleading. The Court cannot tell from the complaint whether the alleged payment-deferral practice, if it occurred, would be a permissible business judgment by Defendants, or whether it would violate an accounting standard or regulatory rule with which Defendants purported to comply, thereby rendering it false.

Third, Plaintiff fails to identify a single loan which Defendants improperly deferred, or for which payment was not timely received. Instead, Plaintiff relies exclusively on Defendants' own financial data, which was timely reported by Defendants, discussed repeatedly on conference calls and at investor presentations, and "promptly digested" by the market. C.C. ¶ 237, at 90. Plaintiff has cited no authority for the proposition that a company has reported false information when the very information upon which the plaintiff relies to demonstrate such falsity was contemporaneously publicized by the company.

Finally, Plaintiff does not contest Defendants' assertion that Sterling's independent auditors consistently provided unqualified opinions for Sterling's financial results. Moreover, Plaintiff does not contest that the FDIC has never required Sterling to restate any of its financials, despite FDIC's issuance of the CDO and its unilateral power to force companies to restate inaccurate financials. *See* 12 U.S.C. § 1818(b); *see also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) ("Had Federal Regulators determined that Capital One's past practices were deficient, they could have applied corrective measures retroactively and forced the company to restate

its earnings to reflect retroactive adjustments."); *XL Capital*, 499 F. Supp. 2d at 148 (noting that "although misreported financial data are clearly false statements of fact . . . there is no allegation here there has been any restatement of any financial statement or that any auditor or actuary has qualified or withdrawn its opinion" (internal citations and quotations omitted)); *In re 2007 Novastar Fin., Inc. Sec. Litig.,* No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *3 (unpublished) ("[I]t is noteworthy that nobody — the SEC, Novastar's auditors, or anyone else — has suggested Novastar should or must restate its financial reports.").

For these reasons, the Court finds that Plaintiff's contention — that Defendants improperly deferred payments and failed to account for missing payments in reporting its troubled assets — does not satisfy the pleading standards imposed by the PSLRA.

*ii.  Ignorance of "Red Flags" and Increasing Risk*

In paragraphs 87 through 96 of the Consolidated Complaint, Plaintiff alleges facts in support of its allegation that Defendants ignored "red flags" and increasing signs of deterioration in the loan portfolio.  Plaintiff identifies a number of downward trends between 2Q07 and 2Q08 (outside the Class Period), C.C. ¶ 87, at 32, and compares the increasing rate of NPAs, NPLs, and delinquencies with Sterling's reserve allowance during the Class Period, *id.* ¶ 89-96, at 33-38.  Plaintiff contends that Defendants should have accounted for the increasing risk "by increasing its ALL Reserves and [PCL] to adequate levels," but that instead, Defendants "kept ALL Reserves and [PCL] artificially low to conceal risk."  *Id.* ¶ 88, at 33.

Setting aside for the moment the conclusory nature of this allegation, it appears that Plaintiff conflates two of the four reasons it gave for why Defendants' financial results constituted false statements: Defendants' ignorance of risk factors and Defendants' manipulation of reserves. *See id.* ¶ 68, at 24-25. To the extent Plaintiff suggests that the ignorance of these risk factors allowed Defendants to manipulate or understate reserve levels, thereby rendering Sterling's financial statements to be false and misleading, this assertion is discussed (and rejected) in the following section. Beyond that, Plaintiff does not identify any other reason why Defendants' alleged ignorance of risk factors, even if true, supports its claim that Sterling's financial statements were misleading.

In fact, Plaintiff's argument is entirely based on financial information Sterling *publicly and contemporaneously reported*. Thus, "all of the information alleged to constitute 'red flags' . . . were matters of public knowledge." *City of Omaha, Neb. Empl. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012). As Plaintiff alleges, this "information was promptly digested" by the market and "reflected" in Sterling's stock price. C.C. ¶ 237, at 90.

Plaintiff provides no authority to support the notion that a company's ignorance and failure to respond to market conditions, standing alone, somehow constitutes an actionable false or misleading statement. In fact, there is substantial authority to the contrary. *See, e.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (noting that when Congress enacted § 10(b), it "did not seek to regulate transactions which constitute no more than internal corporate

mismanagement"); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1087 (C.D. Cal. 2008) (concluding that corporate mismanagement "is not actionable fraud").  As currently pled, the Defendants' alleged failure to respond to market conditions does not support Plaintiff's allegation of falsity.

### iii. Manipulation of ALL Reserves & PCL

Plaintiff also alleges that Sterling maintained artificially low ALL reserves, *id.* ¶ 89, at 33, and at several points, reduced its quarterly PCL (as compared to the previous quarter), despite increasing risk in its loan portfolio, *id.* ¶¶ 97-100, at 38-39. Plaintiff contends that "[t]hese facts evidence an intentional attempt to falsify Sterling's financial results and conceal risk." *Id.* ¶ 100, at 39.  Plaintiff does *not* argue that Sterling's financial statements were facially false – i.e., that Sterling actually maintained different reserve levels than it claimed in its public filings. Instead, Plaintiff argues that Sterling's reserves were simply too low, and that they were not increased with sufficient speed or in sufficient quantity.  Plaintiff thus contends that Sterling's financial statements created a false impression with investors.

To support its contention that Sterling improperly manipulated reserve levels, Plaintiff states that Defendants were aware of Sterling's recent past financial performance, including numerous indicators of deterioration in its loan portfolio, *id.* ¶ 87, at 32, at the time Defendants publicly reported Sterling's ALL reserves and PCL. Plaintiff also states that Defendants were aware, during each quarter in which they recorded a PCL and reported their ALL reserves, that

NPLs, NPAs, Classified Assets, and delinquencies were continuing to increase, and that despite these increases, Defendants failed to increase ALL reserves by a corresponding amount. *Id.* ¶¶ 90-96, at 35-38. Lastly, Plaintiff alleges that on two separate occasions, in 2Q08 and 1Q09, Sterling recorded a PCL that was less than the PCL recorded in the previous quarter. *Id.* ¶ 97, 100, at 38-39.

"If properly pled, overstating of revenues may state a claim for securities fraud . . . ." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005). To support such a claim, however, Plaintiff must include "such basic detail[] as the approximate amount by which revenues and earnings were overstated . . . ." *Id.* (internal quotations omitted).

The Ninth Circuit provided instructive guidance on the issues of loss reserves in a 1993 securities fraud case in which near-identical claims of reserve manipulation were raised. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1), *as recognized in Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000). In *Wells Fargo*, the plaintiffs alleged that the company "intentionally or recklessly understated its loan loss reserves in an effort to inflate corporate earnings (and therefore earnings per share), and then disseminated financial statements reflecting this misallocation to the public and to the SEC . . . ." *Id.* at 926. While acknowledging that the company's financial statement contained accurate data about the level of its reserves, the Ninth Circuit determined that the plaintiffs could state a plausible claim by identifying "some omission

of material fact necessary to make Wells Fargo's literally accurate reporting of the size of its reserve not misleading." *Id.*

In holding that the plaintiffs had sufficiently identified the omission of material information, the Ninth Circuit noted that plaintiffs had 1) specifically identified a number of "[a]lleged problem loans, of which Wells Fargo was 'on notice' prior to the start of the Class Period and failed properly to disclose," *id.*; and 2) provided dollar amounts by which Wells Fargo's reserves and nonperforming assets were understated. *Id.* Distinguishing the case from others in which similar claims of understated loan loss reserves have been found insufficient, the Ninth Circuit concluded the plaintiffs sufficiently alleged a "deliberate failure to disclose the status of *certain specific loans* extended to *identified* borrowers." *Id.* at 927 (emphasis added). Such "specific misrepresentations or material nondisclosures" differentiate actionable securities fraud from inactionable corporate mismanagement. *Id.* at 927-28 (citing cases illustrating the difference).

When viewed in light of *Wells Fargo*, it becomes clear that Plaintiff's claims here do not rise to the level of securities fraud. As a basis for a securities fraud claim, Plaintiff's theory of reserve manipulation fails for several reasons.

First, Plaintiff does not identify the exact amount by which reserves were allegedly understated, a basic detail that is required for Plaintiff to state a claim. True, the Consolidated Complaint creates the appearance of specifically-pled amounts by which reserve levels were understated. *See* C.C. ¶¶ 77-80, at 28-29. But data is

only as good as the assumptions upon which it rests, and in this case, Plaintiff's data lacks sufficient factual foundation. For example, Plaintiff contends that ALL reserves were understated by $149.5 million in 2008. *Id.* ¶ 77, at 28. But to arrive at this figure, Plaintiff relies on its calculation of the alleged amount by which NPAs were understated, a calculation which the Court has already found too conclusory. *See* part IV.B.1.b.i, *supra.* Plaintiff also relies on a ratio of construction NPLs to construction-related ALL reserves at the end of 2008, which, when multiplied by the volume of alleged understated NPAs, yields Plaintiff's figure of $149.5 million. However, Plaintiff fails to provide any factual basis for its conclusion that this ratio is the proper method of determining an adequate amount of ALL reserves. And even if it were an adequate method of determining ALL reserves, Plaintiff's complaint is entirely devoid of support for the notion that this ratio-based method is so universally accepted, Defendants' failure to employ it constitutes a material misrepresentation.

"A company is not required to set its reserve at any predetermined percentage of receivables." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005). Plaintiff, however, relies exclusively on ratios of reserves to other financial data – for example, a ratio of ALL reserves to NPAs during the Class Period by each fiscal quarter.[10] C.C. ¶ 94, at 37.

---

[10] This ratio illustrates precisely why Plaintiff's allegations are insufficient without additional factual detail. Plaintiff contends that "[o]nly after the FDIC issued its [CDO] did [D]efendants increase the

1    Moreover, Plaintiff's own calculations reveal large

2  inconsistencies, rendering those calculations unreliable and suspect.

3  For example, at one point, Plaintiff suggests that ALL reserves should

4  have been $149.5 million higher in 2008. *Id.* ¶ 77, at 28. But then,

5  expressing doubt over the validity of its own calculations, Plaintiff

6  asserts a ratio of ALL reserves to Classified Assets, multiplied by

7  the alleged amount of understated Classified Assets in 2008, yields

8  yet another correct amount of understated ALL reserves: $58 million.

9  *Id.* ¶ 80, at 29. Plaintiff asserts that these calculations

10 demonstrate "Defendants' improper accounting manipulations," which

11 "materially misrepresented Sterling's financial results[.]" *Id.* On

12 the contrary, this is not a specific allegation of accounting error:

13 it is guesswork.

14   Plaintiff essentially argues that the Court (and Defendants)

15 should take their pick of ratio, because the fact that Defendants

16 employed neither demonstrates falsity. This argument demonstrates

17 that, at least as currently pled, neither ratio-based reserve-setting

18 method proposed by Plaintiff has the sort of reliability and

19 acceptance such that Defendants' failure to employ it renders stated

20 _____

21 ALL reserve to appropriate levels[.]" *Id.* But the chart provided to
   illustrate Plaintiff's point shows that Plaintiff's notion of an

22 "acceptable" level of reserves is at least 36.89% of NPAs, as they were

23 in 3Q09. *Id.* The very same chart, however, illustrates that for the
   first three quarters of the Class Period, during which Defendants were

24 allegedly manipulating ALL reserves, the ratios of ALL reserves to NPAs
   were *significantly above* Plaintiff's "acceptable" threshold, which would

25 seem to bely Plaintiff's claim that the reserve levels in those fiscal

26 quarters were insufficient.

reserves to be misleading. *Cf. Stack v. Lobo*, 903 F. Supp. 1361, 1368-69 (finding allegations of understated reserves "to be inadequate because [plaintiffs] did not name any 'less creditworthy' customers or explain why any such customers would have been unlikely to pay their bills [and instead] relied solely on statistics regarding sales and accounts receivable that could have been indicative of numerous factors other than fraud"). In short, Plaintiff's contentions of understated reserves amount to a "conclusory allegation masquerading as fact," which "will not suffice in a claim sounding in fraud." *Alamosa Holdings*, 382 F. Supp. 2d at 854.

The second reason why Plaintiff's claim for understated reserves fails is that Plaintiff does not sufficiently plead that the allegedly insufficient reserve levels were a product of deliberate fraudulent manipulation, as opposed to the exercise of legitimate business judgment. If Plaintiff can identify at least two alternative methods of calculating reserves which might have been appropriate, who can say there are not other ratios or methods? This illustrates precisely why reserve levels cannot be reduced, in a broad stroke, to a simple mathematical ratio of some other element of a company's financials. To demonstrate that Sterling's reserves were the product of securities fraud, Plaintiff "must set forth facts" explaining why the difference in reserve levels "is not merely the difference between two permissible judgments, but rather the result of a falsehood." *GlenFed*, 42 F.3d at 1549. One court has explained in greater detail the level of factual support necessary to state an understated-reserves fraud claim:

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 40

> [A] bare allegation that bad debt reserves were inadequate is insufficient because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood. A company's reserve amounts can be fraudulent only if, when established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. Accordingly, a complaint alleging fraud based on understated reserves must include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the bed debt experienced, and how many accounts ultimately were uncollectible.

*Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006) (internal citations, quotation marks, and alterations omitted).

Determining the proper amount of reserves is an act laden with managerial judgment and discretion. The Ninth Circuit has recognized that "the valuation of assets and the setting of loan loss reserves are based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure." *GlenFed*, 42 F.3d at 1549. The act of estimating required reserves involves assessing the status of loans and the likelihood of timely repayment, and predicting the portion of the loan that may become uncollectable based on declining values in the real estate market, which in turn decreases the value of the collateral underlying the loan. As the Seventh Circuit acknowledged, a securities fraud plaintiff may not recover simply by claiming that a bank defendant failed to act promptly in recognizing and writing off bad loans:

> [E]ven a large column of big numbers need not add up to fraud. For any bad loan[,] the time comes when the debtor's failure is so plain that the loan is written down

or written off.  No matter when a bank does this, someone may say that it should have acted sooner.  If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

In essence, Plaintiff asks the Court to jump to the conclusion that because Defendants had reason to know of adverse information and did not act, Defendants must have engaged in fraud.  But other than the financial information cited above — all of which was publicly and contemporaneously disclosed by Sterling in its quarterly financial reports — Plaintiff does not identify any other facts, statements, internal communications, conversations with the Individual Defendants – *anything* – to suggest that Sterling's reserves were deliberately manipulated to conceal adverse information.[11]

The third and final reason why Plaintiff's claim for understated reserves fails is because each time Defendants disclosed ALL reserves and quarterly PCL, Defendants also stated that they believed the reserves to be sufficient and indicated why they held that belief.  Plaintiff has not pled sufficient facts to show that Defendants did not believe their public representations about the sufficiency of the reserves, or that the reasons they proffered for the level of reserves were false or misleading.

_____

[11] To the extent Plaintiff suggests that Defendants had knowledge of certain undisclosed facts about Sterling's loan portfolio that rendered its reserve levels misleading, Plaintiff failed to specifically allege what those facts are or when Defendants became aware of them.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 42

For example, Plaintiff cites to the fact that Defendants lowered their quarterly PCL between 1Q08 and 2Q08.   C.C.   ¶  97, at  38. Plaintiff contends this reduction smacks of fraud.   But Plaintiff ignores the reason publicly proffered by Defendant Gilkey for why PCL was lowered: that while Sterling's "level of classified and problem accounts increase[ed]," it did so "at [a] lower rate than . . . in the last two quarters."   Ex. B to Greene Decl., ECF No. 51-2, at 15. Plaintiff offers nothing to show that this explanation was false or misleading, or that it did not provide sufficient justification for Defendants to believe that the 2Q08 PCL amount was adequate.

To the extent Plaintiff relies on Defendants' statements regarding the adequacy of Sterling's reserves to show falsity, each of these statements suffers from the same defect: Plaintiff has not shown contemporaneous falsity.   Plaintiff cites to statements by Defendants that they "believe[d] the allowance is adequate and appropriate," C.C. ¶ 147, at 57; that their "year-to-date experience with resolving non-performing credits suggests that [the] actual loan loss content is in line with our estimated loan loss allowances," *id.* ¶ 150, at 58; and that they had their "arms around the issue," *id.* ¶ 152, at 59-60. Plaintiff aptly cherry-picks Defendants' past statements that later proved to be incorrect in light of Sterling's subsequent financial performance.   But Plaintiff does *not* sufficiently allege that these statements were false *when made*.   This is illustrated by the fact that the data upon which Plaintiff relies to show understated reserves is the same information that Sterling contemporaneously disclosed in its press releases and conference calls during the Class Period: its

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 43

quarterly and fiscal-year financials.  Sterling also disclosed ample cautionary warnings about why its reserves might prove insufficient. *See* Ex. Q to Greene Decl., ECF No. 51-17, at 83-87.  Plaintiff provides no basis to conclude that Defendants did not believe their representations about the adequacy of the reserves at the time the statements were made.[12]

What Plaintiff *does* demonstrate is this: based on present-day knowledge, Defendants reserves were too low at the time because they did not sufficiently anticipate the precipitous and massive decline in the market.  But this sort of fraud-by-hindsight claim is not actionable under securities laws. *See, e.g.*, *GlenFed*, 42 F.3d at 1553 ("The fact that policies may change over time does not mean that an earlier policy is inadequate, or that statements regarding its adequacy are falsehoods.  Plaintiff['s] allegations concerning corrective actions taken by [D]efendants do not, without more, explain how statements concerning the company's good health, made before those actions were taken, were false when made."); *Adecco*, 434 F. Supp. 2d at 832-33 ("[S]ubsequent write-offs . . . are not corroborative of anything.  Plaintiff['s] reliance on those write-offs constitutes

---

[12] Ordinarily, what a Defendant believes or knows bears on the question of scienter, not falsity.  However, because Defendants' statements pertained to their belief and expectations about the adequacy of reserves, "Defendants' mental states [are] at issue when analyzing falsity.  . . .  When the alleged false statements are about a defendant's own beliefs and expectations, the analysis of falsity and scienter often will involve examination of the same facts." *Rigel*, 697 F.3d at 882 n.11.

impermissible "fraud by hindsight."); *Novastar*, 2008 WL 2354367, at *3 ("[Defendant] may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made.").

No confidential witness (CW) has come forward to say that Defendants knew reserves were too low, or that they were deliberately indifferent to the level of the reserves. No internal document or communication is offered to corroborate Plaintiff's theory of understated reserves. Essentially, Plaintiff's theory of reserve manipulation is entirely speculative, and only succeeds if all other possible explanations are discounted.

The Consolidated Complaint makes a compelling case that Defendants failed to fully anticipate the scope and pace of deterioration in the national and local real estate and credit markets. Plaintiff certainly raises the prospect that Defendants' failure to maintain higher reserves was corporate mismanagement, even negligence. But Plaintiff does not allege sufficient facts to support the argument that Defendants' reserve levels resulted from or constituted a false or misleading statement.

           *c.*   *Defendants' Assurances of "Safe and Sound" Banking Practices*

Plaintiff asserts that Defendants' repeated assurance during the Class Period that Sterling was operating in a "safe and sound" manner constitutes actionable falsity. Plaintiff identifies the following allegedly false representations:

- "In sum, we are managing through a difficult credit cycle while maintaining a safe, sound and secure banking practice." C.C. ¶ 129, at 51; Ex. J to Greene Decl., ECF No. 51-10, at 49 (October 21, 2008 press release, quoting Defendant Gilkey).

- "Thanks to safe, sound, secure banking discipline, our capital reserves and liquidity position remain strong." C.C. ¶ 130, at 51; Ex. C to Greene Decl., ECF No 51-3, at 24 (statement by Defendant Gilkey on October 22, 2008 conference call).

- "We continue to be committed to safe, sound, and secure banking practices." C.C. ¶ 131, at 52; Ex. M to Greene Decl., ECF No. 51-13, at 57 (January 27, 2009 press release, quoting Defendant Gilkey).

- "During the quarter Sterling proactively took initiatives to enhance its capital position to create a safety and soundness buffer to absorb credit losses." C.C. ¶ 131, at 52; Ex. D to Greene Decl., ECF No. 51-4, at 28 (statement by Defendant Gilkey on January 28, 2009 conference call).

- "Our commitment is to continue maintaining a safe, sound and secure banking practice for the benefit of customers, shareholders and employees." C.C. ¶ 132, at 52; Ex. O to Greene Decl., ECF No. 51-15, at 68 (July 23, 2009 press release, quoting Defendant Gilkey).

Plaintiff initially alleges that these statements are false because Sterling was "engaging in unsafe and unsound practices by, among other things, maintaining a large quality of poor loans, maintaining an unacceptable level of NPAs, giving out additional credit to defaulted borrowers, having insufficient capital in relation to poor quality loans, maintaining inadequate ALL Reserves[,] and maintaining reckless management." C.C. ¶ 133, at 52. Plaintiff does not, however, provide factual support for these assertions. Many of the contentions are highly conclusory; for example, Plaintiff does not identify any specific loan or loans deemed to be of "poor quality," nor does Plaintiff explain what an "unacceptable level of NPAs" is, or specify how Defendants exceeded an acceptable level of NPAs. The only

claim for which Plaintiff provides any factual support is its claim regarding inadequate ALL reserves, but the Court has already concluded that Plaintiff failed to demonstrate contemporaneous knowledge of the inadequacy of such reserves.

In fact, the only specific support Plaintiff identifies for its claim regarding the falsity of Defendants' "safe and sound" representations is the FDIC's CDO, as announced on October 15, 2009, in which the FDIC and DFI concluded "that they had reason to believe that the Bank had engaged in unsafe or unsound banking practices and violations of law or regulations." *Id.* ¶ 134, at 53. Plaintiff contends that the CDO demonstrates that Defendants' representations concerning the safety and soundness of Sterling were false and misleading.

"Only those misrepresentations or omissions that are fairly considered material may form the basis for a securities fraud case." *BankUnited*, 2010 WL 1332574, at *8 (citing 17 C.F.R. § 240.10b-5). To be material, a statement must be important to a reasonable shareholder in making investment decisions. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "A statement that is too vague, too generalized, or mere corporate puffery is immaterial because a reasonable investor would not base her investment decision on the basis of these statements." *BankUnited*, 2010 WL 1332574, at *8 (citing *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 205-07 (2d Cir. 2009)). In *BankUnited*, the court found that descriptions of underwriting, appraisal, and credit standards as "strict," "stringent," "conservative," and "strong" were "commonplace

statements of corporate puffery [that] could not influence a reasonable investor's decision." *Id.* The Ninth Circuit has concluded that similar "vague statements of optimism," like "good" and "well-regarded," are "optimistic, subjective assessment[s] [which] hardly amount[] to a securities violation. Indeed, professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (internal citations and quotations omitted).

In a footnote to the Consolidated Complaint, Plaintiff contends that "[i]n the banking sector, the terminology 'safe and sound' has a specific and formal regulatory and definitional meaning," *id.* ¶ 6 n.1, at 3, and Plaintiff provides an internal cross-reference as authority. However, that cross-reference — and indeed, the Consolidated Complaint — does not contain an established definition of this phrase or indicate that use of the phrase in the banking sector has a universal and well-understood meaning. In fact, the only allegation resembling a definition of "safe and sound" is Plaintiff's assertion that an FDIC finding of "unsafe and unsound practices" has a specific meaning within the scope of the FDIC's Risk Management Manual of Examination Policies. *Id.* ¶ 136, at 53. Absent any support in the Consolidated Complaint for Plaintiff's contention — that "safe and sound" has a specific and well-understood meaning by investors — the Court cannot ascribe any particular meaning or significance to those term. And without such significance, "safe" and "sound" are not actionable terms in a securities fraud claim because they constitute immaterial corporate puffery.

1    Even assuming the FDIC's statement — that it had reason to

2    believe Sterling was operating in an unsafe and unsound manner — could

3    be construed as rendering false Defendants' statements of safe and

4    sound operations, Plaintiff's argument still fails.  The CDO only

5    indicates what the FDIC believed at the time it issued the CDO; it

6    does not reflect a finding about whether Defendants previously engaged

7    in unsafe and unsound practices, when such practices began, or for how

8    long Defendants were engaged in such practices.  In other words, the

9    CDO "does not bolster the strength of the allegations in the

10   [Consolidated Complaint] and does not support a determination that the

11   challenged statements were false *when they were made* or that they were

12   made with the requisite intent."  *New York State Teachers' Ret. Sys.*

13   *v. Fremont Gen. Corp.*, No. 2:07-CV-5756-FMC-FFM, 2009 WL 3112574, at

14   *12 (C.D. Cal. Sept. 25, 2009) (unpublished) (emphasis in original),

15   *aff'd*, 460 Fed. Appx. 642 (9th Cir. 2011).

16   The final statement by Defendants alleged to contain false

17   representations about safety and soundness occurred in a July 23, 2009

18   press release.  The CDO was not announced until October 15, 2009.

19   Especially during a period of unprecedented market collapse, a few

20   months is a long time.  Plaintiff provides no support for the

21   contention that Sterling was operating in an unsafe and unsound manner

22   at the time Defendants made statements regarding Sterling's safety and

23   soundness.  Accordingly, Plaintiff fails to adequately plead falsity

24   with respect to Sterling's "safe and sound" representations.

25   //

26   //

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 49

1               **d.**    *Defendants'    Statements    Concerning    Sterling's*

2                 *Financial Situation and Credit Practices*

3         Plaintiff asserts that Defendants' statements about the quality

4    of Sterling's loan portfolio, the sufficiency of Sterling's reserves,

5    and Sterling's conservative approach toward risk evaluation constitute

6    actionable falsity.   But a number of these statements constitute

7    inactionable corporate puffery, and others constitute "forward-

8    looking" statements that do not give rise to a fraud claim under the

9    PSLRA.   Of those remaining statements which are potentially

10   actionable, the statements can be generally grouped into two

11   categories: 1) statements providing allegedly false reasons for the

12   adverse financial data reported by Sterling at the end of 4Q08, and 2)

13   affirmative representations about Sterling's response to the credit

14   crisis.   For the reasons set forth below, the Court finds that

15   Plaintiff fails to identify a false or misleading statement sufficient

16   to give rise to a securities fraud claim.

17                **i.**   *Puffery*

18        Several of the statements identified by Plaintiff fall into the

19   category of inactionable puffery.   For example, Plaintiff cites to a

20   statement by Defendant Gilkey, contained in Sterling's 2Q08 press

21   release, that Sterling's "core banking operations performed solidly in

22   the midst of an ongoing credit cycle troubling the country.

23   . . . Early in this credit cycle, we implemented stringent measures to

24   address softening credit quality."  C.C. ¶ 147, at 57.  Plaintiff also

25   cites to a statement by Defendant Gilkey on the 2Q08 earnings call the

26   next day: "[O]ur team has taken a conservative approach towards risk

evaluation, and are disciplined in the rating of loans according to the appropriate risk." *Id.* ¶ 148, at 57.

Words like "solidly," "stringent," and "conservative" are classic examples of corporate puffery because they do not provide any meaningful insight into the practices described. *See BankUnited*, 2010 WL 1332574, at *8 (discounting words such as "strict," "stringent," "conservative," and "strong" as examples of inactionable puffery) (citing *J.P. Morgan Chase Co.*, 553 F.3d at 205-07). No reasonable investor would base an investment decision on statements such as these. *Id.*

Plaintiff cites to several cases to suggest these words may constitute more than puffery; however, Plaintiff's authorities are unpersuasive. For example, in *In re New Century*, the court found that New Century's "repeated assurances of strong credit quality and strict underwriting practices" were actionable, but only because the plaintiffs "set those statements against detailed allegations of practices that utterly failed to meet those standards." 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008). In this case, there have been no such detailed allegation of contemporaneous practices that "utterly failed" to meet the standards identified by Defendants. Plaintiff identifies no such practices, and to the extent Plaintiff relies on the statements of various CWs, the statements lack specificity and provide no basis for comparison against Defendants' representations.[13]

---

[13] The assertions by the CWs lack the sort of specificity necessary to evince a material false or misleading statement by Defendants. For example, Plaintiff asserts that CW1 stated that Sterling's problems were

Similarly, *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), is inapposite here. Plaintiff contends that the Ninth Circuit upheld statements such as "our competitive position remains strong," "outlook is bright," and "progress is excellent," as actionable statements giving rise to a securities fraud claim. See Plf's Opp'n to Defs' Mot. Dismiss ("Opp'n"), ECF No. 54, at 46. Plaintiff misstates the holding in *Kaplan*, however. Contrary to Plaintiff's assertion, the Ninth Circuit expressly "decline[d] to address the falsity of [the] statements." *Kaplan*, 49 F.3d at 1381. Recognizing that the district court had granted summary judgment on the issues of materiality and scienter, the court refused to decide whether such statements could support the issue of falsity. *Id.* Accordingly, having been presented with no apposite authority to the contrary, the Court concludes that Defendants' statements cited by Plaintiff, which rest on puffery such as "strong," "stringent," "solidly," "conservative," and the like, are not actionable.

//

---

"compounded by . . . extremely lax credit standards" and that the witness "had serious concerns about Sterling's business practices and saw signs that [it] might not survive." *Id.* ¶ 112, at 44-45. This representation does not demonstrate that Defendants issued a false or misleading representation, but rather that one former Sterling employee formed an opinion that Sterling had lax credit standards. There is simply no specificity about the alleged practices. *Cf. In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145-1150 (detailing *specific* representations by CWs about *specific* Countrywide practices, and how those practices *directly* contradicted Countrywide's public representations).

### ii.  Forward-Looking Statements

Several of the statements identified by Plaintiff can be characterized as "forward-looking" statements.  These statements address Sterling's expectations about future market conditions, future company performance, and its ability to address challenges in the future.  For example:

- "The segmentation and management of construction classified assets will enable Sterling's credit team to fix, repair, and manage these assets," and "I see the runoff as being pretty stable."  C.C. ¶¶ 151-52, at 58-59 (statement by Defendant Gilkey during the October 22, 2008 conference call discussing 3Q08 results).

- "Because of our efforts at early intervention and remediation, we believe our level of classified assets continues to be manageable and will eventually lead to beneficial resolutions."  *Id.* ¶ 155, at 61 (January 27, 2009 press release addressing 4Q08 and FY08 earnings).

- "We believe that we have a strong management team that has the experience to address the current market disruption and the asset quality challenges."  *Id.* ¶ 156, at 61-62 (statement by Defendant Gilkey during the January 28, 2009 conference call discussing 4Q08 and FY08 results).

The PSLRA precludes liability for forward-looking statements that are "identified as a forward-looking statement, and [are] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]"  15 U.S.C. § 78u-5(c)(1)(A)(i).  In the case of oral forward-looking statements, the cautionary statement may be supplied separately in a readily available written document, as long as the oral statement "identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement."  *Id.* §

78u-5(c)(2)(B)(i)-(ii).  The definition of a forward-looking statement is broad and inclusive, encompassing such things as

> statements containing projections of revenues, income, earnings per share, management's plans or objectives for future operations and predictions of future economic performance.  Any statements of the assumptions underlying or relating to these types of statements fall within the meaning of a forward-looking statement.  In addition, a present-tense statement may qualify as forward-looking if the truth or falsity of the statement cannot be discerned until some point in time after the statement is made.

*Copper Mountain*, 311 F. Supp. 2d at 880 (internal citations and quotations omitted).

Each of the above statements cited by Plaintiff qualifies as a forward-looking statement and is therefore protected under the PSLRA's safe harbor provision.  Each statement expresses Defendants' belief about a future outcome or economic conditions.  Moreover, each statement was accompanied by an oral or written warning substantially similar to the following:

> Sterling's management will be referencing forward-looking statements that are not historical facts, and pertain to our future operating results.  These forward-looking statements include, but are not limited to statements about our plans, objectives, expectations and intentions[,] and other statements contained in this report that are not historical facts.  These forward-looking statements are inherently subject to significant business, economic, and competitive uncertainty, many of which are beyond our control.  In addition, these forward-looking statements are subject to assumptions with respect to future business strategies and decisions that are subject to change.  Sterling's actual results may differ materially from the results discussed in these forward-looking statements because of numerous possible risks and uncertainties.  These risks include, but are not limited to, the possibility of adverse economic developments, which may, among other things, increase delinquency risks in Sterling's loan portfolios; shift in industries, which may result in lower interest rate margin; shift in demand for Sterling's loan and other products; increased cost or

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 54

1       lower-than-expected revenues or cost savings in connections
with acquisition; changes in accounting policy; changes in
2       the monetary and fiscal policies of the federal government;
and changes in laws [and] regulations in the competitive
3       environment.

4  Ex. C to Greene Decl., ECF No. 51-3, at 19 (excerpts from Sterling's

5  October 22, 2008 conference call discussing 3Q08 earnings results).

6      When Defendants' statements are further considered in context,

7  the cautionary and qualified nature of each statement becomes more

8  apparent.  For instance, the October 22, 2008 conference call — in

9  addition to being preceded by the above warning — included, *inter*

10  *alia*, the following cautionary statements: 1) "The volatility in the

11  global financial marks and the efforts of central banks around the

12  world to unclog the financial system . . . have been epic.  The

13  Pacific Northwest, long insulated from the slowing national economy,

14  was indeed impacted," *id.*; 2) "We can all agree we're very deep into

15  the current crisis, which is now more than a year old," *id.* at 20; 3)

16  "In sum, we are managing through a difficult credit cycle," *id.*; and

17  4) "Given the economic events over the past several weeks, providing

18  explicit earnings guidance is difficult," *id.*  These cautionary

19  qualifications sufficiently identify "the important factors that could

20  cause actual results to differ materially" from Defendants' forward-

21  looking statements, and the provide sufficient warning for the

22  reasonably prudent investor.  Accordingly, the forward-looking

23  statements identified by Plaintiff as allegedly misleading are not

24  actionable.

25  //

26  //

                    *iii.  Reasons Given for Higher Provisioning in 4Q08*

        Plaintiff alleges that several statements made by Defendants in

Sterling's January 27, 2009 press release and during the January 28,

2009 conference call misled investors about the reasons for sharp

increases in PCL and decline in earnings per share reported for 4Q08

and FY08.  Specifically, Plaintiff cites the following statements:

- "During the fourth quarter of 2008, we witnessed acceleration in the slowdown of the economy, which caused higher levels of credit stress among our borrowers and an elevation in the level of both our non-performing and classified assets.  We, therefore, modified our approach in determining the fair market value of loans identified as impaired.  The weakening economy, the increased chargeoffs [sic] and declines in real estate appraisal values led to the higher level of credit provisioning in the quarter."  C.C. ¶ 101, at 39–40; Ex. M to Greene Decl., ECF No. 51-13, at 57 (quote attributed to Defendant Gilkey in Sterling's January 27, 2009 press release discussing 4Q08 and FY08 financial results).

- "This provision stems from higher levels of classified assets, which include non-performing loans and REO; it reflects significant declines in appraisal values of real estate and the implementation of a modified methodology to determine the fair value on impaired loans."  C.C. ¶ 102, at 40; Ex. M to Greene Decl., ECF No. 51-13, at 58 (statement contained in Sterling's January 27, 2009 press release discussing 4Q08 and FY08 financial results).[14]

- "First and foremost, the provision relates to a decline in the appraisal values of real estate.  As we began the fourth

---

[14]  Plaintiff alleges that Sterling "cryptically" blamed the high provision on a modified methodology to conceal the actual reason: mismanagement. C.C. ¶ 102  However, there is no support for this assertion.  In fact, as explained in the very same press release, Sterling

    modified its methodology for determining the fair value of loans being tested for impairment during the quarter.  The fair value is now determined excluding the potential cash flows from certain guarantors.  To the extent that these guarantors are able to provide a viable source of repayment, a recovery would be recorded upon receipt.

Ex. M to Greene Decl., ECF No. 51-13, at 59.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS – 56

quarter, we began to see adverse trends in real estate values in our primary markets.  As we got deeper into the quarter and particularly into December, we saw appraisal valuations fall significantly in many of our markets.  These valuations affected not only the specific assets but also resulted in adjustments to our loan loss provision rates that we used to evaluate the rest of the portfolio." C.C. ¶ 103; Ex. D to Greene Decl., ECF No. 51-4, at 29 (statement by Defendant Gilkey during the January 28, 2009 investor conference call discussing 4Q08 and FY08 financial results).

Plaintiff characterizes these statements as misleading, in part because Defendants "blamed the increases on an alleged sudden and unexpected economic change," rather than "telling investors the truth . . . that Sterling's deliberately reckless practices, sharp increases in construction loans and failure to adequately account for known risk caused the increased ALL Reserves[.]" C.C. ¶ 101, at 39-40.  In addition, Defendant cites to trends in median home prices in "Sterling's key residential construction markets" to show that prices had been declining before 4Q08.  *Id.* ¶ 104, at 40-41.

Plaintiff's allegation that Defendants blamed the increased reserves on "sudden and unexpected" change appears to have no basis in fact.  Plaintiff cites no statement where Defendants actually use those words or words with comparable meaning.  Defendants acknowledged an "acceleration" in the economic slowdown and "significant declines" in appraisal values, but Plaintiff has not shown that these assertions were false.

In fact, rather than supporting Plaintiff's contentions, the chart of median home prices in the Consolidated Complaint actually supports the veracity of statements made by Defendants.  *See* C.C. ¶ 104, at 40-41.  For example, the Seattle-Tacoma-Bellevue market shows

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 57

monthly declines in home prices ranging from as low as 0.02% to as high as 1.28% between October 2007 and August 2008, with only four of those eleven months reflecting declines exceeding 1.00%.    Between September 2008 and December 2008, however, the monthly declines in home prices were recorded as 1.24%, 1.25%, 1.78%, and *2.86%*.    This data lends credence to Defendants' assertions about acceleration of the decline in the Puget Sound region.

Plaintiff has not shown that Defendants' statements regarding the 4Q08 and FY08 increases in provisioning were false, much less false when made.

> *iv.   Statements about Sterling's Response to the Credit Crisis*

Finally, Plaintiff cites to a number of Defendants' statements about Sterling's credit team, credit risks facing the company, objective market conditions, and Defendants' confidence in their ability to manage the crisis.    These statements include the following:

- "During the last three quarters, our credit team has generally identified, quantified[,] and isolated the distressed assets, which primarily reside in our residential construction portfolio." C.C. ¶ 147, at 57 (quotes attributed to Defendant Gilkey in Sterling's July 22, 2008 press release addressing 2Q08 financial results).

- "We have, indeed identified our credit issues and have allocated the necessary resources to manage through this asset quality cycle. . . . [O]ur credit team is confident that we have identified most of our credits that are either distressed or could become distressed." *Id.* ¶ 148, at 57–58 (statements by Defendant Gilkey during Sterling's July 23, 2008 conference call addressing 2Q08 financial results).

- "Credit quality issues are top priority." *Id.* ¶ 149, at 58 (excerpt from presentation by Defendants Gilkey and Byrne at a July 29-30, 2008 investor conference).

- "Our credit administration and portfolio management teams remain diligent in assessing and ranking risks in our loan portfolio and continue to focus on resolving our classified construction assets." *Id.* ¶ 151, at 58-59 (statements by Defendant Gilkey during Sterling's October 22, 2008 conference call addressing 3Q08 financial results).

- "[W]e have identified — and we have a very disciplined performance of our credit group — to identify the magnitude of our problem accounts.  We do indeed have our arms around the issue[.] . . . I don't believe [our credit issue are] significantly different than what we've said before." *Id.* ¶ 152, at 59-60 (statements by Defendant Gilkey during Sterling's October 22, 2008 conference call addressing 3Q08 financial results).

- "[T]he Puget Sound region and other areas in Washington State, on a percentage basis, continue to perform better than Sterling's overall residential construction portfolio." *Id.* ¶ 155, at 61 (statement in Sterling's January 27, 2009 press release addressing 4Q08 & FY08 financial results).

- "The Puget Sound market still remains one of the best performing economies, albeit there is a little flutter in it." *Id.* ¶ 156, at 61-62 (statements by Defendant Gilkey during Sterling's January 28, 2009 conference call addressing 4Q08 & FY08 financial results).

- "Sterling believes that the slowing growth rates of classified and non-performing assets, mainly related to construction, reflects the cumulative efforts of its construction credit team, which has been in place for more than one year to identify, manage, and resolve stressed assets." *Id.* ¶ 157, at 63 (statement in Sterling's April 24, 2009 press release addressing 1Q09 financial results).

- "[N]onperforming residential construction assets are beginning to recede in many of our markets where we first experienced credit stress." *Id.* ¶ 160, at 63 (statements by Defendant Gilkey during Sterling's July 24, 2009 conference call addressing 2Q09 financial results).

To support the alleged falsity of these statements, Plaintiff cites to many of the same arguments previously raised: allegedly understated reserves, deferral of construction loans, and ignorance of red flags and warning signs.  There is nothing compelling about these

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 59

1    reasserted allegations, in the context of these new statements, that

2    demonstrates Defendants made a false or misleading statement.

3         Plaintiff contends, however, that the various CWs also support

4    the allegation that Defendants' representations about its

5    conservative, cautious approach and strict underwriting guidelines

6    were false.[15]   Based on the CWs' representations, Plaintiff claims

7    that Defendants recklessly relied on undisclosed "'personal

8    guarantees' and assurances, including verbal commitments and

9    undocumented agreements, from borrowers to value Sterling's loans and

10   quantify its credit risks."  Opp'n at 35.

11        The statements by the CWs do not support this contention.  The

12   only CW who alleges that Sterling relied on personal guarantees is

13   CW1, who admittedly left the company by "fall 2008," C.C. ¶ 112, at

14   44; therefore, the Court cannot determine for what duration of the

15   Class Period CW1 was actually employed at Sterling.  Moreover, CW1

16   does not actually allege that any of the allegedly reckless practices,

17   like reliance on personal guarantees, actually occurred during the

18   Class Period.  *See id*. ¶¶ 112-116, at 44-46.  CW1's allegations are

19   highly summarized and conclusory, and only provide one, semi-specific

_____

20

21   [15] Even assuming that such statements about a "conservative, cautious
        approach" and "strict underwriting practices" are not puffery, it

22      appears that these statements upon which Plaintiff relies occurred

23      outside the Class Period.  *See, e.g.*, C.C. ¶¶ 48-56, at 17-21.  Thus,
        these statements are not actionable.  *See Clearly Canadian*, 875 F. Supp.

24      at 1420 ("As the class period defines the time during which defendants'

25      fraud was allegedly alive in the market, statements made . . . before or
        after the purported class period are irrelevant to plaintiffs' fraud

26      claims.").

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS – 60

example of an allegedly improper loan: a $5 million loan granted to the daughter of a big Sterling client who was not independently qualified to receive credit. *Id.* ¶ 113. CW1 does not state whether this incident occurred within the Class Period. *See id.*

Regardless, a single, anecdotal allegation of one improper loan is insufficient to render Defendants' representations about conservative credit practices and underwriting guidelines false. The complaint identifies CW1 as an assistant relationship manager in one of Sterling's Portland branch offices, but it does not allege that the practices identified by CW1 were anything other than a local, isolated practice, or how CW1 would have personal knowledge of whether the alleged practices were widespread or a matter of corporate policy. CW1's representations certainly do not support the contention that the Individual Defendants were aware of the practice.[16]

Other than the possibility that CW1 may have been employed at Sterling at the very outset of the Class Period, the only CWs who actually appear to have been employed at Sterling during the Class

---

[16] At best, CW1 indicates that all loans originated at his/her location "had to be approved by Sterling's Credit Committee in Spokane." C.C. ¶ 116, at 46.    CW1 could not recall whether the Individual Defendants participated in these meetings, but alleges that Sterling's Chief Credit Officer, Steve Page, who reported to Defendant Gilkey, did so. *Id.* This allegation fails to indicate whether CW1 1) actually participated in these meetings, 2) knew that the "personal guarantee" practice was discussed during these meetings, or 3) knew that the practice was communicated by Mr. Page to Defendant Gilkey or Defendant Byrne.

Period are CW3 and CW4.[17]    Accordingly, to the extent that Plaintiff relies on the remaining CWs in alleging falsity, that reliance is misplaced.    *See Zucco Partners*, 552 F.3d at 996 (disregarding statements by two CWs because, *inter alia*, the witnesses "were not employed by Digimarc during the time period in question and have only secondhand information about accounting practices at the corporation during that year.").    And neither CW3 nor CW4, both of whom were more senior employees than CW1, corroborate CW1's unspecific assertion that Sterling relied on personal guarantees.    *See* C.C. ¶¶ 119-122, at 47-49.

Even if Plaintiff had sufficiently demonstrated that Sterling improperly relied on personal guarantees in assessing loan impairment, Plaintiff has still failed to demonstrate falsity.    Although, with the benefit of hindsight, Plaintiff can say that such a practice would be reckless, Plaintiff has not sufficiently alleged that such a practice was known to be reckless *at the time*, much less that Defendants were aware of the practice, chose to ignore it, and continued to represent that Sterling maintained stringent underwriting practices.

In several instances, it is also clear that Plaintiff either misconstrues or ignores the context in which Defendants' allegedly false statements were made.    For example, while alleging falsity in

---

[17] CW2 was employed by Sterling from 2005 to June 2008.    *Id.* ¶ 117, at 46. CW5 was employed by Sterling from October 2003 to June 2008.    *Id.* ¶ 123, at 49.    CW6 was employed by Sterling from 2005 until May 2008.    *Id.* ¶ 126, at 50.    CW7, a "former high ranking executive," left Sterling in summer 2006, more than two years before the beginning of the Class Period.    *Id.* ¶ 127.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 62

Defendants' statement that Sterling's "core banking operations performed solidly in the midst of an ongoing credit cycle troubling the country," *id.* ¶ 147, at 57, Plaintiff overlooks that the statement was made in the broader context of Sterling's overall banking performance, including an increase in fees and service charges income of 17% and a 5% gain in total deposits to a record $7.99 billion. *See* Ex. I to Greene Decl., ECF No. 51-9, at 45. Additionally, Plaintiff cites to Defendants' representations in January 2009 that the Puget Sound economy was performing well, *id.* ¶¶ 155-56, at 61-62; however, Plaintiff overlooks the accompanying clarifications like "on a percentage basis, . . . better than Sterling's overall residential construction portfolio," *id.* ¶ 155, at 61, and "albeit there is a little flutter in it," *id.* ¶ 156, at 62. Moreover, these statements have not been shown to be false; in fact, the chart of housing trends Plaintiff includes in the complaint *supports* the veracity of Defendants' statements. *See id.* ¶ 104, at 40-41 (reflecting, between July and December 2008, a cumulative 13.37% decline in the Los Angeles market and a 12.75% decline in the San Diego market, but only a 9.24% and 9.47% decline in the Portland and Seattle markets, respectively).

There is actually substantial evidence to support the veracity of many of Defendants' statements. For example, Defendants appear to have made substantial efforts to reduce construction lending by the beginning of the Class Period. Despite originating $1.8 billion in construction loans in 2005, $2.3 billion in 2006, and $2.2 billion in 2007, *id.* ¶ 32, at 12, Defendants originated only $602 million in

construction loans in 2008.[18]   Moreover, as early as April 2008, Sterling publicly disclosed the creation of a "Residential Construction Special Project Team" to address impaired loans.   Ex H. to Greene Decl., ECF No. 51-8, at 43.

In conclusion, Plaintiff fails to sufficiently demonstrate that any of Defendants' representations about the quality of Sterling's loan portfolio, the sufficiency of Sterling's reserves, or Sterling's conservative approach toward risk evaluation were actionable misrepresentation.   There has been no showing that any of Defendants' statements were made while contradictory information was contemporaneously available.   Accordingly, these statements do not support a finding of falsity.

e.   *Defendants' Statements Regarding Sterling's Capital Position*

Finally, Plaintiff contends that Defendants' statements regarding Sterling's capital position and strength constitute actionable falsity.   Plaintiff identifies the following allegedly false representations:

- "Capital ratios remain above 'well-capitalized' levels," "Sterling's liquidity position remains strong," and "[r]isk-

[18] Plaintiff claims that the $602 million in construction loans originated in 2008 evinces additional risky and unsound lending practices by Sterling, *id.* ¶ 33, at 13; however, the Class Period encompasses less than half of 2008.   *Id.* ¶ 1, at 1.   There is no indication if some, or even all, of the $602 million was originated before the Class Period began.   For that matter, there is no indication whether these loans eventually became NPAs or whether the loans actually helped bolster Sterling's otherwise-deteriorating loan portfolio.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 64

based capital ratios continue to exceed the 'well-capitalized'
requirements." C.C. ¶ 164, at 65; Ex. I to Greene Decl., ECF
No. 51-9, at 46.[19]

- "I think we know how to manage that leverage well.  And we
  will keep track of it and do what is necessary to main the
  well capitalized position." *Id.* ¶ 166, at 65-66 (statement by
  Defendant Gilkey during July 23, 2008 conference call).

- "Our capital reserve and liquidity positions are the strongest
  levels in Sterling's recent history.  As we begin 2009 . . .
  we believe our capital position is adequate to enable Sterling
  to see its way through this cycle.  We do not anticipate the
  need for further capital." *Id.* ¶ 167, at 66 (statement by
  Defendant Gilkey during January 28, 2009 conference call).

- "We expect to remain well capitalized through 2009. . . . Our
  capital position . . . provide[s] a cushion to absorb
  additional credit costs depending on their timing and without
  implementation of draconian measures. . . . [E]ach subsidiary
  has . . . concluded that the potential loan losses are within
  their capital capacities without raising additional capital."
  *Id*. ¶ 168, at 66 (statement by Defendant Byrne during April
  24, 2009 conference call).

  Plaintiff rests on two assumptions to support its assertion of
falsity: first, Sterling's reserves were allegedly understated, and
once adjusted, Sterling no longer qualified as well-capitalized; and
second, the FDIC required Sterling to raise additional capital in the
CDO.[20]

---

[19] Plaintiff alleges substantively identical representations in every
quarterly press release and conference call during the Class Period.
C.C. ¶ 165, at 65.

[20] Plaintiff also suggests that further evidence of the falsity of this
statement can be discerned from the fact that Sterling qualified for the
U.S. Treasury Capital Purchase Program.  C.C. ¶ 174, at 68-69.
Defendants contend that Sterling improperly qualified for this program
because it represented itself as a well-qualified institution, which it
was not.  *Id.*  This argument, however, does not support Plaintiff's
assertion for falsity, as it does not explain why Sterling was

As already discussed, the Court deemed Plaintiff's allegations regarding understated ALL reserves to lack sufficiency. Accordingly, the allegation of understated ALL reserves does not support Plaintiff's conclusion that Sterling's statements regarding capitalization levels were false when made. *See Downey II*, 2009 WL 2767670, at *5 ("Plaintiff's claims in the [complaint] that the capital levels reported in Downey's SEC Filings were overstated and, thus, false, are premised on the allegation that the loan loss reserves were understated. However, as explained above, Plaintiff's claims about Downey's loan loss reserves are plainly insufficient.").

The CDO also does not support Plaintiff's position. As indicated above, the FDIC did not require Sterling to restate capital ratios — or any aspect of its financials — despite unequivocal statutory authority to do so. *See* 12 U.S.C. § 1818(b); *see also Nolte*, 390 F.3d at 316. Moreover, the FDIC did not conclude that Sterling's previous statements were false or misleading. Instead, the CDO required Sterling to *prospectively* increase its capital to ensure that its leverage ratio equaled or exceeded 10%. Ex. A to C.C., ECF No. 29-1, at 99. This 10% ratio is indisputably *higher* than bank's previous, statutory obligation of a 5% ratio. *See* 12 C.F.R. § 325.103(b)(1)(iii). Thus, the FDIC reset the bar higher; it did not find that Defendants had failed to clear the lower bar. The CDO

---

undercapitalized. If anything, it provides evidence to the contrary: the U.S. government found Sterling sufficiently capitalized to participate in the program. Plaintiff fails to explain why this fact renders Sterling's statements about being well-capitalized false.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 66

1  reflects the FDIC's opinion about what Sterling needed to do to stay

2  in a well-capitalized position going forward.   Requiring future

3  prospective action is distinctly different from finding past action

4  fraudulent.   The Fourth Circuit illustrated this point in *Nolte*:

> The shareholders assert that Federal Regulators would not
> have required Capital One to enter into a Memorandum of
> Understanding calling for increased capital . . . unless
> Capital One had been undercapitalized . . . during the
> class period.   But the Memorandum of Understanding between
> Federal Regulators and Capital One required Capital One to
> make *prospective* changes to its business.   Had Federal
> Regulators determined that Capital One's *past* practices
> were deficient, they could have applied corrective measures
> retroactively and forced the company to restate its
> earnings to reflect retroactive adjustments.   The fact that
> Federal Regulators require a company to change the way it
> does business in the future does not show, as a forced
> restatement of earnings could, that the business violated
> federal guidelines in the past.

*Nolte*, 390 F.3d at 316 (emphasis in original) (internal citations
omitted).

    Additionally, as Defendants correctly point out and as Plaintiff
concedes, Opp'n at 29, the FDIC was concerned with subjective factors:
"the capital *in relation to the kind and quality of the assets held*."
Ex. A to C.C., ECF No. 29-1, at 97.   Especially when considered in
context, the CDO does not suggest falsity – that Defendants had
misrepresented compliance with the statutory standard for "well-
capitalized" – but rather indicates a new, prospective FDIC
requirement: additional capitalization in light of a *subjective*
assessment of other factors.

    Defendants' public statements that Sterling was well-capitalized
were factually supported, and Plaintiff has not sufficiently pled that
Defendants were in contemporaneous possession of information showing

1    otherwise.   In each of the statements cited above, Defendants provided

2    a  factual  basis  for  their  statement  that  Sterling  was  well-

3    capitalized.   For example, in Sterling's 2Q08 press release announcing

4    earning results, Sterling represented that it "continue[d] to exceed

5    the  'well-capitalized'  requirements,"  and  it  provided  an  exact

6    comparison of Sterling's total and risk-based capital ratios to the

7    regulatory minimum "well-capitalized" requirements.   *See, e.g.*, Ex. I

8    to Greene Decl., ECF No. 51-9, at 46.   Even if the Court were

9    persuaded that "well-capitalized" was a subjective, misleading term,

10   Defendants'  precise  disclosure  of  the  data  underlying  their

11   representation negates falsity.   Plaintiff fails to sufficiently

12   establish  that  Defendants'  representations  concerning  Sterling's

13   current capitalization position were false when made.

14            f.   *Conclusion*

15        When examined in context, many of Defendants' statements reflect

16   an optimism – misplaced, in retrospect – that Sterling was positioned

17   to outperform a rapidly-deteriorating global market.   But Plaintiff

18   has not sufficiently alleged that this optimism was disingenuous or

19   known to be misguided at the time.   Indeed, nearly all of Plaintiff's

20   allegations  of  falsity  rest  on  an  in-hindsight  assessment  of

21   Sterling's performance and Defendants' conduct during a time of

22   unprecedented global economic collapse.

23        A securities fraud lawsuit is not a hammer, used to pound out

24   irrational exuberance and imprudent assumptions from the marketplace.

25   Plaintiff must identify a false or misleading statement by Sterling

26   that was false or misleading at the time it was made.   None has been

1  identified here.  Plaintiff has failed to state a claim for securities

2  fraud.

3      2.  Scienter

4      "To adequately plead scienter under the PSLRA, the complaint

5  must 'state with particularity facts giving rise to a strong inference

6  that the defendant acted with the required state of mind.'"  *Rigel*,

7  697 F.3d at 877 (citing 15 U.S.C. § 78u-4(b)(2)(A)).  To demonstrate

8  the required state of mind, a complaint must "allege that the

9  defendants made false or misleading statements either intentionally or

10  with deliberate recklessness."  *Daou*, 411 F.3d at 1014-15 (citing *SGI*,

11  183 F.3d at 974).  The Ninth Circuit has defined "deliberate

12  recklessness" as "a form of intentional or knowing misconduct."  *SGI*,

13  183 F.3d at 976.  Thus, "although facts showing mere recklessness or a

14  motive to commit fraud and opportunity to do so may provide some

15  reasonable inference of intent, they are not sufficient to establish a

16  strong inference of deliberate recklessness."  *Id.* at 974.  Instead,

17  the complaint must reveal "a highly unreasonable omission, involving

18  not merely simple, or even inexcusable negligence, but an extreme

19  departure from the standards of ordinary care, and which presents a

20  danger of misleading buyers or sellers that is either known to the

21  defendant or is so obvious that the actor must have been aware of it."

22  *Id.* at 976.

23      A "strong inference" of scienter exists if, when the allegations

24  are accepted as true, "a reasonable person would deem the inference of

25  scienter cogent and at least as compelling as any opposing inference

26  one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id. at 323.* This "inquiry is inherently comparative." *Id.* Thus, the Court must identify and contrast both the fraudulent and innocent inferences from the facts pled in the Consolidated Complaint. *See Zucco Partners*, 552 F.3d at 991. And the complaint must be dismissed unless the weight of the fraudulent inference equals or exceeds that of the innocent inference. *Id.*

In examining scienter, the Ninth Circuit requires a dual inquiry. First, the Court must decide "whether any of the [P]laintiff's allegations, standing alone, are sufficient to create a strong inference of scienter[.]" *Id.* at 992. Second, if no individual allegation creates a strong inference of scienter, the Court must conduct a 'holistic' review "to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* Under both inquiries, Plaintiff's allegations fall short.

a.   *Plaintiff's Assertions Regarding an Inference of Scienter*

Although scattered throughout the Consolidated Complaint, Plaintiff identifies eight distinct allegations from which Plaintiff asks the Court to draw a strong inference of scienter. Considering each allegation independently, under the first prong of the *Zucco Partners* inquiry, the Court finds that none of these eight allegations independently creates a strong inference of scienter. Each is discussed below.

*i.    Ignorance of Red Flags and Warning Signs*

As identified in part IV.B.1.b.ii, *supra*, Plaintiff alleges that Defendants ignored "red flags" and increasing signs of deterioration in Sterling's loan portfolio. C.C. ¶¶ 87-96, at 32-38. Essentially, Plaintiff claims that Defendants' failure to respond to these red flags creates an inference of scienter because it shows that Defendants intended to conceal risk from the marketplace.

As a basis for scienter, Plaintiff's allegation fails for two reasons. First, the identified "red flags" consist entirely of Sterling's own financial data that Defendants publicly and contemporaneously reported. Thus, "all of the information alleged to constitute 'red flags' . . . were matters of public knowledge." *City of Omaha, Neb. Empl. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012). The fact that Defendants disclosed the adverse information publicly negates an inference of scienter, because it shows that Defendants intended to place the investing public on the same footing as Sterling's management by providing investors with the same adverse information and allowing them to reach their own conclusions.

Second, any alleged "ignorance" of adverse indicators by Defendants is speculative at best. No confidential witness has come forward to say that Defendants were aware of secret, adverse financial information and failed to disclose it, much less that such adverse information contradicted Defendants' public representations. There are no documents or internal communication to show that Defendants were apprised of adverse financial information which they then failed to communicate to the public. At best, Plaintiff may have shown that

Defendants did not react quickly enough to the deteriorating market, and that they likely underestimated the scope of that deterioration at each step of the way.   But in light of the public disclosure of Sterling's "red flags," and the absence of any factual support for Plaintiff's contention that Defendants ignored red flags, this allegation does not support an inference of scienter.

> ii.  *Manipulation of Reserve Levels*

Plaintiff also alleges that Defendants manipulated Sterling's quarterly PCL, which provides a strong inference of scienter. Plaintiff cites to several instances in which Sterling decreased PCL between quarters.   In particular, Plaintiff cites to 1) a $6.2 million decrease in PCL between 1Q08 (outside the Class Period) and 2Q08, *id.* ¶ 98, at 38-39; 2) a $2.8 million decrease in the PCL allocated for residential construction loans between 2Q08 and 3Q08, *id.* ¶ 99, at 39; and 3) a $162.6 million decrease in PCL between 4Q08 and 1Q09.[21]

At the outset, the Court notes that the characterization of the quarter-over-quarter differences in PCL as "decreases" is somewhat misleading.   A brief explanation will illustrate the point.   At the close of each fiscal quarter, Sterling recorded a PCL, which caused a corresponding decrease to its balance sheet but added an equivalent amount to its rolling ALL reserve.   Then, over the course of the following quarter, Sterling recorded charges against its ALL reserve as bad loans were written down.   At the conclusion of the following

---

[21] Admittedly, the 1Q09 decrease came on the heels a ***618% increase*** in PCL between 3Q08 ($36.9 million) and 4Q08 ($228.5 million).

quarter, Sterling assessed the level of its ALL reserves and the need for any additional reserves to determine the new reserve amount required.   To replenish the reserves to the new required level, Sterling recorded its quarterly PCL. And so the cycle continued.

Thus, a decrease in PCL between two fiscal quarters does not necessarily reflect a belief (or create an impression) that risk is decreasing.   On the contrary, even if higher level of ALL reserves were required in the subsequent quarter, the amount of the PCL taken in that quarter need only equal the amount necessary to increase reserves to the new, desired level.   This provision could certainly be less than the amount provisioned in the prior quarter, based on how the reserve balance has been affected over the course of the quarter. And rather than being a *decrease*, a lower PCL might actually result in a net *increase* in total reserves.

This is why setting reserves is an art, not a science.   As one court has aptly stated, "the process of estimating loss reserves is a difficult one, and even following [fixed] accounting policies might not result in adequate loss reserves." *XL Capital*, 499 F. Supp. 2d at 146.   Plaintiff asserts that the "decrease" in PCL — for example, between 1Q08 and 2Q08 — created a false assumption that risk was decreasing.   But Plaintiff identifies nothing to support this assertion.

In fact, when examined in the full context of Sterling's financial results, it becomes clear that Sterling's reduced PCL in 2Q08, as compared to 1Q08, does *not* reflect a representation by Sterling about a decrease in risk. During the same period, Sterling's

ALL reserve *increased* from $145.0 million to $162.3 million.  *See* C.C. ¶ 44, at 16.  Thus, although the amount of the PCL taken in 2Q08 was less than the amount taken in 1Q08, the overall amount of the ALL reserve increased.  Likewise, despite the reduction in PCL between 4Q08 and 1Q09, the level of ALL reserve increased slightly.  When viewed in context, Plaintiff's cited examples of quarterly PCL changes do not support an inference that Defendants were attempting to deliberately manipulate their financials in an effort to deceive investors.  Or, put another way, "the pleading technique employed here, which 'couples a factual statement with a conclusory allegation of fraudulent intent,' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'"  *XL Capital*, 499 F. Supp. 2d at 146 (quoting *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004)) (alterations in original).

Indeed, the competing, more rational inference is that the "decrease" in PCL was reasonable in light of certain aspects of Sterling's publicly-disclosed financials.  For example, Defendants cite to the following factors contributing to the "decrease" in PCL between 1Q08 and 2Q08: 1) the growth of Sterling's total loan portfolio had decreased from the prior quarter by nearly 50%, Exs. DD, EE, & FF to Davis Decl., ECF Nos. 57-2, 57-3, & 57-4, at 11, 14, & 21.; 2) the overall size of Sterling's construction loan portfolio had decreased by over $100 million between 1Q08 and 2Q08, *id.*; and 3) net charge-offs had increased by more than 400%, and once charged off, loans no longer were counted in ALL reserves, Mot. at 18.  Sterling repeatedly disclosed that setting loss reserves "requires significant

judgment and the use of estimates by management." *See, e.g.*, Ex. Q to Greene Decl., ECF No. 51-17, at 89.   Defendants provided specific reasons why reductions in PCL were warranted.   Plaintiff provides only speculation of fraudulent intent.[22]

What Plaintiff appears to be actually arguing is that Defendants should have reserved more, quicker.   But an unadorned contention that Defendants should have reserved more does not support an inference of scienter.   *See, e.g.*, *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1328 (S.D. Fla. 2004) ("Plaintiffs' allegations are essentially a disagreement over how much bad debt should have been included.   The argument that Defendants should have reserved more [than] they did, particularly when they . . . adjusted the amount each year, does not reflect an extreme departure from the standards of ordinary care, and therefore does not support an inference of scienter."); *Alamosa Holdings*, 382 F. Supp. 2d at 854 ("Plaintiffs do not allege facts showing that the estimates for bad debt and allowances for doubtful accounts were unreasonable when made; nor do the confidential witness statements address these issues.   . . . A conclusory allegation

---

[22] None of the CWs allege any facts would suggest that reserve levels were manipulated.   The only assertion that comes close is CW7's representation that Defendants Gilkey and Byrne controlled and closely monitored the setting of reserve levels.   *See* C.C. ¶ 127, at 50-51.   But allegations of control do not create a presumption of fraud.   *See City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) (concluding that a CW's assertion that a defendant was "very hands on" with "a close reign on budgets" did not support an inference that the defendant deliberately manipulated financial statements).

1   masquerading as fact will not suffice in a claim sounding in fraud.").

2   Accordingly, Defendants' allocation of reserves during the Class

3   Period does not support an inference of scienter.

4           *iii. Statements Regarding Causes of 4Q08 Provisioning*

5           Plaintiff cites to Defendants' public statements about the

6   reasons for the sharp increases in reserves and provisioning at the

7   conclusion of 4Q08, and Plaintiff contends these statements support an

8   inference of scienter.  But, again, Plaintiff fails to show that these

9   statements were misleading.  *See* part IV.B.1.d.iii, *infra*.

10          Moreover, Defendants placed investors on notice as early as

11  November 7, 2008 — more than two months before announcing 4Q08 results

12  — that discussions with regulators might result in increases in ALL,

13  PCL, and charge-offs for 2008.  *See* Ex. S to Greene Decl., ECF No 51-

14  19, at 111-12.  This disclosure weighs strongly against scienter, as

15  it represents a prospective, cautionary disclosure to investors that

16  specific, future developments could negatively impact Sterling's

17  earnings.   Further, this disclosure cuts against Plaintiff's

18  allegation that Defendants were supposedly engaged in securities fraud

19  by concealing losses and avoiding a short-term earnings decline, *see*

20  C.C. ¶¶ 18, 59, & 190), particularly when the announcement predictably

21  caused Sterling's stock price to fall, *id.* ¶¶ 223-24, at 85.

22          *iv.  Confidential Witnesses*

23          Plaintiff provides representations from seven CWs — each of whom

24  worked for Sterling at some point in time — and alleges that the

25  witnesses' accounts provide a strong inference of scienter.   A

26  complaint relying on CWs to establish scienter must satisfy two

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 76

requirements to be sufficient; first, the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 551 F.3d at 995 (citing *Daou*, 411 F.3d at 1015-16). "Second, those statements which are reported by [CWs] with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citing *Daou,* 411 F.3d at 1022).

As to the requirement of sufficient particularity, the Court must analyze whether the Consolidated Complaint "has provided sufficient detail about [the CW's] position with the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Zucco Partners*, 552 F.3d at 995. When additional factual information, like documentary evidence, is absent — as it is here — a CW's statement "may only be relied upon where the [CW is] described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* (quoting *Daou*, 411 F.3d at 1015). To determine whether the CW meets this credibility standard, the Court must examine factors such as "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (internal quotation omitted).

As a threshold matter, for the same reason discussed above, the Court declines to consider the representations by CW2, CW5, CW6, and

CW7[23] for the purpose of evaluating scienter: none of these CWs were actually employed by Sterling during the Class Period. *See supra* n.17.    The witnesses therefore lack personal knowledge about Sterling's practices during the Class Period.    Any inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated speculation.    *See Zucco Partners*, 552 F.3d at 996 (noting that two of the witnesses "were not employed by Digimarc during the time period in question and have only secondhand information about accounting practices at the corporation during that year"); *Downey II*, 2009 WL 2767670, at *10 (concluding that two CWs who left the company before the start of the class period "no basis to opine about [the company's] underwriting or lending practices after they left the company").

Of the remaining CWs who worked at Sterling for at least some portion of the Class Period — CW1, CW3, and CW4 — none worked in

---

[23] The Court also finds that CW7 fails to satisfy the sufficient-particularity standard articulated in *Zucco Partners*.    The only information provided about CW7 is that the witness was a "high ranking executive" who left Sterling two years before the Class Period began. C.C. ¶ 127, at 50.    The complaint reflects CW7's assertions that the Individual Defendants were "definitely involved with the determination of the ALL Reserves," and that Defendant Gilkey "'oversaw the processes, approved the procedures, and maintained the standards' for how the ALL reserve was determined." *Id.*, at 50-51.    But other than CW7's undefined position as a high-ranking executive, there is no basis to conclude that CW7 was in any position to know the facts attested to, much less that the facts were true two years after CW7 left the company.    Moreover, the level of detail is scant and conclusory, and does not create an inference of reliability; accordingly, CW7's representations are entitled to no weight. *See Zucco Partners*, 551 F.3d at 995.

accounting or finance, and none were involved with the process of estimating or setting Sterling's loss reserves.  They offer no support for Plaintiff's contentions regarding Sterling's allegedly false financial statements or Defendants' manipulation of reserve levels. *See Adecco*, 434 F. Supp. 2d at 825 (rejecting a plaintiff's contention that a low-level employee, as a CW, could support Plaintiff's attempted extrapolation of nationwide financial data based solely on the witness's knowledge of a local branch office's financials).

Moreover, the witnesses' allegations that Plaintiff relies on to support scienter largely consist of information publicly and contemporaneously disclosed by Sterling.  *Compare, e.g.*, C.C. ¶ 121 (CW3's representation that "by late 2008 . . . the market in the Pacific Northwest had been fully impacted"), *with* Ex. C to Greene Decl., ECF No. 51-3, at 19 & 20 (statements by Defendant Gilkey on Sterling's October 22, 2008 conference call that "[t]he Pacific Northwest, long insulated from the slowing national economy, was indeed impacted" and that "we're very deep into the current crisis"), *and* Ex. D to Greene Decl., ECF No. 51-4, at 30 (statements by Defendant Gilkey on Sterling's 4Q08 conference call, quantifying specific increases in NPAs and NPLs in the Pacific Northwest).

Even the CWs' allegations regarding Sterling's internal practices do not create a strong inference of scienter.  For example, CW1 contends that "Sterling lack defined procedures, processes, and systems for the underwriting of new loans and the monitoring of existing loans," which were compounded by "extremely lax credit standards."  C.C. ¶ 112, at 44.  Without more detail, these statements

are speculative; CW1 provides no specifics about how Sterling's procedures were lacking or why the credit standards were "lax." CW1 alleges that "it was common practice" for Sterling to extend loans to borrowers already having financial difficulties, *id.* ¶ 113, at 45; but again, CW1 offers no specific instance of this occurring. According to CW1, approximately 30% of CW1's loan portfolio should have been "downgraded to lower ratings," *id.* ¶ 114, at 45, but the witness does not describe why those loans should have been written down, who was responsible for not writing them down, or who informed CW1 that the loans were downgraded to avoid having to increase reserves. Absent these sort of details, it appears that most, if not all, of CW1's representations consist of CW1's subjective assessment of Sterling's practices, and not specific, quantifiable facts demonstrating the falsity of Defendants' representations. Perhaps most fatally, CW1 does not attribute knowledge of or responsibility for any of these alleged deficiencies to the Individual Defendants. *See supra* n.16.

Although the CWs express opinions and beliefs about the negligence of Sterling's business practices, which they imply were commonly shared by most Sterling employees, these sort of generic allegations that "everyone knew" are insufficient, because they do not establish that the CWs "were in a position to gain personal knowledge of what Defendants saw, knew, or thought." *Fremont*, 2009 WL 3112574, at *11; *see also Zucco Partners*, 552 F.3d at 997 ("None of these confidential witness statements establishes the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions."). Not one CW represents that he or she ever

interacted with Defendant Gilkey or Defendant Byrne, either before, during, or after the Class Period.  Thus, they cannot offer any insight into the knowledge or culpability of the Individual Defendants.  *See Adecco*, 434 F. Supp. 2d at 830 (finding that the absence of details and lack of personal knowledge "undermines a strong inference of scienter").

Despite reliance on seven CWs, Plaintiff has not alleged specific or credible evidence of a single practice or custom by Defendants that would contradict their public representations. Moreover, the CWs' accounts entirely fail to support an inference that Defendants were aware of such practices or customs and nonetheless deliberately (or recklessly) misrepresented Sterling's practices to the investing public.  The statements by the CWs do not create an inference of scienter.

*v.   Executive Compensation*

Plaintiff alleges that the executive compensation provided by Sterling to the Individual Defendants provides a strong inference of scienter.  In particular, Plaintiff contends that Defendants Gilkey and Byrne's base salaries increased each year between 2007 and 2009. C.C. ¶¶ 191 & 193, at 75.  Plaintiff alleges that the Individual Defendants were motivated to mislead investors for their own pecuniary gain.

By itself, pleading motive and opportunity does not raise a strong inference of scienter.  *SGI*, 183 F.3d at 974; *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009).  For executive compensation to support the inference of scienter, "the allegations in

1   the complaint must demonstrate a strong correlation – including

2   comparisons to previous years' [compensation] – between the

3   [compensation] and the company's 'bottom line.'" *Downey II*, 2009 WL

4   2767670, at *13 (citing *Zucco Partners*, 552 F.3d at 1005).

5       Plaintiff has sufficiently pled that the Individual Defendants'

6   base salaries increased during the class period.   To rebut any

7   inference of scienter, Defendants contend that the increases in the

8   Individual Defendants' salaries were tied to industry averages, not

9   financial metrics or incentive compensation.   That appears to be

10  partially true.   In Sterling's SEC Form 14A Proxy Statement, filed

11  March 27, 2009, Sterling indicated that the Individual Defendants'

12  salary increases were, at least in part, tied to a comparative

13  analysis of industry averages, as determined by an outside consultant.

14  Ex V. to Greene Decl., ECF No. 51-22, at 137.   But the filing also

15  reflects that the Individual Defendants' base salaries were based on

16  "a number of factors," including "Sterling's financial and operating

17  performance as compared with industry averages." *Id.*   However, the

18  specific factors cited by Plaintiff in the Consolidated Complaint —

19  including "maintenance of asset quality," "performance of Sterling's

20  stock price," growth in assets and receivables, and "return on average

21  assets," C.C. ¶ 189, at 74 — do not appear tied to the Individual

22  Defendants' base salary, but rather their annual cash incentive

23  compensation: bonuses.

24  //

25  //

26  //

Notably, neither of the Individual Defendants received *any* bonuses in 2008 or 2009, although both received stock awards.[24]  *See* Ex. V to Greene Decl., ECF No. 51-22, at 139.  In fact, at the end of FY08, Sterling announced that neither would receive any bonus and that accrual for that compensation would be reversed.  Ex. M to Greene Decl., ECF No. 51-13, at 57.  Thus, despite Plaintiff's assertion that increasing salaries provided the impetus for the alleged financial misrepresentation, both Individual Defendants actually received *less* in 2008 and 2009, during the Class Period, than they received in 2007, *before* the Class Period.  Compare C.C. ¶ 193 with Ex. V to Greene Decl., ECF No. 51-22, at 139.

Finally, Sterling's SEC Form 14A Proxy Form, filed November 4, 2010, reflects that Defendant Gilkey was being compensated "well below the market median relative to Sterling's peer group."  Ex. II to Davis Decl., ECF No. 57-7, at 36.  Although Sterling's Compensation Committee sought to increase his salary within 10% of the market median, "the Board determined that Mr. Gilkey would be unwilling to accept an increase in base salary that would increase his salary above $1 million."  *Id.*  This casts further doubt on Plaintiff's contention that Defendant Gilkey was motivated to defraud investors for pecuniary

---

[24] However, the fact that both were compensated by stock awards tends to negate an inference of scienter because neither of them redeemed the awards and sold the stock during the Class Period.  Thus, they were subject to the same large losses as the investors they allegedly defrauded, which negates an inference of fraud.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994).

1  gain, given that he was unwilling to accept a salary increase when it

2  was offered to him.

3      Even if the Individual Defendants' compensation provides some

4  small inference of scienter, that inference is not significant.  It

5  certainly is not strong enough to rebut the far more reasonable

6  competing inference — that Defendants received compensation

7  adjustments in line with market comparisons and standard business

8  practices, unrelated to any alleged manipulation of Sterling's

9  financial results.

10                    *vi.  "Forced" Executive Departures*

11     Plaintiff also alleges that the sudden and "forced" departures

12  of Ms. Stanley and Defendant Gilkey "reinforce[] the inference of

13  their knowledge of Sterling's improper practices."  Plaintiff's

14  contention, however, lacks factual support.  A plaintiff "must allege

15  sufficient information to differentiate between a suspicious change in

16  personnel and a benign one."  *Zucco Partners*, 552 F.3d at 1002.  "A

17  resignation or termination provides evidence of scienter only when it

18  is accompanied by additional evidence of the defendant's wrongdoing."

19  *In re Downey Sec. Litig.* (*Downey I*), No. CV 08-3261-JFW, 2009 WL

20  736802, at *10 (C.D. Cal. Mar. 18, 2009).

21     Here, Plaintiff offers nothing other than the fact of the

22  departures, coupled with the announcement of the CDO the following

23  day.  While these two events are temporally close, and may even be

24  related, there are no facts to suggest that the departures were the

25  result of wrongdoing or fraudulent conduct.  While true, the FDIC did

26  require Sterling to "have and retain qualified management," Ex. A to

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 84

C.C., ECF No. 29-1, at 97, this statement does not support the conclusion that the Individual Defendants engaged in fraud. At best, it supports an inference that the FDIC considered Defendant Gilkey unqualified or believed he was incapable of returning Sterling to financial health.

No facts have been pled to suggest that the departure was not voluntary. Plaintiff's repeated assertion that Defendant Gilkey was "forced" out appears to be speculative at best. Plaintiff asks the Court to engage in a leap of logic, to conclude that the proximity of the departures and the announcement of the CDO is strongly indicative of fraud. But that leap is unwarranted. Corporate executives are held accountable for the corporation's financial performance; when that performance suffers, those executives are often replaced. Such is the order of things. There is simply no evidence, or even a reasoned inference, that Defendant Gilkey's departure was attributable to anything other than personal accountability for Sterling's poor financial performance.[25] *See* *XL Capital*, 499 F. Supp.2d at 162

---

[25] It also bears noting that both Ms. Stanley and Defendant Gilkey were allegedly "forced" to depart the company due to fraudulent conduct. Notably, however, Ms. Stanley is not a named defendant, and there has been no allegation she ever knew or participated in any instance of securities fraud. Thus, her simultaneous departure with Defendant Gilkey suggests that both departed for a similar, non-fraudulent reason: Sterling's poor market performance. Moreover, Defendant Byrne was not "ousted" at the same time as Ms. Stanley or Defendant Gilkey. Plaintiff has provided no reason why Defendant Byrne somehow avoided simultaneous termination with Defendant Gilkey, unless of course the conduct alleged by Plaintiff was not the reason for Defendant Gilkey's departure.

1  (noting, notwithstanding an agency's report of management problems,

2  that executive departures are "more likely . . . a result of company

3  mismanagement, not securities fraud."). Accordingly, Defendant

4  Gilkey's departure does not support an inference of scienter.

5                       *vii. Cease & Desist Order*

6      Plaintiff additionally asserts that the FDIC's issuance of the

7  CDO creates a strong inference of scienter. In particular, Plaintiff

8  cites to the FDIC's statement that it "had reason to believe that

9  [Sterling] had engaged in unsafe or unsound banking practices and

10 violations of law and/or regulations." Ex. A to C.C., ECF No. 29-1,

11 at 96-97. Plaintiff also relies on the fact that the FDIC cited

12 Sterling's "large volume of poor loans," *id.* at 97, and ordered

13 Sterling to take certain remedial action.

14     The CDO does not provide a strong inference of scienter. As

15 discussed above, *see* part IV.B.1.e, *supra*, the CDO *prospectively*

16 required Sterling to take certain steps to address what the FDIC

17 perceived to be excessive risk in Sterling's practices. The mere fact

18 that the FDIC required Sterling "to change the way it does business in

19 the future does not show, as a forced restatement of earnings could,

20 that the business violated federal guidelines in the past." *Nolte*,

21 390 F.3d at 316. The CDO reflects the FDIC's *presently held* belief,

22 at the time of the CDO's issuance, that Sterling was not complying

23 with sound practices and banking regulations, but it does not support

24 an inference that Defendants knew at the time they made the allegedly

25 fraudulent representations that the representations were inaccurate.

26 Notably, many other courts have refused to find an inference of

scienter based on similar cease-and-desist orders, for this very same reason. *See, e.g.,* *Fremont*, 2009 WL 3112574, at *4 ("Plaintiff's reliance on statements in the FDIC's Cease & Desist Notice . . . does not bolster the strength of the allegation[] . . . that the challenged statements were false *when they were made* or that they were made with the requisite intent." (emphasis in original)); *BankUnited*, 2010 WL 1332574, at *12 ("Plaintiffs' conclusory statement that BankUnited engaged in unsafe and unsound lending practices . . . — referring to the [Office of Thrift Supervision's] post-class period conclusion after investigating BankUnited — is no answer to the question of how Defendants' specific outline describing the manner in which the Company deemed itself to pursue strict underwriting was false or misleading at the time the statements were made."). Because the CDO does not suggest that Defendants were aware of the issues identified by the FDIC at the time Defendants made the challenged representations, the CDO does not support an inference of scienter.

> *viii. Violations of GAAP, OCC Regulations, and SEC Rules*

Finally, Plaintiff alleges that Defendants violated various GAAP provisions, SEC rules, and regulations promulgated by the Office of the Comptroller of the Currency (OCC), and that these violations provide a strong inference of scienter. C.C. ¶¶ 195-220, at 75-84. It appears, however, that most, if not all, of the violations alleged by Plaintiff rest on the assumption that Sterling intentionally manipulated its loss reserves and provisioning, and as a result, overstated its earnings. These contentions have already been

addressed at length, and the Court has found them insufficient; thus, to the extent Plaintiff relies on them again in alleging regulatory violations, Plaintiff's contentions are unpersuasive.

Nonetheless, even assuming that Plaintiff had sufficiently alleged regulatory violations, these violations do not support an inference of scienter. In essence, Plaintiff asks the Court to accept that Defendants' fraudulent conduct caused GAAP violations, which in turn provide support for the inference that the conduct was fraudulent; but this is circular reasoning. "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter [in a securities fraud claim]." *Worlds of Wonder,* 35 F.3d at 1426 (quoting *Malone v. Microdyne Corp.,* 26 F.3d 471, 479 (4th Cir.1994)). "Thus, the allegations do not state a prima facie case under pre-PSLRA law . . . much less the heightened pleading standard under the PSLRA." *Colin v. Onyx Acceptance Corp.,* 31 Fed. Appx. 359, 361 (9th Cir. 2002) (unpublished) (citing *SGI,* 183 F.3d at 974); *see also Countrywide*, 554 F. Supp. 2d at 1070 n.31 (noting that plaintiffs did not plead loan loss reserves violated GAAP where they failed to show what losses were probable at the time of reporting or that magnitude of the losses could be reasonably estimated).

Plaintiff alternatively relies on the FDIC's belief, expressed in the CDO, that Sterling violated "laws and/or regulations," Ex. A. to C.C., ECF No. 29-1, at 96-97, as evidence of scienter. But the FDIC's boilerplate language does not identify a specific law or regulation violated by Defendants. Plaintiff's contention — that a

1  violation of some unspecified regulation, without more, evinces an

2  intent to deceive — is without merit.

3          Plaintiff is correct that intentional violations of accounting

4  regulations could provide an inference of scienter for securities

5  fraud claims, because a defendant knowingly violating such regulations

6  is likely aware that the violations are causing unwarranted reliance

7  on the company's financial representations.  *See Daou*, 411 F.3d at

8  1022 ("[W]hile scienter cannot be established by publishing inaccurate

9  accounting figures, even when in violation of GAAP, significant

10  violations of GAAP standards can provide evidence of scienter so long

11  as they are pled with particularity." (internal citation omitted)).

12  But Plaintiff's claims here do not rise to that level; instead,

13  Plaintiff identifies several regulations pertaining to the setting of

14  reserve levels and alleges that post-hoc realization of Sterling's

15  inadequate reserves unequivocally shows that Defendants *intended* to

16  manipulate reserve levels and mislead the world about it.  That

17  argument is conclusory, and it does not hold.  Even if the Court

18  accepts Plaintiff's allegations of regulatory violations as factual,

19  those violations do not, as currently pled, support an inference of

20  scienter.

21              b.   *Facts Negating an Inference of Scienter*

22          Before conducting a "holistic review," of Plaintiff's individual

23  allegations of scienter to determine whether they collectively create

24  a strong inference of scienter, *see Zucco Partners*, 552 F.3d at 992,

25  the Court first considers several other facts, each of which tend to

26  negate an inference of scienter.

i.   *Stock Trading Activity*

"Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute evidence of scienter" under specific circumstances, *SGI*, 183 F.3d at 986, the complete absence of any stock sales during the Class Period "negates any slight inference of scienter," *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000), *aff'd*, 32 Fed. Appx. 338 (9th Cir. 2002); *see also Adecco*, 434 F. Supp. 2d at 835 (concluding that because only one purported insider "traded stock during the relevant time period, [the trading activity] negates any inference of scienter"); *Downey II*, 2009 WL 2767670, at *14 ("In this case, any inference of scienter is negated by the complete lack of stock sales by the Individual Defendants during the class period.").

Defendants assert that neither of the Individual Defendants sold shares of Sterling during the Class Period.[26]   In fact, public SEC reflect that on two occasions during the Class Period — July 25, 2008, and February 2, 2009 — Defendant Gilkey purchased shares of Sterling, for a total of 60,000 shares.  Ex. W to Greene Decl., ECF No. 51-24, at 142 & 144.  The fact that Defendant Gilkey purchased stock during the Class Period — at the time he was allegedly engaged in securities

---

[26] Plaintiff does not contest this assertion, but instead argues that the lack of stock sales is not dispositive.  Accordingly, the Court interprets Plaintiff's response as a concession that the Individual Defendants did not sell shares during the Class Period.  *See, e.g.*, *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1090 (W.D. Wash. 2003) (interpreting the non-moving party's failure to address an issue in its opposition memorandum as a concession).

fraud — is "wholly inconsistent with fraudulent intent." *XL Capital*, 499 F. Supp.2d at 152.    Plaintiff is correct that "the lack of stock sales is not *dispositive* as to scienter." *America West*, 320 F.3d at 944 (emphasis added).    And the Court does not find this single factor dispositive.    But in the final holistic analysis, *see* part IV.B.2.c, *infra*, this factor weighs against a finding of scienter.

Moreover, because neither of the Individual Defendants sold shares of stock during the Class Period, both lost millions in stock value.    *See* Exs. V & W to Greene Decl., ECF Nos. 51-23 & 51-24, at 135-36, 147, & 149; *see also* C.C. ¶ 18, at 7-8 (documenting the decline of Sterling's stock price during the Class Period).    The fact that an officer holds stock and incurs the same large losses as the allegedly defrauded investors tends to further negate an inference of scienter.    *See also Worlds of Wonder,* 35 F.3d at 1424-25 (finding no scienter because defendants "held onto most of their [company's] stock and incurred the same large losses" as plaintiffs).

Plaintiff, relying on *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004), contends that in light of Defendants' alleged "concealment of catastrophic increases in risk," Defendants could not sell their Sterling stock because "'by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability.'"    Opp'n at 49 (quoting *Crowell*, 343 F. Supp. 2d at 15).    But Plaintiff offers nothing to support this assertion.    On the contrary, Plaintiff alleges that Defendants had been allegedly concealing risk and manipulating reserves, only to be forced to substantially increase reserve allowances in 4Q08 – in the

*middle* of the class period.   True, Defendants disclosed the large 4Q08 PCL in their January 28, 2009 press release and during the January 29, 2009 investor conference call, which put the market on notice of Sterling's increasing financial difficulty.   But Defendants also *pre-disclosed* the likelihood of an increase in PCL as early as November 7, 2008.   *See* Ex. S to Greene Decl., ECF No 51-19, at 111-12.   Defendants also *pre-disclosed* the estimated amount of the provision on January 13, 2009, more than two weeks before publicly disclosing the rest of the quarterly and year-end financial results.   Ex. L to Greene Decl., ECF No. 51-12, at 55.   These disclosures tend to further negate an inference of scienter, because it shows that Defendants did not conceal adverse information — and thereby profit — but rather promptly disclosed it.

### ii.   Lack of Contemporaneous Internal Documents

The lack of contemporaneous information or documents that conflict with Defendants' public representations has already been addressed by the Court several times, but it bears repeating in the context of scienter.   Plaintiff has not identified a single document, e-mail, meeting, conversation, or statement of any kind that supports the complaint's allegations concerning the existence of known-but-undisclosed deficiencies in loss reserves or nonperforming assets. Plaintiff relies entirely on confidential witnesses and contemporaneous public statements by Defendants themselves.   The fact that Plaintiff has been unable to identify such a conflicting document tends to negate an inference of scienter.   *See XL Capital*, 499 F. Supp. 2d at 161 (rejecting claim that defendants should have known

1    loss reserves were inadequate because the complaint failed "to
2    reference any actual reports reviewed by any specific
3    individuals . . . on any specific date that indicated that
4    [defendant's] loss reserves were not sufficient").

### iii. Lack of Restated Financials

Although discussed above in the context of Plaintiff's assertion
regarding Sterling's alleged understatement of NPAs and Classified
Assets, the Court finds that the lack of restated financials also
tends to negate an inference of scienter. Plaintiff does not contest
Defendants' assertion that the FDIC has never required Sterling to
restate any of its financials, despite the FDIC's issuance of the CDO
and its unilateral power to force Sterling to restate inaccurate
financials. Plaintiff does not contest that Sterling has never
restated its financials, and that Sterling's independent auditors have
always provided unqualified opinions. And there have been no
allegations of collusion between Sterling and its auditors. To the
extent Plaintiff relies on claims that Defendants manipulated
Sterling's financials, the lack of a restatement weighs against a
finding of scienter. *Cf. Nolte.*, 390 F.3d at 316; *XL Capital*, 499 F.
Supp. 2d at 148; *Novastar*, 2008 WL 2354367, at *3.

### iv. Timely Disclosure of Risks and Difficulties

Robust disclosure of risks and problems further "negates an
inference that the company acted with intent to defraud." *Alfus v.
Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1520 (N.D. Cal. 1990); *see
also In re Dot Hill Systems Corp. Sec. Litig.*, 594 F. Supp. 2d 1150,
1160 (S.D. Cal. 2008) ("Disclosing the precise risks at issue negates

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 93

an inference of scienter." (internal quotations omitted)).    In each of
the press releases and conference calls cited by Plaintiff, Defendants
disclosed the risks and uncertainties facing Sterling.

Moreover, Defendants repeatedly discussed the increasing default
rates in residential construction lending, the rapidly-worsening real
estate and credit markets, increasing customer delinquencies and
defaults, the significant increases in NPAs and NPLs, and Sterling's
need to increase capital.    Defendants repeatedly disclosed the
challenges that Sterling faced in the real estate markets.    *See, e.g.*,
Exs. A, G, & Q to Greene Decl., ECF Nos. 51-1, 51-7, & 51-17, at 9,
39, 84, & 92.    Defendants repeatedly indicated that Sterling was
"navigating through a very difficult financial storm," Ex. B to Greene
Decl., ECF No. 51-2, at 15, and that it was "making assumptions on how
quickly loans will be paid off and the ability of its borrowers to
carry the inventory until it is sold."    *Id.* at 16.    On October 22,
2008, Defendant Gilkey pointedly began Sterling's 3Q08 earnings
conference call with remarks about the volatility in financial markets
and the effects being felt in the Pacific Northwest.    Ex C. to Greene
Decl., ECF No. 51-3, at 19-20.    The complaint readily concedes that
Sterling's publicly reported quarterly results continued to
demonstrate market deterioration.    C.C. ¶¶ 15, 36-37, & 40, at 6, 14,
& 15.

Sterling frankly disclosed that it was discussing with
regulators its internal methodology for calculating loan impairment,
and that its calculations could change based on whether it included
potential cash flows from guarantors, resulting in higher

provisioning.   Ex. T to Greene Decl., ECF No. 51-20, at 111 & 112.
"The public disclosure of the company's problems and its efforts to
address those problems (no matter how inadequate . . .) weighs against
a conclusions that, taken together, the individual Defendants
knowingly or recklessly made misleading statements." *Fremont*, 2009 WL
3112574, at *14.   Defendants' actions do not evince an intent to
deceive, particularly when "the market got the message [and] sent the
Bank's stock spiraling downward at each step of the way."[27]
*BankUnited*, 2010 WL 1332574, at *16.

>           *c.*    *Holistic Review of Allegations Regarding Scienter*

Having individually considered each of Plaintiff's allegations,
and having concluded that none independently creates a strong
inference of scienter, the Court must conduct a "holistic review" of
the allegations to determine whether they collectively create a strong
inference of scienter.   *See Zucco Partners*, 552 F.3d at 992.   "[E]ven
'[v]ague or ambiguous allegations are now properly considered as a
part of a holistic review when considering whether the complaint

---

[27] Perhaps inadvertently, the Consolidated Complaint also creates an
inference that, rather than concealing the source of risk to investors,
Defendants were actually *increasing* their level of disclosure.   Prior to
4Q07, Defendants did not provide a breakdown of construction NPLs that
separately quantified *residential* construction NPLs — the riskiest
category of construction loans — but Defendants began doing so in 4Q07.
C.C. ¶ 38, at 15.   Likewise, prior to 2008, Sterling did not provide a
breakdown of Classified Assets that separately quantified construction
loans, but they began doing so at the beginning of FY08.   *Id.* ¶ 40 &
n.3.   Thus, even prior to the Class Period, Sterling had begun providing
additional details to investors about the nature and risk of its loan
portfolio and NPAs.

raises a strong inference of scienter.'"   *Id.* at 1006 (quoting *S.
Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).   But the
Court must also "take into account plausible opposing inferences" that
could weigh against a finding of scienter.   *Tellabs,* 551 U.S. at 323.
"Even if a set of allegations may create an inference of scienter
greater than the sum of its parts, it must still be at least as
compelling as an alternative innocent explanation."   *Zucco Partners*,
551 F.3d at 1006.

    Plaintiff's allegations, even when considered holistically, do
not create an inference of scienter that is nearly as compelling as
the far more likely alternative inference — "that Defendants
underestimated the risks in their loan portfolio and the oppressive
nature of the slumping economy . . . ."   *BankUnited*, 2010 WL 1332574,
at *17.   The facts identified by Plaintiff suggest that Defendants
persistently maintained a belief that Sterling was well-positioned to
weather the economic collapse, but that Defendants were unable to
fully predict and account for the speed and scope of the collapse in
the real estate and credit markets.   As that collapse became evident,
Defendants sought to compensate, but they underestimated how
significantly Sterling would be affected and how long the crisis would
last.

    Early in the class period, Defendants expressed optimism that
the Puget Sound was initially surviving the collapse better than most
other markets.   But as the Puget Sound market caught up to the rest of
the national economy, Defendants were simply unprepared.   When it
became clear that Defendant Gilkey could not return the bank to

operating profits, the FDIC stepped in.  Defendant Gilkey's departure, whether voluntary or not, was the natural and probable consequence of his failure to guide Sterling through the Great Recession.

In sum, Plaintiff fails to create a strong inference of scienter, and thus fails to state a claim for securities fraud.

### 3.  Leave to Amend

Plaintiff requests leave to amend the complaint if any portion of Defendants' motion is granted.  Opp'n at 50.  Under the Federal Rules of Civil Procedure, the Court must "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Court may, in its discretion, deny leave to amend if such an amendment would be futile.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).  The Court is skeptical that Plaintiff will be able to allege sufficient facts to create a strong inference of scienter, particularly in light of the foregoing analysis.  However, the Court cannot conclude on the basis of the present complaint that amendment would be futile.  Accordingly, Plaintiff is granted leave to file an amended complaint within sixty (60) days of the date of this Order.

### V.  CONCLUSION

Plaintiff claims that despite Sterling's public representations during the Class Period about operating in a safe and responsible manner, "[t]he facts *now* show that Sterling was nowhere close to meeting the regulatory safety and soundness requirements of U.S. banks."  Opp'n at 6 (emphasis added).  Whether true or not, this statement epitomizes the problem with Plaintiff's securities fraud claim: what Plaintiff knows ***now*** about Sterling's practices has no

1   bearing on what Defendants knew *then*.    Plaintiff must show that

2   Defendants knew, or deliberately disregarded the risk, that they were

3   making material misrepresentations *at the time* the misrepresentations

4   were made.    Absent evidence of contemporaneous falsity and scienter,

5   Plaintiff cannot state a claim securities fraud.    From the facts pled

6   in the Consolidated Complaint, that is plainly the case here.    And for

7   that reason, the Consolidated Complaint is dismissed.

8          Accordingly, **IT IS HEREBY ORDERED:**

9          1.    Defendants' first Request for Judicial Notice and Notice of

10                Incorporation by Reference, **ECF No. 50**, is **GRANTED IN PART**

11                and **DENIED IN PART**, as set forth above.

12         2.    Defendants' Second Request for Judicial Notice and Notice

13                of Incorporation by Reference, **ECF No. 59**, is **GRANTED IN**

14                **PART** and **DENIED IN PART**, as set forth above.

15         3.    Defendants' Motion to Dismiss Consolidated Complaint, **ECF**

16                **No. 46**, is **GRANTED.**

17         4.    The Consolidated Complaint, **ECF No. 29**, is **DISMISSED**

18                **WITHOUT PREJUDICE.**

19         5.    Plaintiff is granted leave to file an amended complaint,

20                consistent with the above rulings, within **sixty (60) days**

21                **of the date of this Order.**

22         **IT IS SO ORDERED.**    The Clerk's Office is directed to enter this

23   Order and provide copies to all counsel.

24         **DATED** this 5th day of August 2013.

25                              s/Edward F. Shea
                              _____
                              EDWARD F. SHEA
26                      Senior United States District Judge

Q:\EFS\Civil\2009\368.dismiss.grant.lc2.docx

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 98